# Nos. 23-1118, 23-1166

---

**United States Court of Appeals for the Second Circuit**

---

Connecticut Fair Housing Center and Carmen Arroyo,
individually and as conservator of Mikhail Arroyo,
*Plaintiffs-Appellants-Cross-Appellees*
v.
CoreLogic Rental Property Solutions, LLC,
*Appellee-Cross-Appellant*

---

**Appeal from the United States District Court for the District of Connecticut**

---

## PAGE PROOF PRINCIPAL BRIEF OF PLAINTIFFS-APPELLANTS, CROSS-APPELLEES

### Oral Argument Requested

Eric Dunn
**National Housing Law Project**
919 E. Main Street
Suite 610
Richmond, VA 23219
(415) 546-7000
edunn@nhlp.org

Christine Webber
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave NW
Suite 500
Washington, D.C. 20005
(202) 408-4600
cwebber@cohenmilstein.com

Greg Kirschner
**Connecticut Fair Housing Center**
60 Popieluszko Ct.
Hartford, CT 06106
(860) 263-0724
greg@ctfairhousing.org

**Rule 26.1 Disclosure Statement**

The Connecticut Fair Housing Center is a non-profit organization. It has no parent corporation and no publicly held corporation owns 10% or more of its stock.

# TABLE OF CONTENTS

I.  Jurisdictional Statement ................................................................. 1

II.  Issues Presented for Review .......................................................... 1

III.  Statement of the Case ................................................................... 2

    A.  Overview and Procedural Summary ...................................... 3

    B.  Statement of Relevant Facts ................................................. 9

IV.  Summary of Argument .................................................................. 17

    A.  The trial court erred in its conclusion of law that adverse
    CrimSAFE reports do not "otherwise make unavailable or
    deny" housing for purposes of the Fair Housing Act ......................... 17

    B.  The trial court erroneously dismissed Plaintiffs-Appellants
    disability discrimination claims on summary judgment. ................... 20

V.  Argument ......................................................................................... 22

    A.  The facts as found by the trial court establish that CoreLogic
    denies or otherwise makes housing unavailable to rental
    applicants when it reports those applicants have disqualifying
    criminal records under the relevant landlord's admission
    criteria. .......................................................................................... 22

        1.  To "otherwise make unavailable or deny housing" under
        the Fair Housing Act requires only that an action
        proximately causes housing to become more difficult to
        obtain. ................................................................................... 22

        2.  An adverse CrimSAFE report directly and foreseeably
        makes housing more difficult to obtain. ............................... 24

        3.  An adverse CrimSAFE report foreseeably and directly
        caused the denial of housing to Mikhail Arroyo. ................. 29

        4.  Landlord's ability to override adverse CrimSAFE results
        does not negate proximate causation on CoreLogic's part. ...... 31

# TABLE OF CONTENTS

Page

5.  Winn Residential's failure to review or override the adverse CrimSAFE report did not attenuate CoreLogic's proximate causation. ................................................................34

6.  CoreLogic takes significant steps to carry out the criminal history screening policies of its landlords and is accountable for discriminatory impacts of those policies. .......39

B.  Plaintiffs-Appellants' disability discrimination claims were improperly dismissed on summary judgment. ....................................47

1.  Summary of disability discrimination claims. ..........................47

2.  Plaintiffs-Appellants presented sufficient evidence on summary judgment to at least proceed to trial on the reasonable accommodation claim. ...............................................50

3.  The lack of a visible impressed seal on the copy of Carmen Arroyo's conservatorship certificate was not fatal to her claim. ......................................................................52

4.  The evidence presented on summary judgment also sufficiently established that the disparate impact file disclosure claim.........................................................................57

5.  This Court should vacate summary judgment and reinstate disability discrimination claims. ...............................58

VI.  Conclusion ...................................................................................................61

# TABLE OF AUTHORITIES

Page

CASES

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)......................................................................................59

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)......................................................................................24

*Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*,
   620 F.3d 62 (1st Cir. 2010)..........................................................................48

*Bank of Am. Corp. v. City of Miami*,
   581 U.S. 189 (2017)................................................................................24, 30

*Barry v. Quality Steel Prods., Inc.*,
   263 Conn. 424, 820 A.2d 258 (2003) ..........................................................39

*Cabrera v. Jakabovitz*,
   24 F.3d 372 (2d Cir. 1994) ...........................................................................23

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
   735 F.3d 114 (2d Cir. 2013) .........................................................................47

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
   478 F.Supp.3d 259 (D. Conn. 2020)..............................................................3

*Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*,
   No. 3:18-CV-705, 2023 WL 4669482 (D. Conn. July 20, 2023)..................3

*Darnell v. Pineiro*,
   849 F.3d 17 (2d Cir. 2017) ...........................................................................47

*Doe ex rel. Doe v. Fed. Express Corp.*,
   345 F. App'x 670 (2d Cir. 2009) ..................................................................24

*Exxon Co., U.S.A. v. Sofec, Inc.*,
   517 U.S. 830 (1996)......................................................................................38

*Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*,
   388 F.Supp.3d 145 (E.D.N.Y. 2019) .............................................................4

*Gilead Cmty. Servs., Inc. v. Town of Cromwell*,
    432 F.Supp.3d 46 (D. Conn. 2019) ........................................... 23, 32, 38

*Hous. Rts. Initiative v. Compass, Inc.*,
    No. 21-CV-2221, 2023 WL 1993696 (S.D.N.Y. Feb. 14, 2023),
    *reconsideration denied*, No. 21-CV-2221, 2023 WL 2989048 (S.D.N.Y.
    Apr. 18, 2023) ........................................................................................ 41

*Jackson v. Tryon Park Apts., Inc.*,
    No. 18-CV-06238, 2019 WL 331635 (W.D.N.Y. Jan. 25, 2019) ........................ 4

*Jeanty v. McKey & Poague, Inc.*,
    496 F.2d 1119 (7th Cir. 1974) ................................................. 40, 41, 43

*Johnson v. Priceline.com, Inc.*,
    711 F.3d 271 (2d Cir. 2013) ............................................................... 46

*LeBlanc-Sternberg v. Fletcher*,
    67 F.3d 412 (2d Cir. 1995) ................................................................ 22

*Logan v. Matveevskii*,
    57 F.Supp.3d 234 (S.D.N.Y. 2014) ....................................... 48, 52, 56

*Lowman v. Platinum Prop. Mgmt. Servs., Inc.*,
    166 F.Supp.3d 1356 (N.D. Ga. 2016) ........................................... 30, 31

*In re M/V MSC Flaminia*,
    72 F.4th 430 (2d Cir. 2023) ............................................................... 22

*Menton v. Experian Corp.*,
    No. 02 Civ. 4687, 2003 WL 941388 (S.D.N.Y. Mar. 6, 2003) ............. 54, 55, 56

*Mhany Management, Inc. v. Cnty. of Nassau*,
    819 F.3d 581 (2d Cir. 2016) .......................................... 33, 34, 57, 58

*Munn v. Hotchkiss Sch.*,
    795 F.3d 324 (2d Cir. 2015) ............................................................... 24

# TABLE OF AUTHORITIES

*Oliver v. N.Y. State Police*,
    Nos. 17-CV-01157, 18-CV-00732, 2019 WL 453363 (W.D.N.Y. Feb. 5,
    2019) .......................................................................................................... 53

*Olsen v. Stark Homes, Inc.*,
    759 F.3d 140 (2d Cir. 2014) ...................................................................... 50, 51

*Orange Lake Assocs., Inc. v. Kirkpatrick*,
    21 F.3d 1214 (2d Cir. 1994) ............................................................................ 35

*Robinson v. 12 Lofts Realty, Inc.*,
    610 F.2d 1032 (2d Cir. 1979) .......................................................................... 35

*In re Robinson*,
    403 B.R. 497 (Bankr. S.D. Ohio 2008) ..................................................... 21, 53

*Sanborn v. Wagner*,
    354 F.Supp. 291 (D. Md. 1973) ...................................................................... 40

*Sassower v. Field*,
    752 F.Supp. 1190 (S.D.N.Y. 1990) ................................................................ 41

*Schwab v. GMAC Mortg. Corp.*,
    333 F.3d 135 (3d Cir. 2003) ...................................................................... 53, 55

*Short v. Manhattan Apts., Inc.*,
    916 F.Supp.2d 375 (S.D.N.Y. 2012) ....................................................40, 41, 43

*In re Shulman Transp. Enters., Inc.*,
    744 F.2d 293 (2d Cir. 1984) ............................................................................ 46

*Simmons v. T.M. Assocs. Mgmt., Inc.*,
    287 F.Supp.3d 600 (W.D. Va. 2018) .............................................................. 14

*Smith v. Nat'l Credit Sys., Inc.*,
    No. 13-CV-4219, 2015 WL 12780446 (N.D. Ga. 2015) ................................ 53

*Souza v. Exotic Island Enters., Inc.*,
    68 F.4th 99 (2d Cir. 2023) ............................................................................... 59

# TABLE OF AUTHORITIES

Page

*Staub v. Proctor Hosp.*,
562 U.S. 411 (2011)............................................................*passim*

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
576 U.S. 519 (2015)........................................................................23

*Thurmond v. Bowman*,
211 F.Supp.3d 554 (W.D.N.Y. 2016)......................................23, 32, 38

*Tiffany & Co. v. Costco Wholesale Corp.*,
971 F.3d 74 (2d Cir. 2020) ...............................................................59

*United States v. Hoskins*,
44 F.4th 140 (2d Cir. 2022) .............................................................45

*United States v. Yonkers Bd. of Educ.*,
624 F.Supp. 1276 (S.D.N.Y. 1985), *aff'd*, 837 F.2d 1181 (2d Cir. 1987) .........23

*Warfield v. Byron*,
137 F. App'x 651 (5th Cir. 2005) ................................................53, 55

*Williamson v. Hampton Mgmt. Co.*,
339 F.Supp. 1146 (N.D. Ill. 1972) ....................................................40

*Young v. AAA Realty Co.*,
350 F.Supp. 1382 (M.D.N.C. 1972) ..................................................40

## STATUTES

15 U.S.C. § 1681a(x) ......................................................................54

15 U.S.C. § 1681c(a)(2) ...............................................................6, 44

15 U.S.C. § 1681g(a) .........................................................2, 13, 47, 56

15 U.S.C. § 1681h(a) .................................................................21, 52

15 U.S.C. § 1681m...........................................................................12

28 U.S.C. § 1291 ..............................................................................1

# TABLE OF AUTHORITIES

Page

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1343 ...............................................................................1

28 U.S.C. § 1367 ...............................................................................1

42 U.S.C. § 3602 .............................................................................50

42 U.S.C. § 3608 ...............................................................................4

Conn. Gen. Stat. § 45a-644 (2016) .............................................51, 57

Conn. Gen. Stat. § 45a-650 (2018) .............................................51, 57

Connecticut Unfair Trade Practices Act ...........................................1

Fair Credit Reporting Act, FCRA.............................................*passim*

Fair Housing Act, 42 U.S.C. § 3604.........................................*passim*

## OTHER AUTHORITIES

12 C.F.R. § 1022.137 .................................................................54, 56

24 C.F.R. § 100.7 ......................................................19, 41, 43, 46

24 C.F.R. § 100.500 ...................................................................57, 58

Fed. R. Civ. P. 56(a)...................................................................20, 59

Restatement (Second) of Agency § 343 (1958).................................40

Restatement (Second) of Torts § 440 (1965).....................................39

Restatement (Second) of Torts § 443 (1965).....................................39

# I. JURISDICTIONAL STATEMENT

The district court had jurisdiction of the Plaintiffs-Appellants' Fair Housing Act claims under 28 U.S.C. §§ 1331 and 1343. Though relevant only to the cross-appeal, the district court had jurisdiction of the Plaintiffs-Appellants' Fair Credit Reporting Act claims under 28 U.S.C. § 1331, and supplemental jurisdiction of the Connecticut Unfair Trade Practices Act claim under 28 U.S.C. § 1367.

This Court has jurisdiction over this appeal under 28 U.S.C. § 1291 because it is taken from a final decision of a United States District Court that resolved the last remaining claims, which was entered on July 20, 2023. This appeal is timely, the notice of appeal having been filed on August 4, 2023.

# II. ISSUES PRESENTED FOR REVIEW

1. Defendant-Appellee CoreLogic Rental Property Solutions, LLC, is a residential tenant-screening company that retrieves and evaluates a potential tenant's criminal history in connection with a housing application. If CoreLogic determines an applicant's criminal history to be disqualifying under the landlord's criteria, CoreLogic reports that determination to the landlord's leasing staff, often without also including the applicant's underlying criminal records. Do such reports "otherwise make unavailable, or deny" housing, within the meaning of the Fair Housing Act (42 U.S.C. § 3604(a)), such that CoreLogic must comply with the Act's anti-discrimination requirements when making the reports?

2. As a consumer reporting agency, CoreLogic was obligated under 15 U.S.C. § 1681g(a) to disclose the contents of consumer files on request. Mikhail Arroyo was unable to request disclosure of his consumer file from CoreLogic because of his disabilities, so his conservator, Plaintiff-Appellant Carmen Arroyo, requested the disclosure for him. CoreLogic refused to make the disclosure because of a policy requiring any third-person seeking a file disclosure on a consumer's behalf to present a "power-of-attorney," signed by the consumer, authorizing the disclosure. Plaintiffs-Appellants argued CoreLogic's refusal to disclose consumer files to conservators under this policy amounted to disability discrimination in services in connection with housing (*see* 42 U.S.C. § 3604(f)). The district court dismissed the claim on summary judgment, finding that no reasonable finder-of-fact could conclude that CoreLogic adhered to such a power-of-attorney requirement. But after trial, the district court, relying on the same evidence as had been before the court on summary judgment, found CoreLogic did adhere to the power-of-attorney requirement. Should the district court's dismissal of the disability discrimination claims be reversed?

## III.    STATEMENT OF THE CASE

This is an appeal taken from a final decision and order by the U.S. District Court for the District of Connecticut, Hon. Vanessa Bryant, following a bench

trial.[1] Also relevant to this appeal are portions of Judge Bryant's previous order on summary judgment.[2]

## A. Overview and Procedural Summary

Defendant-Appellee CoreLogic Rental Property Solutions, LLC, markets an automated tenant-screening product to residential landlords called "Registry CrimSAFE."[3] Unlike traditional criminal background reports, which simply gather and transmit the criminal records matching an applicant to a landlord for consideration, CrimSAFE interprets those records and assesses whether the applicant qualifies under the relevant landlord's admission policy.[4] If so, then CrimSAFE returns a favorable result and the applicant faces no further criminal history scrutiny.[5] But if CrimSAFE returns an unfavorable result, the applicant will not be offered housing unless the landlord takes further steps to access the

---

[1] Dkt. No. 317, Mem. of Decision and Order (hereafter "MDO"), reported as *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, No. 3:18-CV-705, 2023 WL 4669482 (D. Conn. July 20, 2023).

[2] Dkt. No. 194, Mem. of Decision on Mots. for Summ. J. 80-83, 86 (hereafter "Summ. J. Order"), reported as *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F.Supp.3d 259 (D. Conn. 2020).

[3] MDO ¶ 6

[4] MDO ¶¶ 13, 17.

[5] MDO ¶ 12 ("By filtering out records a housing provider deems irrelevant to their housing decision, CrimSAFE increases the number of automatic acceptances for individuals that have older and minor criminal histories.").

underlying criminal records, reconsider the application, and override the CrimSAFE result.[6]

Criminal history screening in rental housing admissions raises fair housing implications because, due to longstanding and widespread overrepresentation of Black and Latino individuals in the criminal legal system, the denial of housing based on criminal history tends to cause disparate impacts on Black and Latino renters.[7] This does not mean that all such criminal history screening is impermissible, only that such screening must not be broader than reasonably necessary to protect persons and property.[8]

As the agency responsible for interpretation and enforcement of the Fair Housing Act,[9] the U.S. Department of Housing & Urban Development (HUD) has

---

[6] MDO ¶¶ 32-34.

[7] *See* U.S. Dept. of Hous. & Urb. Dev., Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions at 1-2 (Apr. 4, 2016) (hereafter "HUD Guidance"), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF .

[8] *See* HUD Guidance at 2; *see also, e.g., Fortune Soc'y v. Sandcastle Towers Hous. Dev. Fund Corp.*, 388 F.Supp.3d 145, 175 (E.D.N.Y. 2019) (landlord potentially liable for overbroad criminal history screening policy that could have disparate impact on Black renters); *Jackson v. Tryon Park Apts., Inc.*, No. 18-CV-06238, 2019 WL 331635, at *3 (W.D.N.Y. Jan. 25, 2019) (allegation that defendant "automatically excluded" persons with felony convictions from apartment complex stated cognizable claim for disparate impact on Black renters).

[9] *See* 42 U.S.C. § 3608.

published guidance describing how landlords may avoid violating fair housing obligations when conducting criminal background screening.[10] According to HUD, "blanket bans" that deny housing "based on generalizations or stereotypes that any individual with an arrest or conviction record poses a greater risk than any individual without such a record" are unlikely to be justifiable.[11] Especially suspect are exclusions based on non-conviction records, very old crimes, or offenses having little relation with housing.[12] HUD also observed that "individualized assessment of relevant mitigating information beyond that contained in an individual's criminal record" is also likely to have less of a discriminatory effect than automatically denying housing.[13]

Criminal history screening through CrimSAFE is not limited to these parameters. CrimSAFE will report that an applicant has a disqualifying criminal history based any type of crime a landlord wishes, whether or not related to housing.[14] CrimSAFE will report disqualifying criminal history based on a

---

[10] *See* HUD Guidance at 5-7.

[11] HUD Guidance at 5.

[12] *See* HUD Guidance at 5-7.

[13] HUD Guidance at 7, 10 ("Where a policy or practice excludes individuals with only certain types of convictions, a housing provider will still bear the burden of proving that any discriminatory effect caused by such policy or practice is justified. Such a determination must be made on a case-by-case basis.").

[14] MDO ¶¶ 7-8, 21.

conviction record for up to 99 years into the past,[15] and a non-conviction record up for to seven years.[16] Rather than facilitate individualized reviews, CrimSAFE is an automated decision-making product that enables landlords who purchase it to suppress applicants' underlying criminal records so that leasing staff receive only a decision report.[17]

The Plaintiffs-Appellants, who include a fair housing center and a Latino man denied rental housing when a non-conviction record for a minor crime triggered a disqualifying CrimSAFE report,[18] challenged these features of CrimSAFE under the Fair Housing Act.[19] Specifically, they contended that CoreLogic caused unjustified disparate impacts on Black and Latino renters in Connecticut by reporting disqualifying criminal history, including when based on non-conviction records or conviction records too old to be of meaningful use, as

---

[15] MDO ¶¶ 7-8, 21.

[16] MDO ¶ 21. Note that seven years is the maximum permitted time during which a non-conviction record may lawfully appear in a consumer report under the federal Fair Credit Reporting Act. *See* 15 U.S.C. § 1681c(a)(2).

[17] MDO ¶¶ 25-26; *see also* Trial Tr. Oct. 25, 2022 pp. 611-13, Trial Ex. 7, Proposal to Winn incl. attachments, Aug. 2015, at p. 14 ("Users who choose to have their rental decisions automated using ScorePLUS and CrimSAFE may suppress the full reports from the view of their on-site staff."), admitted at Trial Tr. Mar. 24, 2022 p. 125.

[18] *See* MDO ¶ 48.

[19] *See* Dkt. No. 1, Complaint.

well as by denying on-site leasing agents the detailed criminal history information necessary for individualized review.[20]

At trial, Plaintiffs-Appellants presented evidence showing that CrimSAFE use caused disparate racial and ethnic impacts in each of Connecticut's rental housing markets.[21] Plaintiffs-Appellants also presented evidence showing that the discriminatory impacts of CrimSAFE could be significantly reduced if CoreLogic were to stop reporting disqualifying results based on non-conviction records and on conviction records more than nine years old, and facilitate individualized reviews by including the applicant's underlying criminal records with every unfavorable CrimSAFE report.[22]

The trial court's ruling, however, did not evaluate the Plaintiffs-Appellants' statistical evidence, CoreLogic's justification for CrimSAFE use, or the less-

---

[20] *See* Dkt. No. 1, Complaint ¶¶ 10-14.

[21] *See* Trial Tr. Mar. 15, 2022 pp. 105-14 (summarizing statistical evidence in closing arguments; Appellants intend to omit the actual testimony from the Appendix because it is voluminous and irrelevant to this appeal, but it can be found at Trial Tr. Mar. 15, 2022 (Dr. Christopher Wildeman, Dr. Allan Parnell) and Trial Tr. Oct. 24, 2022 (conclusion of Dr. Parnell).

[22] *See* Trial Tr. Oct. 24, 2022 pp. 459-62 (Dr. Lila Kazemian, testifying that "generally, studies have found that if somebody remains arrest-free for a period of about five to nine years, then their likelihood of recidivism becomes comparable to that of someone without a criminal record or to the general population") *and* Trial Tr. Oct. 25, 2022 pp. 477-79 (Dr. Kazemian, testifying that assessing public safety risk calls for consideration of "indicators of social integration and rehabilitation," for which "individualized assessments would be in order").

discriminatory alternatives offered.[23] Rather, the court ruled adverse CrimSAFE reports do not make housing unavailable to applicants (as necessary to implicate 42 U.S.C. § 3604(a)),[24] given the landlord's control over the admission criteria and other customizable CrimSAFE configurations, as well as their power to admit an applicant regardless of an adverse CrimSAFE result.[25] Plaintiffs-Appellants appeal from this ruling.

The case also includes an ancillary set of claims, based on CoreLogic's failure to disclose Mikhail Arroyo's consumer file to his conservator, Carmen Arroyo.[26] The Plaintiffs-Appellants' argued CoreLogic violated the Fair Credit Reporting Act, and failed to make a reasonable accommodation required by the Fair Housing Act,[27] when it refused to disclose the file without a "power of attorney" signed by Mikhail, even after Carmen Arroyo provided a copy of her conservatorship certificate.[28] Plaintiffs-Appellants also challenged the power-of-

---

[23] *See* MDO p. 37.

[24] *See* 42 U.S.C. § 3604(a) (unlawful to "otherwise make unavailable or deny," housing based on race or national origin).

[25] *See* MDO p. 46.

[26] *See* Dkt. No. 1, Complaint ¶¶ 16-18; *see* MDO pp. 46-47.

[27] *See* 42 U.S.C. § 3604(f)(2), (3)(B) ("[D]iscrimination includes— … (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling.").

[28] *See* MDO ¶¶ 67-79, p. 53.

attorney requirement as functionally denying all conserved persons in Connecticut access to their consumer files.[29]

The trial court dismissed the disability discrimination claims on summary judgment on the grounds that CoreLogic did not have the power-of-attorney policy.[30] But after trial, the court ruled that that CoreLogic did have the power-of-attorney policy, and willfully violated the FCRA by withholding Mikhail's file and not reasonably informing Carmen Arroyo what identification materials she would need to obtain it.[31] Plaintiffs-Appellants appeal the dismissal of the disability discrimination claims, while CoreLogic cross-appeals on the FCRA claim.

## B. Statement of Relevant Facts

Mikhail Arroyo became profoundly disabled in a 2015 accident, after which he was unable to walk, talk, or care for himself.[32] His mother, Plaintiff-Appellant Carmen Arroyo of Windham, Connecticut, then became Mikhail's primary caregiver and conservator.[33] On April 26, 2016, Carmen Arroyo applied to her landlord, Winn Residential, for a larger apartment (in the same building) to share with Mikhail.[34]

---

[29] *See* Dkt. No. 1, Complaint, Count II, pp. 49-50.
[30] *See* Summ. J. Order 80-83, 86.
[31] *See* MDO pp. 52-53.
[32] MDO ¶ 1.
[33] MDO ¶ 2, p. 1.
[34] MDO ¶¶ 1-2, 5, 47.

Winn Residential had previously contracted with Defendant-Appellee CoreLogic for tenant-screening services, including "Registry CrimSAFE," a criminal background check product for large, multifamily housing providers like Winn Residential.[35] Accordingly, to process Mikhail's application Winn Residential submitted his personal identifiers to CoreLogic.[36]

Landlords using CrimSAFE must configure the system at the outset.[37] For this purpose, CoreLogic provides a matrix that contains more than thirty categories of crimes and four "severity" columns (i.e., whether or not a felony, and whether or not conviction).[38] CoreLogic's "Enterprise Data Team" solely determines which categories the matrix contains, and which specific crimes go into which categories (i.e., landlords cannot customize their matrix or crime categories).[39] Using the matrix, landlords input a lookback period (i.e., a "minimum number of years . . . to decline an applicant") for each combination of crime category and severity level.[40]

Thereafter, when a potential tenant applies to a landlord using CrimSAFE, a leasing agent enters the applicant's personal identifiers into a CoreLogic web

---

[35] MDO ¶ 5.

[36] *See* MDO ¶¶ 47-48.

[37] MDO ¶ 20.

[38] MDO ¶¶ 15, 21; *see* Trial Ex. 1, CrimSAFE configuration form, *admitted at* Trial Tr. Oct. 24, 2022 p. 450.

[39] *See* Trial Tr. Nov. 3, 2022 pp. 91-93, 179.

[40] MDO ¶ 21.

portal.[41] CrimSAFE instantly searches for and retrieves any criminal records matching the applicant's identifiers, assigns each such record to a crime category and severity column and determines its age, filters the records using the landlord's criteria, and generates the decision report.[42] By viewing the decision report, the leasing agent sees only whether the applicant does, or does not, meet the landlord's criminal history requirements.[43]

CoreLogic also enables landlords to specify which of its employees have access to the "Multi-State Criminal Search Report," which contains an applicant's detailed criminal record information.[44] Commonly, CoreLogic's landlord clients limit such access to "senior level managers"—while leasing agents or other staff who interact with rental applicants may only access "decision reports," which merely state whether or not an applicant has a disqualifying criminal record.[45] At Winn Residential, only unspecified "executives" could access the Multi-State

---

[41] MDO ¶ 29. Appellants use the term "leasing agent" to refer to any of various landlord employees, typically based at specific rental properties, who interact with potential new tenants and receive and process their rental applications.

[42] MDO ¶ 29; *see* Trial Ex. 27, Arroyo Lease Recommendation Report, admitted at Trial Tr. Nov. 3, 2022 p. 44.

[43] MDO ¶ 25.

[44] MDO ¶¶ 25-26. The actual language of the decision reports can be customized, but will otherwise bear default text. MDO ¶ 27. The default favorable message is "Accept;" the default adverse message was originally "Decline" and was later changed to "Records Found." MDO ¶¶ 23, 27; *see also* Trial Tr. Oct. 25, 2022 p. 591 ("'Records found' is a soft way of saying 'you're declined.'").

[45] MDO ¶ 26.

Criminal Search Report, which required logging into CoreLogic's "Insights Center" and searching for the proper file.[46]

After receiving Mikhail's application, Winn Residential leasing agent Melissa Desjardins entered his personal identifiers into the CoreLogic portal and received a decision report.[47] That report stated "Records Found," meaning that CoreLogic had matched Mikhail Arroyo to a criminal record that was disqualifying under Winn Residential's criteria.[48] Upon receiving the report, Ms. Desjardins—who did not have permission to access the Multi-State Criminal Search Report— "verbally told Ms. Arroyo that Mr. Arroyo's application was denied and gave Ms. Arroyo CoreLogic's phone number on a sticky note."[49]

---

[46] MDO ¶ 32, Trial Tr. Nov. 7, 2022 pp. 201-02.

[47] MDO ¶ 48.

[48] MDO ¶¶ 21-22, 48. Accompanying text below the "Records Found" message stated: "Based upon your community CrimSAFE settings and the results of this search, disqualifying records were found. Please verify the applicability of these records to your applicant and proceed with your community's screening policies." *See* Trial Ex. 32, CrimSAFE Lease Recommendation Report for Mikhail Arroyo, admitted at Trial Tr. Nov. 7, 2022 p. 203.

[49] MDO ¶¶ 50, 65. The trial court noted that, under Winn Residential's tenant selection plan, Ms. Desjardins should have given Carmen Arroyo an "adverse action letter"—a notice, required by the Fair Credit Reporting Act, which notifies rejected applicants they have been denied and contains certain information about a consumer's rights to credit reporting information. *See* MDO ¶ 49; *see* 15 U.S.C. § 1681m.

Carmen Arroyo contacted CoreLogic the next day, seeking a copy of Mikhail's consumer file.[50] Through a series of communications with members of CoreLogic's consumer relations department, Carmen Arroyo related that Mikhail was unable to request his consumer file on his own, and that she was his court-appointed conservator and sought the disclosure on his behalf.[51] She provided corroborating documentation on June 24, 2016, including photo identification of herself and Mikhail and a copy of her conservatorship certificate.[52] However, CoreLogic did not make the file disclosure.[53]

Pursuant to its policy for responding to third-party requests for consumer disclosures, CoreLogic repeatedly told Carmen Arroyo that to receive Mikhail's file she would need to submit a "power of attorney" signed by Mikhail—impossible given his condition and conserved person status.[54] Finally, in November 2016, CoreLogic "escalated" the file request to its legal department, which determined that to receive the documents Carmen Arroyo would need to

---

[50] MDO ¶ 61; *see also* 15 U.S.C. § 1681g(a) ("Every consumer reporting agency shall, upon request . . . clearly and accurately disclose to the consumer: (1) All information in the consumer's file at the time of the request…").

[51] MDO ¶ 61; *see* Trial Ex. T, AS 400 Notes, *admitted at* Trial Tr. Oct. 28, 2022 pp. 890-91.

[52] MDO ¶¶ 66, 79.

[53] MDO ¶¶ 61-81.

[54] MDO ¶¶ 64, 70, 72-73, pp. 52-53.

provide a "a new conservatorship certificate with a visible seal."[55] Ms. Arroyo faxed a copy of her new conservatorship certificate to CoreLogic the next day, but the seal turned out not to be visible on the faxed copy.[56] CoreLogic did not make the disclosures.[57] Ms. Arroyo then contacted the Connecticut Fair Housing Center (CFHC) for assistance and stopped interacting with CoreLogic herself.[58]

CFHC also attempted to obtain a copy of Mikhail's file from CoreLogic, but was not successful.[59] Nevertheless, CFHC and Ms. Arroyo later learned through separate efforts that Mikhail had a 2014 retail theft charge from Pennsylvania.[60] Mikhail was never convicted of that crime; the charge was withdrawn after Carmen Arroyo submitted evidence of his medical history to the court.[61] CFHC and Ms. Arroyo also requested that Winn Residential admit Mikhail despite the criminal record as a reasonable accommodation for his disability, but this too was unsuccessful.[62]

---

[55] MDO ¶¶ 76-78.

[56] MDO ¶ 79; *see* Trial Tr. Oct. 24, 2022 p. 11.

[57] MDO ¶¶ 79-80.

[58] MDO ¶¶ 80-81.

[59] MDO ¶ 81.

[60] MDO ¶ 55.

[61] MDO ¶¶ 55, 58.

[62] MDO ¶ 54; *see generally Simmons v. T.M. Assocs. Mgmt., Inc.*, 287 F.Supp.3d 600, 602 (W.D. Va. 2018) (Fair Housing Act in some cases may require landlord to make an exception in admission policies for disability-related criminal history).

With CFHC's assistance, Ms. Arroyo in February 2017 initiated an administrative fair housing complaint against Winn Residential with the Connecticut Commission on Human Rights and Opportunities (CHRO), seeking redress for Winn Residential's denial of Ms. Arroyo's accommodation request.[63] In response, Winn Residential stated "they do not know the facts behind the criminal background findings, however they hire a third-party vendor to perform the checks, and trust in the results they are given and therefore make their decisions based on these results."[64] CHRO conducted a fact-finding hearing, and shortly thereafter Winn Residential approved Mikhail to move into the property.[65] The CHRO matter later settled for a monetary payment and fair housing training for Winn Residential staff.[66]

The Arroyos and CFHC then brought this action, asserting two sets of claims against CoreLogic. The "criminal history screening" claims alleged that CoreLogic rendered automated criminal history decisions on rental applicants that caused unlawful discriminatory effects on Black and Latino renters.[67] The second set of claims pertained to CoreLogic's failure to properly disclose the contents of

---

[63] MDO ¶ 56.

[64] MDO ¶ 57.

[65] MDO ¶ 59.

[66] MDO ¶ 60.

[67] MDO ¶ 83; *see also* Dkt. No. 1, Complaint ¶¶ 105-127.

Mikhail's consumer file, or to have practical procedures enabling conserved persons to access such disclosures.

The court dismissed the disability discrimination claims on summary judgment, finding that CoreLogic did not have a policy of "requiring that third-parties, including court-appointed conservators or guardians, submit a 'power of attorney' executed by the consumer in order to receive the consumer file."[68] The district court also ruled that any accommodation by which CoreLogic would make the file disclosure without receiving a conservatorship certificate bearing the visible impressed seal would not be reasonable.[69]

The case then proceeded to a bench trial on the remaining claims. After the trial, the court ruled that CoreLogic had willfully violated the Fair Credit Reporting Act by withholding Mikhail's consumer file and unreasonably failing to advise Ms. Arroyo how to obtain a copy of it.[70] On the criminal history screening claims, however, the court ruled that CoreLogic's adverse CrimSAFE reports did not "otherwise make unavailable or deny" housing, within the meaning of the Fair

---

[68] Summ. J. Order 80-83, 86.

[69] *See* Summ. J. Order 85-86.

[70] MDO pp. 52-55.

Housing Act—and thereby dismissed those claims without reaching the merits of the disparate impact evidence.[71]

## IV.   SUMMARY OF ARGUMENT

### A.   The trial court erred in its conclusion of law that adverse CrimSAFE reports do not "otherwise make unavailable or deny" housing for purposes of the Fair Housing Act.

The trial court erroneously determined, as a matter of law, that Corelogic did not "otherwise make unavailable, or deny" housing under 42 U.S.C. § 3604(a) by making an adverse CrimSAFE report to Winn Residential in connection with Mikhail Arroyo's rental application. Yet to "otherwise make unavailable, or deny" housing under that provision includes conduct that imposes burdens on protected class members that make housing more difficult  to obtain or communicates to such persons that they are unwanted. CoreLogic's adverse CrimSAFE report deemed Mikhail Arroyo unfit for tenancy under Winn Residential's screening policy, blocked his prompt admission to the housing, and forced him to overcome that unfavorable presumption to secure admission. These actions made housing more difficult for Mikhail to obtain and marked him as unwanted. The trial court should have ruled that CoreLogic did otherwise make unavailable or deny housing

---

[71] MDO p. 46; *see* 42 U.S.C. § 3604(a) (unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, *or otherwise make unavailable or deny, a dwelling* to any person because of race, color, religion, sex, familial status, or national origin") (emphasis added).

to Mikhail Arroyo, then proceeded to analyze whether CoreLogic did so in a manner that was discriminatory on the basis of race of national origin.

The rationale driving the trial court's contrary decision was that CoreLogic's client landlords, including Winn Residential, have the ultimate control over their screening criteria and their own responsibility for making housing decisions in a nondiscriminatory manner. While this is undeniable, CoreLogic takes substantial steps to implement and carry out those screening policies—and owes its *own* duty not to engage in housing discrimination while doing so.

Through CrimSAFE, CoreLogic interprets specific applicants' criminal records and determines whether those applicants meet the landlord's admission criteria.[72] An applicant with a favorable CrimSAFE report passes the criminal history screening, while an applicant with an adverse report is presumptively disqualified and will be admitted only if the landlord later makes an exception.[73] Whether or not the landlord ever reconsiders the application or deviates from the CrimSAFE result, the adverse report makes housing more difficult for the affected

---

[72] *See* MDO ¶¶ 10, 13.

[73] *Compare* MDO ¶ 12 ("By filtering out records a housing provider deems irrelevant to their housing decision, CrimSAFE increases the number of automatic acceptances for individuals that have older and minor criminal histories.") *with* ¶ 33 ("[T]he housing provider decides who within their organization has access to the full criminal reports and whether the records are in fact reviewed . . . .").

applicant to obtain; that alone is sufficient to "otherwise make unavailable or deny" housing for Fair Housing Act purposes.[74]

CrimSAFE found Mikhail Arroyo's criminal record, determined that record disqualified him under Winn Residential's admission policy, and reported that bare determination to leasing agent Melissa Desjardins, which prompted her to notify Carmen Arroyo that Mikhail's admission was declined.[75] In this way, CrimSAFE functionally administered Winn Residential's criminal history screening policy, and directly caused the denial of a profoundly disabled Latino man (a member of a group significantly overrepresented in the criminal-legal system) for a non-conviction record of a minor offense that occurred before his disabling accident.[76] CoreLogic, which applies whatever criminal history screening policies its client landlords choose—irrespective of whether those policies are consistent with fair housing requirements—bears accountability for its *own* actions in carrying out that policy.[77] This Court should reverse and remand to the trial court to determine whether the adverse CrimSAFE report had an unjustifiable discriminatory effect.

---

[74] 42 U.S.C. § 3604(a).

[75] *See* MDO ¶¶ 48, 50.

[76] *See* MDO ¶¶ 55, 58; *see* HUD Guidance at 2-4 (discussing evidence showing African-Americans and Latinos face disproportionate rates of arrest and incarceration).

[77] *See, e.g.*, 24 C.F.R. § 100.7(a)(1)(i).

## B. The trial court erroneously dismissed Plaintiffs-Appellants disability discrimination claims on summary judgment.

The trial court's dismissal of Plaintiffs-Appellants' disability discrimination claims also cannot stand. Those claims assert that CoreLogic adhered to a policy of requiring people seeking consumer file disclosures on behalf of a different person to present a "power of attorney" authorizing the disclosure, and refused under that policy to disclose Mikhail Arroyo's file to his conservator.[78] The district court dismissed the disability discrimination claims on summary judgment, substantially on the grounds that CoreLogic had no such power-of-attorney policy.[79] But after trial, the court found that CoreLogic did adhere to the power-of-attorney policy and failed for more than six months to disclose Mikhail Arroyo's file under the auspices of that policy.[80] Since all the same evidence in support of the power-of-attorney policy was presented to the trial court at the summary judgment stage, the dismissal of those claims on summary judgment was necessarily incorrect and should be reversed.[81]

The summary judgment order also rested on a determination that disclosing a consumer file to a conservator without first being provided a copy of the

---

[78] *See* Complaint ¶¶ 17-19.

[79] *See* Summ. J. Order 80-83.

[80] *See* MDO ¶¶ 64, 70, 72-73, pp. 54-55.

[81] *See* Fed. R. Civ. P. 56(a).

conservatorship certificate with a fully-visible impressed seal would not have been reasonable, because such a certificate would not have amounted to proper identification as required by the FCRA.[82] This ruling was incorrect as a matter of law because the lack of a seal on a photocopy of a document is immaterial so long as the original document bears the seal.[83] But even if CoreLogic could lawfully have insisted upon a fully-visible seal, CoreLogic did not communicate the impressed seal requirement to Carmen Arroyo in a timely manner—a failure that separately impeded her from obtaining such an accommodation.[84]

This Court should reverse the trial court's decision that adverse CrimSAFE reports do not make unavailable or deny housing, and remand for determination of whether such reports do so on an unlawfully discriminatory basis. The Court should also reverse the dismissal of the summary judgment order dismissing the disability discrimination claims.

---

[82] *See* Summ. J. Order 80, 86; see also 15 U.S.C. § 1681h(a)(1) ("A consumer reporting agency shall require, as a condition of making the disclosures required under section 1681g of this title, that the consumer furnish proper identification.").

[83] *See, e.g., In re Robinson*, 403 B.R. 497, 503 (Bankr. S.D. Ohio 2008) and other cases discussed at note 206, *infra.*

[84] *See* MDO p. 53 ("While CoreLogic may have questioned the authenticity of the conservatorship appointment, it did not direct Ms. Arroyo to submit one with an original seal.").

## V.    ARGUMENT

### A.    The facts as found by the trial court establish that CoreLogic denies or otherwise makes housing unavailable to rental applicants when it reports those applicants have disqualifying criminal records under the relevant landlord's admission criteria.

The trial court's conclusion that an adverse CrimSAFE report does not make unavailable or deny housing for purposes of 42 U.S.C. § 3604(a) is a pure question of law subject to de novo review. *See In re M/V MSC Flaminia*, 72 F.4th 430, 446 (2d Cir. 2023) ("After a bench trial, we review the district court's . . . conclusions of law *de novo*.").

This Court should reverse that finding because an adverse CrimSAFE report marks the affected applicant as undesirable and burdens or prevents admission to the housing. This is true even though such reports are based on criminal history criteria that landlords select, and even though landlords are free to deviate from or overrule the CrimSAFE results.

### 1.    To "otherwise make unavailable or deny housing" under the Fair Housing Act requires only that an action proximately causes housing to become more difficult to obtain.

The phrase "otherwise make unavailable" housing in 42 U.S.C. § 3604(a) has been interpreted to reach a wide variety of discriminatory housing practices.[85] The language "has been construed to reach every practice which has the effect of

---

[85] *LeBlanc-Sternberg v. Fletcher*, 67 F.3d 412, 424 (2d Cir. 1995).

making housing more difficult to obtain on prohibited grounds."[86] The U.S. Supreme Court has recognized the provision "as [a] catchall phrase[] looking to consequences, not intent."[87] This Court has stated that affording "fewer housing opportunities" on the basis of race meets the standard.[88] A fellow Connecticut district judge summarized otherwise making housing unavailable as including conduct that imposes burdens on protected class members, "making it more difficult for [them] to obtain housing or conveying a sense that [they] are unwanted."[89]

Broad though the "otherwise make unavailable" standard is, the Supreme Court made clear in the 2017 case of *Bank of America Corp. v. City of Miami* that the provision is tethered to a proximate cause requirement that excludes claims for remote and indirect consequences of housing discrimination:

> The housing market is interconnected with economic and social life. A violation of the FHA may, therefore, 'be expected to cause ripples

---

[86] *Thurmond v. Bowman*, 211 F.Supp.3d 554, 564 (W.D.N.Y. 2016), *citing United States v. Yonkers Bd. of Educ.*, 624 F.Supp. 1276, 1291 n.9 (S.D.N.Y. 1985), *aff'd*, 837 F.2d 1181 (2d Cir. 1987) (quotation omitted).

[87] *Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 534-35 (2015) (disparate impact claims cognizable under Fair Housing Act).

[88] *Cabrera v. Jakabovitz*, 24 F.3d 372, 390 (2d Cir. 1994) ("As long as a plaintiff can prove that a defendant afforded an African-American person fewer housing opportunities than a similarly-situated White person on account of race, the plaintiff has made out a case under Title VIII.").

[89] *Gilead Cmty. Servs., Inc. v. Town of Cromwell*, 432 F.Supp.3d 46, 72 (D. Conn. 2019).

of harm to flow' far beyond the defendant's misconduct. Nothing in the statute suggests that Congress intended to provide a remedy wherever those ripples travel.[90]

The *Bank of America* decision went on to require, analogous to common law tort doctrines, foreseeability and "some direct relation between the injury asserted and the injurious conduct alleged."[91] Hence, the "otherwise make unavailable" standard under 42 U.S.C. § 3604(a) reaches conduct which can foreseeably make housing more difficult to obtain, provided there is a direct relation between the challenged practice and the unavailability or denial of housing.

### 2. An adverse CrimSAFE report directly and foreseeably makes housing more difficult to obtain.

Foreseeability exists when a reasonable person in the defendant's position, knowing what the defendant knew or should have known, would anticipate the harm resulting from its conduct.[92] CoreLogic knew or should have known that returning disqualifying "records found" messages through CrimSAFE would make housing more difficult to obtain for the affected rental applicants.

---

[90] *Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 202 (2017), quoting *Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 534 (1983).

[91] *Bank of Am. Corp.*, 581 U.S. at 202-03.

[92] *See e.g., Munn v. Hotchkiss Sch.*, 795 F.3d 324, 329-30 (2d Cir. 2015) (summarizing foreseeability test under Connecticut law); *see also Doe ex rel. Doe v. Fed. Express Corp.*, 345 F. App'x 670, 671 (2d Cir. 2009) (discussing foreseeability under the Restatement and Connecticut law).

The fundamental function of CrimSAFE is to sort applicants into those who meet the landlord's criminal history criteria, and those who do not.[93] As the trial court found, landlords routinely follow *favorable* CrimSAFE decisions "[b]y filtering out records a housing provider deems irrelevant to their housing decision, CrimSAFE increases the number of automatic acceptances for individuals that have older and minor criminal histories."[94] The natural corollary of this finding is that applicants for whom CrimSAFE reports disqualifying records are *not* automatically accepted; those applicants will by definition face greater difficulty in obtaining the housing.

As the trial court found below, CrimSAFE not only locates and retrieves an applicant's criminal records—but proceeds to interpret those records, determine whether each record disqualifies the applicant under the relevant landlord's admission policy, and report that determination to the landlord during the rental admission process.[95] An adverse CrimSAFE report thus signifies that an applicant has criminal history incompatible with that landlord's screening criteria.[96] That landlords would rely on such determinations is eminently foreseeable.

---

[93] MDO ¶¶ 10-12.

[94] MDO ¶ 12.

[95] MDO ¶¶ 10, 21, 29-30.

[96] MDO ¶¶ 16-17, 30(b).

Indeed, landlords pay an added charge for the CrimSAFE decisions compared with CoreLogic's other criminal background product, CrimCHECK, which simply provides landlords with an applicant's criminal records, free of the decision component.[97] That landlords would pay extra for the CrimSAFE decisions, rather than just receive applicant's criminal records and interpret those records itself, logically implies that such landlords intended to make some use of the CrimSAFE decisions. Whether a landlord would defer entirely to the CrimSAFE result as occurred here, or simply as a presumption of ineligibility that an applicant might be able to overcome upon individual review, an adverse CrimSAFE report makes housing more difficult to obtain.

There is no guarantee an applicant denied after an adverse CrimSAFE report will ever even receive the benefit of any further review.[98] CoreLogic advertised CrimSAFE as a means of automatically determining whether an applicant meets a landlord's criminal history criteria, so that landlords could "implement consistent decisions" and "free [their] staff from interpreting criminal records."[99] Landlords who reviewed and interpreted applicants' criminal records themselves would not

---

[97] MDO ¶ 12.

[98] MDO ¶ 33 ("CoreLogic trains housing providers to designate someone to receive the records, but the housing provider decides who within their organization has access to the full criminal reports and whether the records are in fact reviewed as CoreLogic advises.").

[99] MDO ¶¶ 13-14, 17.

enjoy the efficiency of such automation. And routinely deviating from the CrimSAFE results could undermine the promised consistency—hence, even if further review is conducted, the adverse report functions effectively as a presumption of ineligibility that the applicant must overcome to be admitted. CoreLogic also prepares adverse action letters for client landlords to use in notifying applicants of denial.[100] CrimSAFE generates those letters for issuance at the time of a decision report, and can even be configured to send the letters automatically to applicants without action by the landlord.[101]

Over time, CoreLogic became more careful about removing words like "decline" or "decision" from their marketing and training materials,[102] eventually cautioning landlords to "proceed with [their] community's screening policies"[103] upon receiving an adverse CrimSAFE report rather than to simply reporting "decline" as CoreLogic had previously done.[104] The trial court found these semantic changes lessened the direct connection between the making of an adverse CrimSAFE report and the denial of housing.[105] But CrimSAFE had not materially changed, because an adverse report still meant a specific applicant's criminal

---

[100] MDO ¶ 35.
[101] MDO ¶¶ 35-38.
[102] MDO p. 40.
[103] MDO ¶ 30(b).
[104] *See, e.g.,* MDO ¶¶ 22-23.
[105] *See* MDO p. 45.

history fell outside the landlord's permissible admission criteria, even if the specific words used to convey that meaning may have been minced. Even so, as late as August 2015—less than nine months before Mr. Arroyo's application—CoreLogic held the product out to Winn Residential as providing "criminal record search results are evaluated using our own advanced, proprietary technology and an accept/decline leasing decision is delivered to your staff."[106]

CoreLogic also designed CrimSAFE to allow the suppression of criminal history details from property management staff and supported landlords in utilizing that function.[107] As a practical matter, individualized reviews for applicants who received unfavorable CrimSAFE results require access to the detailed criminal history reports. Without such details, leasing staff cannot apply their own judgment as to whether a crime is serious enough, recent enough, or sufficiently related to housing so as to merit exclusion. And such staff cannot even tell an applicant what criminal record(s) caused or contributed to a denial, let alone meaningfully

---

[106] MDO ¶ 17.

[107] MDO ¶¶ 25-26, 32-33; *see also* Trial Ex. 7, Proposal to Winn incl. attachments, Aug. 2015, ARROYO000277 ("Users who choose to have their rental decisions automated using ScorePLUS and CrimSAFE may suppress the full reports from the view of their on-site staff. Winn Residential currently uses this option and the site managers view a decision report."), admitted at Trial Tr. Mar. 24, 2022 p. 125.

evaluate any mitigating information or evidence of changed circumstances the applicant might present.[108]

All these facts, as found by the trial court, show that adverse CrimSAFE reports made housing more difficult for affected applicants to obtain, and that CoreLogic foresaw (or should have foreseen) as much. The trial court should thus have concluded that an adverse CrimSAFE report otherwise makes unavailable or denies housing within the meaning of 42 U.S.C. § 3604(a), and proceeded to determine whether those reports did so on an improperly discriminatory basis.

### 3. An adverse CrimSAFE report foreseeably and directly caused the denial of housing to Mikhail Arroyo.

The adverse CrimSAFE report was the precipitating cause for the denial of housing to Mikhail Arroyo. As the trial court found, CrimSAFE retrieved Mikhail's criminal record, determined that the record disqualified him under Winn Residential's admission policy, and made an adverse "records found" report to Winn Residential leasing agent Melissa Desjardins.[109] Neither Ms. Desjardins nor other Winn Residential leasing staff had access to the Multi-State Criminal Search

---

[108] *See* HUD Guidance at 7 ("Relevant individualized evidence might include: the facts or circumstances surrounding the criminal conduct; the age of the individual at the time of the conduct; evidence that the individual has maintained a good tenant history before and/or after the conviction or conduct; and evidence of rehabilitation efforts.").

[109] MDO ¶ 48.

Report containing the details about Mikhail's criminal record.[110] With nothing further to review, Ms. Desjardins notified Carmen Arroyo of Mikhail's rejection.[111] These facts showed a direct relation between the adverse CrimSAFE report and the denial of Mikhail's application.[112]

Even if Winn Residential reconsidered and later overturned the denial of Mikhail's application, that would not have negated the fact of this original denial.[113] In *Lowman v. Platinum Property Management Services, Inc.*, a man applied to a rental complex and was told initially that he was denied for lack of a clear copy of his driver's license and a complete tax return.[114] He later submitted the complete tax return and the property approved his application.[115] The applicant sued, arguing the complex imposed greater documentation requirements on him, because of his race, than required for other applicants.[116] The landlord moved to dismiss, arguing the applicant was never denied housing, but the court ruled a housing denial occurred when the applicant was first told he was denied.[117] "The

---

[110] MDO ¶¶ 26, 49.

[111] MDO ¶ 50.

[112] *See Bank of Am. Corp.*, 581 U.S. at 203.

[113] *See Lowman v. Platinum Prop. Mgmt. Servs., Inc.*, 166 F.Supp.3d 1356, 1360 (N.D. Ga. 2016).

[114] *See id.* at 1359.

[115] *See id.*

[116] *See id.* at 1361.

[117] *See id.* at 1360.

fact that Defendant soon thereafter accepted Plaintiff's application does not alter this result," the court wrote. "Defendant has cited no case, and the Court can find none, standing for the proposition that the subsequent approval of an application negates a prior denial for the purposes of the Federal FHA."[118]

### 4. Landlord's ability to override adverse CrimSAFE results does not negate proximate causation on CoreLogic's part.

*Lowman* suggests a landlord ought not rely on CrimSAFE results alone to reject an applicant, and should have some additional review process available before an applicant is ever denied at all. On this basis, the trial court implied that a housing rejection based on a CrimSAFE report may not be foreseeable, stating "no housing provider who uses CrimSAFE could reasonably believe that CoreLogic makes housing decisions for them."[119] But that conclusion is irreconcilable with the facts of this case; CoreLogic could hardly have failed to foresee that Mikhail could be denied without further review when it made an adverse CrimSAFE report about him, along with a pre-printed adverse action letter, to a leasing agent from whom the underlying criminal history details were suppressed.[120] On the contrary, Mikhail's denial pursuant to the adverse report demonstrated precisely how

---

[118] *Id.*

[119] MDO p. 40.

[120] *See* MDO ¶¶ 48-49.

CrimSAFE produces "consistent decisions" through an automated process and "frees [landlord] staff from interpreting criminal records."[121]

More importantly, the trial court's reasoning on this point overlooks that the central function of CrimSAFE, sorting rental applicants into those who meet the landlord's criminal history criteria and those who do not, inherently places those applicants in the latter group on a more difficult path to admission. Even if not automatically rejected, applicants for whom CrimSAFE reports "records found" must undergo a review procedure in which the landlord may or may not override the CrimSAFE result. Whether or not they are ultimately denied, an adverse CrimSAFE report marks those applicants as unwanted and makes obtaining housing more difficult—this is sufficient for 42 U.S.C. § 3604(a) to apply.[122] An adverse CrimSAFE report thus proximately makes housing unavailable, and hence 42 U.S.C. § 3604(a) requires that CoreLogic avoid issuing such reports in ways that have unjustifiable discriminatory impacts on protected class members.[123]

Corelogic's significant participation in the initial admission decision also distinguishes this case from *Mhany Management, Inc. v. County of Nassau*, on

---

[121] MDO ¶¶ 13-14, 17.

[122] *See, e.g., Thurmond*, 211 F.Supp.3d at 564.

[123] *See id.*; *see Gilead*, 432 F.Supp.3d at 72.

- 32 -

which the trial court heavily relied in finding a lack of proximate cause.[124] *Mhany* was primarily a challenge to a discriminatory zoning decision by an incorporated village in New York.[125] But the plaintiffs also named the county in which the village was located as a defendant, because the county had an "advisory veto" over village zoning decisions and did not exercise that veto despite knowing the zoning decision was discriminatory.[126] The trial court analogized CoreLogic to the county, suggesting its potential liability arose from a failure to veto landlords' housing decisions.[127] Yet the analogy was misplaced.

Unlike the county in *Mhany*, which played no role in the underlying zoning decision by the village,[128] CoreLogic is heavily involved in the underlying criminal screening decision by evaluating applicant criminal history and reporting to the landlord whether specific individuals qualify for admission.[129] No one is asking CoreLogic to veto landlords' decisions; on the contrary, landlord review of

---

[124] *See* MDO pp. 43-44; *see Mhany Management, Inc. v. Cnty. of Nassau*, 819 F.3d 581 (2d Cir. 2016).

[125] *See id.* at 588.

[126] *See id.* at 621.

[127] *See* MDO pp. 43-44; *see also Mhany*, 819 F.3d at 621-23 (proceeding to uphold the county's dismissal for lack of causation, finding the county had no real power to stop the zoning change because the village board of trustees could override the advisory veto by a majority-plus-one vote, and had already approved the zoning change unanimously).

[128] *See id.* at 621.

[129] MDO ¶¶ 10-17, 28-30, 34.

applicants rejected by CrimSAFE might result in *landlords* overruling *CoreLogic's* decisions. The *Mhany* analogy is deeply flawed, but CoreLogic's position more closely resembles that of the village than the county in that case.

> **5.    Winn Residential's failure to review or override the adverse CrimSAFE report did not attenuate CoreLogic's proximate causation.**

The trial court appeared particularly unimpressed with Winn Residential's failure to review Mikhail Arroyo's application after the adverse CrimSAFE report. Winn Residential gave only "selected senior level managers" access to the Multi-State Criminal Search Report,[130] and the circumstances or procedures by which an authorized executive might actually view such a report or reconsider a denied application never became entirely clear at the trial.[131] Regional manager Michael Cunningham, the supervisor of Melissa Desjardins, did not have access to applicants' criminal history details and appeared to have been under an erroneous impression that *nobody* at Winn Residential had such access.[132] Cunningham nevertheless "escalated the issue to Winn Residential vice presidents," but still no person at Winn Residential ever reviewed the Multi-State Criminal Search Report to reconsider Mikhail's application.[133]

---

[130] MDO ¶¶ 26, 49.

[131] *See* MDO ¶¶ 51, 57, p. 42.

[132] MDO ¶ 57.

[133] MDO ¶¶ 51, 57.

Clearly, Winn Residential could have and should have done more to review and reconsider Mikhail's application rather than simply deny him based on the adverse CrimSAFE report.[134] But Winn Residential's failure to take such steps does not attenuate the proximate causation on CoreLogic's part.[135] As discussed above, simply by reporting to Winn Residential that Mikhail had a disqualifying criminal history, CoreLogic marked him as unwanted and proximately caused admission to be more difficult for him to obtain.[136] Especially in the absence of any reconsideration or override of that adverse report, CoreLogic proximately caused the denial.

Even if Winn Residential had reviewed Mikhail's application, that alone would not prevent CoreLogic from proximately causing the denial, as the Supreme Court's decision in an employment discrimination case, *Staub v. Proctor Hospital*, instructs.[137] *Staub* held that an earlier actor who prompts a subsequent decision-

---

[134] See MDO ¶ 60.

[135] *See* MDO p. 39.

[136] *See* MDO ¶ 48.

[137] *See Staub v. Proctor Hosp.*, 562 U.S. 411, 414 (2011). As a general rule, employment discrimination cases tend to be instructive in housing discrimination cases. *See, e.g., Orange Lake Assocs., Inc. v. Kirkpatrick*, 21 F.3d 1214, 1227 (2d Cir. 1994) (noting adoption of Title VII disparate impact theory for Fair Housing Act claims); *Robinson v. 12 Lofts Realty, Inc.*, 610 F.2d 1032, 1038 (2d Cir. 1979) (analogizing to Title VII principles in housing discrimination analysis).

maker to take an adverse action can still proximately cause that adverse action—even if the subsequent decisionmaker is fully independent and free of bias.[138]

Staub was a hospital technician whose two immediate supervisors plotted to remove him because of his participation in military reserve training.[139] The supervisors made a series of complaints about Staub to hospital executives, which he contended were false and motivated by hostility to his military obligations.[140] The complaints prompted a higher executive to independently review Staub's personnel file, after which she decided to fire him.[141] Staub then brought suit for military status discrimination.[142]

The Seventh Circuit reasoned that the biased supervisors did not proximately cause Staub's dismissal because of the higher executive's review; as the reviewer was free of bias and exercised independent judgment, the termination was not tainted by military status discrimination.[143] But the Supreme Court disagreed,

---

[138] *See Staub* at 414.

[139] *See id.*

[140] *Id.* at 414-15.

[141] *Id.* at 415.

[142] *See id.* ("Staub sued Proctor under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. § 4301 *et seq.*, claiming that his discharge was motivated by hostility to his obligations as a military reservist.").

[143] *See id.* at 415-16 ("[U]nder Seventh Circuit precedent, a 'cat's paw' case could not succeed unless the nondecisionmaker exercised such 'singular influence' over the decisionmaker that the decision to terminate was the product of 'blind reliance.'") (citation omitted).

observing that "it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm."[144] The review of Staub's personnel file (and resulting termination) was prompted by complaints from the biased supervisors, and a "biased report may remain a causal factor if the independent investigation takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified."[145]

By the same principle, a landlord's independent review of a leasing decision would not necessarily preclude an adverse CrimSAFE report from proximately causing a housing denial.[146] But causal connection between an adverse CrimSAFE report and a housing denial is even stronger than in *Staub*. Whereas Staub's employment was not be terminated until after the independent review,[147] a rental applicant may be denied housing immediately once CrimSAFE reports a disqualifying criminal history—and, as occurred in Mikhail's case, that denial may never be independently reviewed.[148] If no review ever takes place, the applicant is

---

[144] *Id.* at 419.

[145] *Id.* at 421.

[146] *See id.* at 419-20.

[147] *See id.* at 415.

[148] *See* MDO ¶¶ 50-51, 57.

simply denied housing as a direct and proximate consequence of the adverse CrimSAFE report.[149]

Even if a review does take place, an adverse CrimSAFE result tends to shape that review, because such a report means the applicant has disqualifying criminal history under that landlord's policy and should not be approved absent some error or grounds for an exception or change to the policy.[150] This is unlike the independent review in *Staub*, in which there was no evidence that the reviewer began with any preconceived notions about the veracity of the complaints against Staub or whether his employment should be terminated.[151] And unlike Staub, who needed to establish that the biased supervisors proximately caused his loss of employment, the anti-discrimination duty under 42 U.S.C. § 3604(a) is triggered once an adverse CrimSAFE result puts a rental applicant in a position to be denied admission—thus making housing more difficult to obtain.[152]

The *Staub* court also observed that a subsequent decisionmaker's judgment cannot be a "superseding cause" of a discriminatory action.[153] At common law, a

---

[149] *See* MDO ¶ 50.

[150] *See* MDO ¶¶ 20-21.

[151] *See Staub*, 562 U.S. at 414-15.

[152] *See Thurmond*, 211 F.Supp.3d at 564; *see Gilead*, 432 F.Supp.3d at 72.

[153] *Staub*, 562 U.S. at 420 ("Nor can the ultimate decisionmaker's judgment be deemed a superseding cause of the harm. A cause can be thought 'superseding' only if it is a 'cause of independent origin that was not foreseeable.'"), *quoting Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996).

"superseding cause" is an intervening action by a new actor that cuts off the proximate cause from an earlier actor.[154] But "[t]he intervention of a force which is a normal consequence of a situation created by the actor's [tortious] conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about."[155]

Like in *Staub*, a landlord's denial of a rental applicant based on an adverse CrimSAFE report cannot be a superseding cause of that denial, but is simply a normal and foreseeable consequence of a tenant-screening product that promises efficiency and consistent decisionmaking.[156] Connecticut no longer follows the "superseding cause" doctrine in any event, holding instead (at least in negligence cases) that all parties whose actions tortuously harm another will be liable in proportion to their respective shares of fault.[157]

> **6. CoreLogic takes significant steps to carry out the criminal history screening policies of its landlords and is accountable for discriminatory impacts of those policies.**

The trial court's remaining reason for concluding that adverse CrimSAFE reports do not proximately make housing unavailable was because "the housing

---

[154] *See* Restatement (Second) of Torts § 440 (1965); *see also Staub*, 562 U.S. at 420.

[155] Restatement (Second) of Torts § 443 (1965).

[156] *See* MDO ¶¶ 13-14, 17; *see Staub*, 562 U.S. at 419-20.

[157] *See Barry v. Quality Steel Prods., Inc.*, 263 Conn. 424, 442, 820 A.2d 258, 269 (2003).

provider decides what criminal records are relevant to their assessment of an applicant's qualification" and "configures the look back periods with no significant input from CoreLogic."[158] It is true that landlords establish their own criminal history screening policies—but it is also long established that when a landlord establishes a discriminatory admission policy, an agent or other person who carries out that policy may be held liable for their own conduct.[159]

Indeed, from the earliest days of the Fair Housing Act courts have confronted cases involving leasing agents or other subordinates who administered discriminatory policies established by a landlord or other principal. Those courts consistently held that such employees or agents have no obligation to carry out such discriminatory policies and are liable for their own conduct when they do. [160] In the leading case of *Jeanty v. McKey & Poague, Inc.*, for example, the court found immaterial that a property management company's refusal to accept Black tenants was based on the property owner's preferences, stating "whoever decided

---

[158] MDO p. 38.

[159] *See Short v. Manhattan Apts., Inc.*, 916 F.Supp.2d 375, 399 (S.D.N.Y. 2012), *citing Jeanty v. McKey & Poague, Inc.*, 496 F.2d 1119, 1120-21 (7th Cir. 1974) ("It is well-established that agents will be liable for their own unlawful conduct, even where their actions were at the behest of the principal.") *and* Restatement (Second) of Agency § 343 (1958).

[160] *Jeanty*, 496 F.2d at 1120-21, *citing Sanborn v. Wagner*, 354 F.Supp. 291, 295 (D. Md. 1973); *Young v. AAA Realty Co.*, 350 F.Supp. 1382, 1387 (M.D.N.C. 1972); *Williamson v. Hampton Mgmt. Co.*, 339 F.Supp. 1146, 1149 (N.D. Ill. 1972).

not to rent to the plaintiffs, the discriminatory acts alleged were performed by [the property management firm]."[161] HUD has since incorporated these rules by regulation: "A person is directly liable for: (i) The person's own conduct that results in a discriminatory housing practice."[162] That remains true of persons acting at the request or direction of some other person.[163]

District courts in the Second Circuit have held persons liable for carrying out discriminatory policies on behalf of landlords where such persons took substantial steps to facilitate the discrimination.[164] The *Short* case held that real estate firms that managed rental properties for owners could be liable for taking substantial steps to carry out owners' instructions not to accept tenants participating in a subsidy program for people with HIV.[165] That court distinguished *Sassower v. Field*, in which an attorney who merely communicated a cooperative apartment board's discriminatory decision to an applicant was not liable because the attorney had not participated in making that decision.[166]

---

[161] *Jeanty*, 496 F.2d at 1120-21.

[162] 24 C.F.R. § 100.7(a)

[163] *See also Hous. Rts. Initiative v. Compass, Inc.*, No. 21-CV-2221, 2023 WL 1993696, at *25 (S.D.N.Y. Feb. 14, 2023) (real estate brokers may be held liable for carrying out discriminatory wishes of property owners), *reconsideration denied*, No. 21-CV-2221, 2023 WL 2989048 (S.D.N.Y. Apr. 18, 2023).

[164] *See Short*, 916 F.Supp.2d at 399; *see, accord, Hous. Rts. Initiative*, 2023 WL 1993696, at *25.

[165] *See Short*, 916 F.Supp.2d at 400.

[166] *Sassower v. Field*, 752 F.Supp. 1190 (S.D.N.Y. 1990).

CrimSAFE does not "merely communicate" decisions fully taken by landlords. Though landlords choose which categories of crimes to screen for, CoreLogic creates the available categories and exercises the judgment necessary to determine the category to which each specific criminal record belongs.[167] Though landlords determine their lookback periods, CoreLogic decides which of various dates associated with a criminal record (e.g., offense date, arrest date, disposition date, release date, etc.) to utilize in establishing its age.[168] CoreLogic further interprets each criminal record to assign a severity and disposition column, then compares the record with the landlord's criminal screening criteria to decide whether it disqualifies the applicant.[169] The resulting reports, which indicate whether specific applicants pass or fail particular landlords' admission criteria, are not, "merely public information," as the trial court erroneously characterized them.[170] Rather, in rendering a CrimSAFE report, CoreLogic takes substantial

---

[167] MDO ¶¶ 21, 32; *see also* Trial Tr. Nov. 3, 2022 pp. 91-93, 179; Dkt. No. 178-3, Joint Trial Mem., Attach. B (deposition designations of Yvonne Rosario).

[168] Trial Tr. Nov. 7, 2022 pp. 260-61 ("A. …If a disposition date isn't there then it might go off a sentence date. If that's not there then it will go off a file date.

Q. Okay. So CrimSAFE can actually assign an age to a record using different possible dates?

A. Depending on what's provided.").

[169] MDO ¶¶ 17, 21, 29-30.

[170] *See* MDO p. 44 ("CoreLogic has no say in whether housing providers accept or decline applicants, it merely provides the housing provider with publicly available information.").

steps to carry out the admission policies of its client landlords—and if discriminatory criteria are embedded in those policies then CoreLogic bears liability for carrying those policies out.[171]

CoreLogic is fundamentally no differently-situated than the property management firms of antiquity who rejected applicants based on the instructions of their client landlords—even if those instructions were unlawfully discriminatory. The only difference here is that CrimSAFE is an automated electronic system, rather than a traditional human agent. As in *Jeanty*, that landlord users establish their own criminal screening polices, and can override a CrimSAFE result if they so choose, does not diminish CoreLogic's duty to refrain from applying screening policies that have unjustifiable discriminatory impacts.[172]

CoreLogic also exerts significant influence on the types of criminal history policies client landlords can use by offering and not offering certain CrimSAFE functions. For instance, CrimSAFE cannot be configured to require multiple criminal records be matched to an applicant before an adverse result is reported.[173] Landlords cannot modify the crime categories or adjust the categorization of

---

[171] *See* 24 C.F.R. § 100.7(a).

[172] *See Jeanty*, 496 F.2d at 1120-21; *accord, Short*, 916 F.Supp.2d at 399.

[173] Trial Tr. Nov. 8, 2022 p. 36.

offenses.[174] Landlords cannot add new severity columns to the CrimSAFE configuration matrix.[175] CoreLogic could likewise have chosen not to offer CrimSAFE functions that enabled landlords to screen applicants for criminal history in ways contrary to the HUD Guidance.

Indeed, CrimSAFE limits the reporting of some criminal records as necessary to comply with *credit reporting* laws, but CoreLogic chose not to limit the reporting of any criminal history information to comply with *fair housing* considerations.[176] CoreLogic continued to report adverse CrimSAFE results based on non-conviction records, despite HUD's warning that a landlord who denies housing based on a non-conviction record "cannot prove that the exclusion actually assists in protecting resident safety and/or property."[177] CoreLogic also chose to report adverse CrimSAFE results based on any type of crime for conviction records up to 99 years, rather than limit the reporting of crimes bearing little or no relationship to housing, or cap lookback periods for at least some types of

---

[174] Trial Tr. Nov. 8, 2022 p. 36 ("Q. So if a landlord wanted to have one lookback period for criminal mischief and property damage and then a different lookback period for traffic accidents involving damage, there's not a way to do that, right?

There is not.").

[175] Trial Tr. Nov. 8, 2022 p. 36.

[176] *See* MDO ¶ 21; *see also* 15 U.S.C. § 1681c(a)(2) (Fair Credit Reporting Act prohibits consumer reporting agencies from reporting non-conviction records beyond seven years).

[177] HUD Guidance at 5.

offenses.[178] CoreLogic chose to report adverse CrimSAFE results to property staff while denying them access to the underlying criminal records relevant to individualized reviews.[179] Having chosen to give landlords the ability to screen for criminal history in discriminatory ways, CoreLogic is responsible for its own actions in carrying out such discrimination if it occurred.

The trial court also noted that "CrimSAFE customers were also required to sign a contract, acknowledging that CoreLogic is not an agent of the housing provider, and the housing provider had the obligation to follow the FHA,"[180] and based on that accepted that "CoreLogic is not the agent or supervisor of their housing provider customers."[181] Of course, CoreLogic certainly appears to have been the agent of its client landlords; CoreLogic undertook to search for and filter criminal records on rental applicants and report to those landlords whether particular applicants had disqualifying criminal history, and the landlords were to be in control of that arrangement by selecting the relevant screening criteria, the form of report to be delivered, the landlord staff who could access various parts of the report, and so on.[182] That CoreLogic's contract denied that CoreLogic was an

---

[178] MDO ¶¶ 8, 21.

[179] MDO ¶¶ 26, 49

[180] *See* MDO ¶ 19, p. 42.

[181] MDO p. 44.

[182] *See, e.g., United States v. Hoskins*, 44 F.4th 140, 149-50 (2d Cir. 2022) ("The three elements necessary to an agency relationship are (1) a manifestation by

agent of its client landlords is of no moment.[183] But whether CoreLogic was or was not the agent of its client landlords is ultimately immaterial; what matters is that CoreLogic did have control over its own conduct and key aspects of CrimSAFE.

CoreLogic alone determined which types of offenses could result in an adverse CrimSAFE report, the maximum lookback periods, the availability of non-conviction records, and the extent to which access to Multi-State Criminal Search Reports could be suppressed.[184] Whether or not an agent, "[a] person is directly liable for: . . . (iii) Failing to take prompt action to correct and end a discriminatory housing practice by a third-party, where the person knew or should have known of the discriminatory conduct and had the power to correct it."[185] CoreLogic was in a position to prevent client landlords from using discriminatory criminal history

---

the principal that the agent will act for him; (2) acceptance by the agent of the undertaking; and (3) an understanding between the parties that the principal will be in control of the undertaking."), *quoting Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 277 (2d Cir. 2013).

[183] *See, e.g., In re Shulman Transp. Enters., Inc.*, 744 F.2d 293, 295 (2d Cir. 1984) ("[W]here the public interests or the rights of third parties are involved, the relationship between contracting parties must be determined by its real character rather than by the form and color that the parties have given it."). As the trial court noted, the Plaintiffs never argued that CoreLogic was vicariously liable for discrimination by client landlords. MDO p. 36. Apart from the reasons the trial court referenced, such a claim would not have made sense because vicarious liability flows from the agent to the principal—and CoreLogic is the agent, not the principal, in its relationships with client landlords.

[184] MDO ¶¶ 8, 21, 25.

[185] 24 C.F.R. § 100.7(a).

screening policies by limiting the parameters within which CrimSAFE would return adverse reports, and chose not to do so. On the contrary, CoreLogic—through the provision of CrimSAFE—participated actively in evaluating and rendering opinions on the suitability of specific applicants under whatever criminal history policies those client landlords wanted.

## B. Plaintiffs-Appellants' disability discrimination claims were improperly dismissed on summary judgment.

This Court reviews the dismissal of Plaintiffs-Appellants' disability discrimination claims on summary judgment de novo, construing all evidence in the light most favorable and drawing all reasonable inferences and resolving all ambiguities in their favor.[186]

### 1. Summary of disability discrimination claims.

A consumer has the right to obtain, on request, a copy of substantially all information any "consumer reporting agency"—such as CoreLogic—has on file about the consumer at the time of the request.[187] This is commonly referred to as a "consumer file disclosure." In this case, Carmen Arroyo sought to obtain a copy of

---

[186] *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017), quoting *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 118 (2d Cir. 2013).

[187] *See* 15 U.S.C. § 1681g(a); *see also* MDO ¶ 62 ("CoreLogic is a consumer reporting agency as defined under the FCRA.").

Mikhail Arroyo's consumer file for use in advocating with Winn Residential to admit him as a tenant.[188]

Carmen Arroyo first requested the file by telephone on April 27, 2016.[189] At that time, CoreLogic refused to make the file disclosure because of a policy allowing such disclosures to be made to someone other than the named consumer only if the requesting person presented a "power of attorney" signed by the consumer.[190] Carmen Arroyo informed CoreLogic that Mikhail had disabilities that prevented him from requesting the file himself, and that she was Mikhail's court-appointed conservator. [191] Shortly thereafter, Carmen provided identification materials for herself and Mikhail, including a copy of her conservatorship certificate.[192] But CoreLogic denied the disclosure, continuing to insist on a power-of-attorney for a prolonged period of time.[193]

---

[188] Dkt. No. 87-3, Decl. of C. Arroyo ¶¶ 7, 10, 14, 18-19; *see also* MDO ¶ 65.

[189] Decl. of C. Arroyo ¶ 9; *see also* MDO ¶ 65; *see* Trial Ex. T, AS 400 notes, admitted at Trial Tr. Oct. 28, 2022 pp. 891-92.

[190] MDO pp. 52-53.

[191] Decl. of C. Arroyo ¶ 10.

[192] Decl. of C. Arroyo ¶ 11.

[193] Decl. of C. Arroyo ¶¶ 12-15; s*ee Logan v. Matveevskii,* 57 F.Supp.3d 234, 273 (S.D.N.Y. 2014) (unjustifiable delay in responding to or approving reasonable accommodation request tantamount to denial of the request); *see, accord, Astralis Condo. Ass'n v. Sec'y, U.S. Dep't of Hous. & Urb. Dev.*, 620 F.3d 62, 69 (1st Cir. 2010) (rejecting argument that reasonable accommodation request was never denied because defendant never expressly refused to make the accommodation); *see also* MDO:

Plaintiffs-Appellants contended that Carmen Arroyo's request that CoreLogic disclose Mikhail's consumer file to her, based on her status as his conservator, constituted a request for a reasonable accommodation under the Fair Housing Act, which CoreLogic unlawfully failed to make.[194] In addition, CoreLogic's power-of-attorney policy effectively prevented substantially any conserved person in Connecticut from obtaining copies of their tenant-screening reports from CoreLogic, for which reason Plaintiffs-Appellants brought a second

---

CoreLogic required Ms. Arroyo to produce a power of attorney *after* she proffered what was ostensibly a conservatorship appointment, albeit without a seal. While CoreLogic may have questioned the authenticity of the conservatorship appointment, it did not direct Ms. Arroyo to submit one with an original seal. Instead, CoreLogic required Ms. Arroyo to produce a document that she legally could not produce, thereby making it impossible for her to obtain her conserved son's consumer report. CoreLogic did not rescind this impossible condition until November 14, 2016, when it ultimately told Ms. Arroyo that a valid conservatorship certificate would constitute proper identification. Thus, the time period during which CoreLogic set an impossible condition for Ms. Arroyo to request a consumer report on Mr. Arroyo's behalf, and thus violating the FCRA, was between June 30, 2016, and November 14, 2016.

MDO p. 53.

[194] *See* 42 U.S.C. § 3604(f)(2) & (3)(B) (prohibiting discrimination "in the provision of services or facilities in connection with [a] dwelling" based on a disability, including by "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]").

disability discrimination claim that challenged the discriminatory impact of the power-of-attorney policy on people with disabilities in the state. [195]

### 2. Plaintiffs-Appellants presented sufficient evidence on summary judgment to at least proceed to trial on the reasonable accommodation claim.

The elements of a failure-to-accommodate claim are: (1) the plaintiff had a disability, (2) the defendant knew or reasonably should have known of the disability, (3) an accommodation was likely necessary to afford the person with the disability an equal opportunity to use and enjoy a dwelling; (4) the requested accommodation was reasonable; and (5) the defendant failed to make the accommodation. [196]

The evidence presented on summary judgment satisfied each of these elements. Mikhail Arroyo had a disability (or "handicap") for FHA purposes because he had a physical condition that substantially limited his abilities to speak, walk, and care for himself. [197] Corelogic knew, or reasonably should have known, that Mikhail had such a disability because Carmen Arroyo told CoreLogic that Mikhail was a conserved person and provided a copy of her conservatorship

---

[195] Dkt. No. 1, Complaint, Count II, pp. 49-50; *see also* MDO pp. 54-55 ("In many cases, including Mr. Arroyo's, a person can lack physical and/or mental capacity to make a valid power of attorney. CoreLogic's written policies entirely overlooked this group of people….").

[196] *Olsen v. Stark Homes, Inc.*, 759 F.3d 140, 156 (2d Cir. 2014).

[197] 42 U.S.C. § 3602(h); *see* Dkt. No. 87-3, Decl. of C. Arroyo ¶ 2.

certificate.[198] To be a conserved person in Connecticut, an individual must be unable to care for themselves or manage their own affairs.[199]

Mikhail's disability prevented him from obtaining his consumer file, because he was unable to speak and had neither the mental nor legal capacity to sign a power-of-attorney.[200] He needed CoreLogic to make an accommodation— disclose the consumer file to his conservator without requiring a power of attorney, just as Carmen Arroyo requested.[201] That accommodation may have been necessary to afford Mikhail equal access to housing because Carmen Arroyo sought the consumer file in order to Mikhail's admission to Winn Residential.[202] The request was reasonable because producing the file disclosure to Carmen Arroyo would not have imposed undue financial and administrative burdens on CoreLogic.[203] Yet CoreLogic did not, within a reasonable time, either make this accommodation or propose any other accommodation.[204]

---

[198] *See* Decl. of C. Arroyo ¶¶ 3, 9-11.

[199] *See* Conn. Gen. Stat. §§ 45a-644 (2016), 45a-650 (2018); *see also* Dkt. No. 87-10, Expert Report of Nancy Alisberg at 3.

[200] *See* Decl. of C. Arroyo ¶¶ 2-3, 10; *see* Conn. Gen. Stat. § 45a-644; *see also* Dkt. No. 87-10, Expert Report of Nancy Alisberg at 5-9.

[201] See Decl. of C. Arroyo ¶¶ 9-14, 18.

[202] *See* Decl. of C. Arroyo ¶¶ 7, 14, 18-19.

[203] *See Olsen*, 759 F.3d at 156 (accommodations are reasonable where "they do not pose an undue hardship or a substantial burden" and "cost is modest").

[204] *See* Decl. of C. Arroyo ¶¶ 12-15 ("Ms. Santos repeatedly stated that 'legal' would need to make a decision on whether to provide the disclosures and, if so, what documentation CoreLogic would require first . . . but to my knowledge no

### 3. The lack of a visible impressed seal on the copy of Carmen Arroyo's conservatorship certificate was not fatal to her claim.

The trial court also ruled that making the consumer file disclosures to Carmen Arroyo, based on the copy of the conservatorship certificate she had submitted, would not have been a reasonable accommodation because the impressed seal was not visible on that copy, and therefore did not amount to "proper identification" as required to make file disclosures under FCRA provision 15 U.S.C. § 1681h(a).[205] The trial court's ruling that the visible seal was necessary for proper identification was incorrect as a matter of law—but even if the visible seal had been necessary on the copy, its absence was also immaterial to the reasonable accommodation claim.

First, courts have repeatedly held in other contexts that the lack of a visible impressed seal on a copy of a document is immaterial so long as the original

---

such decision was ever made. Neither Ms. Santos nor CoreLogic offered any alternative proposals as to how I could obtain Mikhail's file."); *see also Logan*, 57 F.Supp.3d at 273 (prolonged delay in responding to a reasonable accommodation request is tantamount to a denial thereof). Note the trial court ultimately found CoreLogic adhered to the power-of-attorney policy for more than fourth months, when a CoreLogic representative finally indicated willingness to make the disclosure to Carmen Arroyo if she submitted "a new conservatorship certificate with a visible seal." MDO ¶ 78.

[205] Summ. J. Order 76; *see* 15 U.S.C. § 1681h(a) ("A consumer reporting agency shall require, as a condition of making the disclosures required under section 1681g of this title, that the consumer furnish proper identification.").

document bears the required seal.[206] The trial court rejected these cases as not

being from Connecticut and not involving documents that specifically noted the

requirement for a seal.[207] But there is no apparent reason to apply visible seal

requirements more strenuously in Connecticut than other states, and the text on the

original document asserting the need for an impressed seal does not make any

reference to copies.[208]

Second, a consumer provides sufficient identification for FCRA file

disclosure purposes when she supplies enough information to confirm her

identify—whether or not that information is the same as what the consumer

---

[206] *See, e.g., In re Robinson*, 403 B.R. 497, 503 (Bankr. S.D. Ohio 2008) ("[I]nability to detect the notary public's raised seal on the image of the [m]ortgage available in the public records" did not affect validity of mortgage); *Schwab v. GMAC Mortg. Corp.*, 333 F.3d 135, 138 (3d Cir. 2003) (lack of visible notary seal on recorded mortgage document did not affect its validity as statute imposed "no requirement that the embossment be 'capable of photographic reproduction'"); *Warfield v. Byron*, 137 F. App'x 651, 655 (5th Cir. 2005) (lack of visible seal on judicial summons did not affect its validity because "[t]he [district court] uses an embossed seal on photocopying, meaning that the absence of a visible seal on a photocopy does not demonstrate that a seal was not on the original"); *Oliver v. N.Y. State Police*, Nos. 17-CV-01157, 18-CV-00732, 2019 WL 453363, at *6 (W.D.N.Y. Feb. 5, 2019) (same); *see also Smith v. Nat'l Credit Sys., Inc.*, No. 13-CV-4219, 2015 WL 12780446, at *2 (N.D. Ga. 2015) (lack of visible embossed notary seal on court filed copy did not preclude consideration of affidavit, if actually sworn to before authorized officer).

[207] *See* Summ. J. Order 74.

[208] *See* Dkt. No. 87-6, Ex. C to Decl. of C. Arroyo 4 (conservatorship certificate), *see* Dkt. No. 87-3, Decl. of C. Arroyo ¶ 11 (authenticating Exhibit C).

reporting agency requests.[209] In *Menton v. Experian Corp.*, a consumer requested a copy of his consumer file and provided a copy of his driver's license, a bank statement with his name and address, and his home telephone number.[210] Experian declined to disclose the file because its policy required a Social Security Number.[211] The Court held Experian violated FCRA's disclosure requirements because there was "no reason that Experian could not have verified Mr. Menton's identity and provided him with his credit report soon after receiving the various alternative forms of identification which he did furnish."[212]

Similarly, Regulation V, which implements FCRA, provides that a nationwide specialty consumer reporting agency, such as CoreLogic,[213] should not, in response to file disclosure requests, collect more information than reasonably necessary to properly identify the consumer.[214] This provision balances consumer

---

[209] *See Menton v. Experian Corp.*, No. 02 Civ. 4687, 2003 WL 941388, at *3 (S.D.N.Y. Mar. 6, 2003).

[210] *See id.* at *1.

[211] *See id.* at *1.

[212] *Id.* at *3.

[213] "The term 'nationwide specialty consumer reporting agency' means a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis relating to … (2) residential or tenant history[.]" 15 U.S.C. § 1681a(x)(2).

[214] 12 C.F.R. § 1022.137(a) ("Any nationwide specialty consumer reporting agency shall have a streamlined process for accepting and processing consumer requests for annual file disclosures [that] shall: . . . (2) [b]e designed, funded, implemented, maintained, and operated in a manner that: . . . (ii) [c]ollects only as much personal information as is reasonably necessary to properly identify the

access and with data security by requiring enough identification to avoid releasing a consumer's information improperly, without demanding so much identification as to unreasonably restrict a consumer's access to the file.[215]

Here, Carmen Arroyo provided sufficient identification, and the function of the conservatorship certificate was to demonstrate her authority to receive the file disclosure on Mikhail's behalf.[216] The certificate did so, as it specifically stated that the Connecticut Probate Court for the Windham-Colchester District had assigned Carmen Arroyo various authorities, such as to "[m]anage the estate, property, and finances of [Mikhail Arroyo]."[217] Though an impressed seal was necessary for the original document to be valid, CoreLogic should certainly have understood that such a seal might not appear on a photocopy.[218] Even without the visible seal, the certificate provided enough information from which CoreLogic could have independently verified the conservatorship—such as the court name, case caption, and cause number—had CoreLogic doubted its veracity.[219]

---

consumer as required under the FCRA, section 610(a)(1), 15 U.S.C. 1681h(a)(1), and other applicable laws and regulations.").

[215] *See also Menton*, 2003 WL 941388, at *3.

[216] *See* Summ. J. Order 73.

[217] *See* Dkt. No. 87-6, Ex. C to Decl. of C. Arroyo 4.

[218] *See* Summ. J. Order at 74 ("If anything, the cited cases demonstrate that it is commonly understood that impressed seals are not visible on photocopies."), citing *Schwab*, 333 F.3d at 138 *and Warfield*, 137 F. App'x at 655.

[219] *See* Ex. C to Decl. of C. Arroyo 4.

Or, of course, CoreLogic could have promptly informed Carmen Arroyo of the need for a copy with the fully-visible seal. Hence, whether CoreLogic could lawfully have withheld Mikhail's file until Carmen Arroyo provided a copy of the certificate with the visible seal is ultimately irrelevant, because CoreLogic's prolonged failure to advise Carmen Arroyo of the need for that document was tantamount to a denial of a reasonable accommodation all the same.[220] Indeed, the trial court separately found CoreLogic's failure to inform her within a reasonable time what additional identification materials it needed to release Mikhail's file amounted to a willful violation of FCRA.[221] The supposed visible impressed seal requirement was quite transparently a post-hoc justification for failing to make a consumer file disclosure to Mikhail Arroyo's conservator, and that failure violated his right to a reasonable accommodation every bit as much as it violated his credit reporting rights.

---

[220] *See Logan*, 57 F.Supp.3d at 273.

[221] MDO pp. 52-53; *see also* 15 U.S.C. § 1681g(a). While this was the correct result, Plaintiffs believe the trial court should have found the initial identification materials, including the copy of Carmen Arroyo's conservatorship certificate (without the visible seal), sufficient for CoreLogic to make the disclosure. While consumer reporting agencies must impose identification requirements adequate to protect consumer privacy, excessively burdensome requirements frustrate consumers' statutory right to access their files. *See Menton*, 2003 WL 941388, at *3; *see also* 12 C.F.R. § 1022.137(a)(2)(ii).

### 4. The evidence presented on summary judgment also sufficiently established that the disparate impact file disclosure claim.

A Connecticut probate court may not order an involuntary conservatorship without finding by clear and convincing evidence that an individual is unable to care for themselves or manage their affairs, and that no less restrictive means of intervention is available to assist them in managing their affairs.[222] This means all conserved persons in Connecticut are, by definition, persons with disabilities who are unable to execute powers-of-attorney, and CoreLogic's power-of-attorney requirement thus caused a disparate impact on such persons by preventing substantially all of them from being able to access their consumer files.[223] Rigid adherence to that policy did not serve any substantial legitimate interest of CoreLogic—but even if it did, CoreLogic had a less-discriminatory alternative of making consumer disclosures to conservators.[224] Hence, the Plaintiffs-Appellants

---

[222] *See* Conn. Gen. Stat. §§ 45a-644, 45a-650.

[223] *See* 24 C.F.R. § 100.500(c)(1) (prima facie disparate impact claim established where challenged practice will predictably cause discriminatory effect on members of a protected class); *see also* Dkt. No. 87-9, Resume of Nancy Alisberg; Dkt. No. 87-10, Expert Report of Nancy Alisberg; *see also* MDO pp. 54-55.

[224] S*ee Mhany*, 819 F.3d at 617 (FHA discriminatory effects claims analyzed under a three-step framework in which (1) plaintiff must first establish a prima facie case by demonstrating that a policy has a disparate impact, (2) defendant must then rebut the prima facie case by proving that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests," and (3) burden then shifts back to plaintiff to show that those interests

also presented a viable disparate impact claim for disability discrimination that should have survived summary judgment.[225]

> **5.** **This Court should vacate summary judgment and reinstate disability discrimination claims.**

On summary judgment, the trial court declared undisputed facts showed CoreLogic had no policy of requiring all third-persons seeking a consumer file disclosure to present a "power of attorney" signed by the consumer or refusing to deviate from that policy even for court-appointed conservators.[226] For this reason, the court considered only whether CoreLogic improperly required a court-appointed conservator to provide more onerous documentation of their authority (to receive a consumer file disclosure) than a third-party holding a power of attorney.[227] The trial court ultimately found against the Plaintiffs-Appellants on this ground and dismissed both the reasonable accommodation and disparate impact disability discrimination claims.[228]

---

"could be served by another practice that has a less discriminatory effect"); *see also* 24 C.F.R. § 100.500.

[225] *See Mhany*, 819 F.3d at 617; *see also* 24 C.F.R. § 100.500(a) ("A practice has a discriminatory effect where it actually or predictably results in a disparate impact on a group of persons . . . because of . . . handicap[.]").

[226] Summ. J. Order 80.

[227] Summ. J. Order 80-86.

[228] Summ. J. Order 81-86.

After trial, however, the court found CoreLogic *did* require any third-person seeking a consumer file disclosure to present a "power of attorney" signed by the consumer, *did* refuse to deviate from that policy even for a court-appointed conservator, and adhered to that policy in this case.[229] This Court should reverse the plainly-inconsistent summary judgment order and reinstate the disability discrimination claims.

Summary judgment is appropriate only when there is no disputed question of material fact and moving party entitled to judgment as a matter of law.[230] Here, since the district court ultimately found at trial that CoreLogic did adhere to the power-of-attorney policy, the court's contrary decision on summary judgment, that no reasonable finder-of-fact could find that CoreLogic had such a policy, must have been erroneous.[231] This is especially so because appellate review of a summary judgment order is "de novo, resolving all ambiguities and drawing all permissible inferences in favor of the nonmoving party."[232] By contrast, the court

---

[229] MDO pp. 52-53.

[230] *See* Fed. R. Civ. P. 56(a).

[231] *See generally Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie if . . . the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

[232] *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 108 (2d Cir. 2023), quoting *Tiffany & Co. v. Costco Wholesale Corp.*, 971 F.3d 74, 83 (2d Cir. 2020).

reached its post-trial conclusion that CoreLogic did establish and adhere to the power-of-attorney requirement without any such presumption in effect.

Nowhere in the post-trial ruling did the district court explain how it reached such inconsistent factual findings or attempt to reconcile the post-trial decision with the summary judgment ruling. But the inconsistency cannot be explained by the presentation of new or different evidence at trial than on summary judgment. Carmen Arroyo made clear in her declaration on summary judgment that CoreLogic repeatedly told her between April and November 2016 that she would not be granted disclosure of Mikhail's consumer file unless she provided a power of attorney.[233] And the critical "AS 400" notes, on which the trial court primarily based its post-trial ruling,[234] were also before the court on summary judgment (submitted through the declaration of CoreLogic employee Angela Barnard).[235] These were ample materials for the trial court to have found a question of fact as to whether CoreLogic adhered to the power-of-attorney for all third-party file disclosure requests.

---

[233] Decl. of C. Arroyo ¶¶ 9, 12-15.

[234] MDO p. 27, n.6 ("The Court does not credit [CoreLogic consumer operations team manager] Ms. Barnard's interpretation of the internal notes because she was not the author of any of the notes and several of her characterizations were directly inconsistent with the plain statements made in the notes. The Court will determine what was stated during the calls based on the notes.").

[235] Dkt. No. 99-6, Decl. of A. Barnard ¶ 11 and Ex. B (AS 400 notes).

## VI. CONCLUSION

For the foregoing reasons, this Court should reverse the trial court's decision that adverse CrimSAFE reports do not make unavailable or deny housing, and remand for determination of whether such reports do so on an unlawfully discriminatory basis. The Court should also reverse the summary judgment order dismissing the disability discrimination claims, and remand for further proceedings on those claims as well.

Respectfully Submitted this 17th day of November, 2023,

| | | |
|---|---|---|
| */s/ Eric Dunn* | */s/Christine Webber* | |
| Eric Dunn | Christine Webber | Greg Kirschner |
| **National Housing Law Project** | **Cohen Milstein Sellers & Toll PLLC** | **Connecticut Fair Housing Center** |
| 919 E. Main Street | 1100 New York Ave NW | 60 Popieluszko Ct. |
| Suite 610 | Suite 500 | Hartford, CT 06106 |
| Richmond, VA 23219 | Washington, D.C. 20005 | (860) 263-0724 |
| (415) 546-7000 | (202) 408-4600 | greg@ctfairhousing.org |
| edunn@nhlp.org | cwebber@cohenmilstein.com | |

# CERTIFICATE OF COMPLIANCE WITH RULE 32(g)(1)

This document complies with the type-volume limit of FRAP 32(g)(1) and the word limitation of LR 28.1.1 because, excluding those portions of the document exempted by FRAP 32(f), the document contains 13,997 words.

This document complies with the typeface requirements of FRAP 32(a)(5) and the type-style requirements of FRAP 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

*/s/Christine Webber*
Christine Webber

## CERTIFICATE OF SERVICE

I hereby certify that on November 17, 2023, I electronically filed the foregoing

Brief using the Court's CM/ECF system, which will automatically send copies to all

counsel of record pursuant to LR 25.1(d)(1).

*s/Christine Webber*
Christine Webber