# 23-1118(L)

23-1166 (XAP)

IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———————————

CONNECTICUT FAIR HOUSING CENTER and CARMEN ARROYO, individually and as conservator of MIKHAIL ARROYO,

Plaintiffs-Appellants-Cross-Appellees

v.

CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,

Defendant-Appellee-Cross-Appellant

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

———————————

BRIEF FOR THE UNITED STATES AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS-APPELLANTS-CROSS-APPELLEES AND URGING VACATUR AND REMAND

———————————

DAMON SMITH
  General Counsel
SASHA SAMBERG-CHAMPION
  Deputy General Counsel for
  Enforcement & Fair Housing
AYELET WEISS
  Assistant General Counsel for Fair
  Housing Enforcement
MARGARET DONAHUE
PAUL OSADEBE
  Attorneys
  U.S. Department of Housing and Urban
  Development
  451 7th Street SW
  Washington, D.C.  20410

KRISTEN CLARKE
  Assistant Attorney General
NICOLAS Y. RILEY
YAEL BORTNICK
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-8271

# TABLE OF CONTENTS

**PAGE**

INTEREST OF THE UNITED STATES ................................................................. 1

STATEMENT OF THE ISSUES.......................................................................... 2

STATEMENT OF THE CASE............................................................................ 2

    A.    Factual Background........................................................................ 2

    B.    Procedural History......................................................................... 6

SUMMARY OF ARGUMENT ......................................................................... 10

ARGUMENT

    Tenant-screening companies are subject to 42 U.S.C. 3604(a)
    because they can effectively "make [housing] unavailable.".................... 11

    A.    Text and precedent make clear that Section 3604(a)
        reaches the actions of non-housing providers even
        though they do not make the final decision whether
        to accept or reject a tenant.................................................... 12

    B.    Instead of focusing on CoreLogic's control over the
        ultimate housing decision, the district court should
        have engaged in a standard causation analysis under the FHA. ........ 19

CONCLUSION .................................................................................... 24

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES:**                                                                             **PAGE**

*Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994) .......................................... 12, 19

*Casa Marie, Inc. v. Superior Ct. of P.R. for Dist. of Arecibo*,
    988 F.2d 252 (1st Cir. 1993) ................................................... 14-15

*Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*,
    666 F.3d 1216 (9th Cir. 2012) ........................................................ 14

*Francis v. Kings Park Manor, Inc.*, 944 F.3d 370 (2d Cir. 2019),
    *opinion vacated on reh'g en banc*, 992 F.3d 67 (2d Cir. 2021) .................... 13

*Georgia State Conf. of the NAACP v. City of LaGrange*,
    940 F.3d 627 (11th Cir. 2019) ....................................................... 20

*Hanson v. Veterans Admin.*, 800 F.2d 1381 (5th Cir. 1986) ................................ 15

*Jackson v. Okaloosa Cnty.*, 21 F.3d 1531 (11th Cir. 1994) .................................... 14

*McDiarmid v. Economy Fire & Cas. Co.*,
    604 F. Supp. 105 (S.D. Ohio 1984) ................................................ 15

*Meyer v. Holley*, 537 U.S. 280 (2003) ..................................................... 13

*Mhany Mgmt., Inc. v. County of Nassau*,
    819 F.3d 581 (2d Cir. 2016) ............................................... 11, 21-22

*Michigan Prot. & Advoc. Serv., Inc. v. Babin*,
    18 F.3d 337 (6th Cir. 1994) ................................................. 14, 23

*NAACP v. American Family Mut. Ins. Co.*,
    978 F.2d 287 (7th Cir. 1992) ................................................. 15-16

*National Fair Hous. All. v. Travelers Indem. Co.*,
    261 F. Supp. 3d 20 (D.D.C. 2017) ................................................ 17

**CASES (continued):**                  **PAGE**

*Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351 (6th Cir. 1995)......................16

*Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205 (9th Cir.),
    *as amended* (Apr. 30, 2010) ...........................................................................15

*Reyes v. Waples Mobile Home Park Ltd. P'ship*,
    903 F.3d 415 (4th Cir. 2018) ..........................................................................21

*Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*,
    576 U.S. 519 (2015).........................................................................................13

*United States v. Space Hunters, Inc.*, 429 F.3d 416 (2d Cir. 2005) ........................14

*United States v. Taylor*, 142 S. Ct. 2015 (2022).....................................................13

*Woods-Drake v. Lundy*, 667 F.2d 1198 (5th Cir. 1982) ..........................................19

**STATUTES:**

Fair Housing Act
    42 U.S.C. 3601.................................................................................................19
    42 U.S.C. 3604............................................................................................ 16, 19
    42 U.S.C. 3604(a) ..................................................................................... *passim*
    42 U.S.C. 3604(b)............................................................................................20
    42 U.S.C. 3610...................................................................................................1
    42 U.S.C. 3612...................................................................................................1
    42 U.S.C. 3614...................................................................................................1

**RULE:**

Fed. R. App. P. 29(a)(5)............................................................................................1

**REGULATIONS:**

24 C.F.R. 100.70(d)(4)............................................................................................16

24 C.F.R. 100.500(c)...............................................................................................21

**MISCELLANEOUS:**                                                    **PAGE**

HUD, *Office of Gen. Counsel Guidance on Application of Fair Hous. Act Standards to the Use of Crim. Recs. by Providers of Hous. & Real Estate-Related Transactions* (Apr. 4, 2016), https://perma.cc/PS7P-PGEU ......................................................................... 1

HUD, *Implementation of the Office of Gen. Counsel's Guidance on Application of Fair Hous. Act Standards to the Use of Crim. Recs. by Providers of Hous. & Real Estate-Related Transactions* (June 10, 2022), https://perma.cc/A9VL-V4JS ........................................... 1-2

Shivangi Bhatia, *To "Otherwise Make Unavailable": Tenant Screening Companies' Liability Under the Fair Housing Act's Disparate Im*pact Theory, 88 Fordham L. Rev. 2551 (2020) .............17

## INTEREST OF THE UNITED STATES

The United States has a substantial interest in this appeal, which concerns the application of the Fair Housing Act (FHA) to tenant-screening companies. The Department of Justice (DOJ) and the Department of Housing and Urban Development (HUD) share enforcement authority under the FHA. *See* 42 U.S.C. 3610, 3612, 3614. The United States has a particularly strong interest in ensuring the correct interpretation and application of the FHA in this context given landlords' growing reliance on tenant-screening companies.

This case also concerns two of HUD's other priorities: Helping formerly incarcerated people return to their communities and reducing housing barriers for those who have criminal records. As part of these efforts, HUD has released guidance addressing, in part, how the FHA's discriminatory-effects standard applies in cases where a housing provider justifies an adverse housing action based on an individual's criminal history. *See* HUD, *Office of Gen. Counsel Guidance on Application of Fair Hous. Act Standards to the Use of Crim. Recs. by Providers of Hous. & Real Estate-Related Transactions* (Apr. 4, 2016) (HUD 2016 Guidance), https://perma.cc/PS7P-PGEU. In supplemental guidance, HUD confirmed that its 2016 Guidance "applies to a wide-range of entities covered by the Act," including "third-party screening companies." *See* HUD, *Implementation of the Office of Gen. Counsel's Guidance on Application of Fair Hous. Act*

*Standards to the Use of Crim. Recs. by Providers of Hous. & Real Estate-Related Transactions* at 3 (June 10, 2022) (HUD 2022 Guidance), https://perma.cc/A9VL-V4JS. Accordingly, the United States has a substantial interest in the proper resolution of this appeal.

## STATEMENT OF THE ISSUES

This case involves a disparate-impact claim under the Fair Housing Act against a tenant-screening company, defendant CoreLogic Rental Property Solutions (CoreLogic), which "automates the evaluation of criminal records" by providing landlords with selective criminal-history information about prospective tenants. The United States will address the following question:

Whether the district court erred in concluding that CoreLogic is not subject to 42 U.S.C. 3604(a) because it does not "make unavailable or deny" housing.[1]

## STATEMENT OF THE CASE

### A.    Factual Background

In the summer of 2015, Mikhail Arroyo, who is Latino, was in a serious accident that left him severely disabled and permanently unable to care for himself.

---

[1] The United States takes no position on any other issues presented in this appeal, including how the district court should resolve this case on remand.

- 2 -

Doc. 317 (Mem. of Decision & Order), at 1, 3.[2]  After spending more than half a year in the hospital, followed by many months in a nursing home, Mr. Arroyo had finally recovered enough to be discharged.  *Id.* at 1, 3.  In April 2016, Mr. Arroyo's mother applied for him to move in with her at the apartment complex where she lived, ArtSpace Windham, so that she could serve as his primary caregiver.  *Id.* at 1, 3-4.

At the time, ArtSpace used CoreLogic's tenant-screening services to evaluate prospective tenants.  Doc. 317 at 4-5.  Specifically, it used a web-based service known as CrimSAFE, which allows landlords to search CoreLogic's large criminal-records database for information about prospective tenants.  *Id.* at 5.  The database includes, among other information, conviction records that are up to 99 years old, and all charges from the prior seven years, even if they do not result in convictions.  *Id.* at 9-10.  CoreLogic allows landlords to configure CrimSAFE to filter out certain criminal-records searches based on the type, severity, disposition, and date of any criminal offense in a prospective tenant's history.  *Id.* at 5-6, 9-10.  Landlords, however, may only select filters from the options CoreLogic provides.  Thus, for example, while landlords can filter records based on the type of offense,

---

[2] "Doc. _, at _" refers to the docket entry and page numbers of documents filed in the district court, *Connecticut Fair Hous. Ctr., et al. v. CoreLogic Rental Prop. Sols., LLC*, No. 3:18-cv-705 (D. Conn.).

they must choose from the 36 categories of offenses created by CoreLogic.  *Id.* at 5.

If a search identifies any responsive records, CrimSAFE then generates a report and a recommendation that the landlord either "accept" or "decline" the prospective tenant.  *Id.* at 10 (citation omitted).  CrimSAFE also has a function that produces a template denial letter that the landlord can edit and send to rejected applicants.  *Id.* at 15-16.  CrimSAFE allows landlords the option of having full access to the details of the responsive criminal records or more limited access that simply alerts the landlord to the fact that disqualifying records were found, without any detail about those records.  *Id.* at 5.[3]

When ArtSpace's property manager entered Mr. Arroyo's information into CrimSAFE, the program generated a report, which included both a summary of Mr. Arroyo's credit score, as well as a criminal history decision.[4]  *See* Doc. 317, at 13.  The "Crim Decision" portion of the report stated "Record(s) Found" but did not provide any details about those records; instead, it contained a message

---

[3]  CoreLogic markets CrimSAFE to landlords as a product that "automates the evaluation of criminal records," "[m]aintain[s] a safer community," "[i]mproves Fair Housing compliance," and "[s]av[es] time for leasing staff" by "free[ing] your staff from interpreting criminal records."  Doc. 317 at 7 (alterations and citation omitted).

[4]  The credit score portion of the report recommended that ArtSpace accept Mr. Arroyo with conditions.  Doc. 317, at 20.

directing the reader to "verify the applicability of these records to your applicant and proceed with your community's screening policies." *Id.* at 20 (citation omitted). Based on that result, the property manager—who had not been granted access to the underlying criminal records referenced in the report—denied Mr. Arroyo's application. *Id.* at 20-21.

After months of failed conversations with ArtSpace regarding the denial of her son's application, Ms. Arroyo reached out to the Connecticut Fair Housing Center (CFHC), a housing advocacy nonprofit, for help getting her son's application approved. Doc. 317, at 3-4, 21. With CFHC's assistance, Ms. Arroyo learned that her son's application was denied because he had been arrested and charged with retail theft in Pennsylvania one year prior to his accident. *Id.* at 1, 22. Ms. Arroyo submitted her son's medical history to a Pennsylvania court, which withdrew his pending charge. *Id.* at 22-23. She also filed an administrative complaint against ArtSpace with a state agency, seeking a reasonable accommodation for her son. *Id.* at 22. In June 2017, while the administrative complaint was pending, ArtSpace accepted Mr. Arroyo as a tenant. *Id.* at 23. By that point, more than a year had elapsed since it had denied the Arroyos' original application.

**B.    Procedural History**

CFHC and Ms. Arroyo, on her own behalf and as conservator for Mr. Arroyo, sued CoreLogic.  Doc. 317, at 1-2.  They asserted claims under the Fair Housing Act (FHA), Fair Credit Reporting Act, and Connecticut Unfair Trade Practices Act.  Doc. 1 (Complaint), at 48-55.  Among other relief, plaintiffs sought compensatory damages for the added medical, travel, and housing expenses that resulted from Mr. Arroyo having to spend an extra year in a nursing home.  Doc. 1, at 56; Doc. 252 (Pls.' Proposed Findings of Fact & Conclusions of Law), at 65.

Their FHA claim alleged, in part, that CoreLogic's CrimSAFE product caused an unjustified disparate impact based on race.  Doc. 317, at 29-30.  Specifically, plaintiffs asserted that CoreLogic violated 42 U.S.C. 3604(a), which makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race," among other grounds.  *Id.* at 31-32.

1.  Both sides moved for summary judgment on the FHA disparate impact claim.  Doc. 194 (Dist. Ct. Order on SJ), at 24, 31.  Plaintiffs argued that CoreLogic caused the denial of housing to Mr. Arroyo.  *Id.* at 31-32.  CoreLogic argued, conversely, that it was "not a direct cause of any housing discrimination"

because its "customers set the criteria for deciding which criminal records should result in rejection." *Id.* at 37. The district court denied both motions.

As relevant here, the district court concluded that a reasonable factfinder could find CoreLogic proximately caused the denial of housing. Doc. 194, at 34. The court reasoned that CoreLogic had built certain features into CrimSAFE that were likely to produce a disparate impact in housing access. It pointed, for example, to the fact that CrimSAFE "allows clients to disqualify innocent people who have been charged but not convicted." *Id.* at 34-35. The court also found that, in combining separate offenses into categories, "CrimSAFE reduces housing providers' discretion" in selecting tenants. *Id.* at 35. The court noted, for instance, that CrimSAFE combines certain "traffic accidents," which it "concedes ha[ve] no relationship to suitability for tenancy," into the same category as "vandalism and property damage." *Id.* at 35-36 (citation omitted). As a result, "a housing provider cannot exclude vandals without also excluding people involved in traffic accidents." *Id.* at 36. Finally, the district court rejected CoreLogic's argument that it cannot be liable because it was not "a direct cause of any housing discrimination," holding instead that "discrimination may have multiple causes and parties other than final decisionmakers may be liable." *Id.* at 37.

2. The district court held a ten-day bench trial over several months in 2022. Doc. 317, at 30. In July 2023, it issued an opinion setting forth its findings of fact

- 7 -

and conclusions of law. Doc. 317. In that opinion, the court explained that, before it could address the merits of plaintiffs' disparate-impact theory, it had to address "[a]s an initial matter" whether CoreLogic is even "subject to the FHA." *Id.* at 34. The court ultimately concluded that CoreLogic is not subject to the FHA. *Id.* at 46.

In reaching that conclusion, the court focused its analysis on what it deemed the "central" question: "whether CoreLogic 'make[s] unavailable or den[ies]' housing" in violation of 42 U.S.C. 3604(a). Doc. 317, at 34 (brackets in original) (quoting 42 U.S.C. 3604(a)). To answer that question, the district court examined what it said were plaintiffs' "two theories for how CoreLogic's use of CrimSAFE denies or makes housing unavailable": (1) that CrimSAFE itself disqualifies applicants, and (2) that CrimSAFE prevents housing providers from conducting an individualized assessment of applicants. *Id.* at 37.[5]

As for the first theory, the district court held that CrimSAFE itself does not disqualify applicants. Doc. 317, at 37. The court found that CrimSAFE "matched applicants with data," but did not decide whether an applicant qualified for housing. *Ibid.* Rather, the court found that it was the housing provider that

---

[5] Plaintiffs also argued that CoreLogic "encourages" housing providers to not conduct an individualized assessment and to rely on the CrimSAFE report for housing decisions, and that CoreLogic could influence the outcomes of its criminal-background searches through setting the parameters for a landlord's searches. *See, e.g.*, Doc. 252, at 45-46, 58, 63. The district court did not address these additional theories. *See generally* Doc. 317.

"control[led] the disqualification process" by deciding which employees received criminal reports, what records are relevant for their decision, how to review the records, and when to accept an applicant. *Ibid.* Although the court acknowledged that CoreLogic did not "need[] to be the ultimate decisionmaker to be found liable under the FHA," it concluded that "the connection between CoreLogic and the decision on housing availability" was too "tenuous." *Id.* at 43.

As for the second theory, the district court held that CrimSAFE did not prevent housing providers from conducting individualized assessments. Doc. 317, at 45. Although there was "some testimony" that CrimSAFE allows housing providers to limit which employees receive access to the full report, including any identified criminal records, the court instead credited "testimony that this is not the default setting." *Ibid.* The court concluded that allowing a housing provider to limit access "can hardly serve the role of decisionmaker where the program's default provides unlimited access." *Id.* at 46.

After rejecting each of these theories, the district court entered judgment "in favor of CoreLogic on the FHA claims because the [p]laintiffs have failed to prove by a preponderance of the evidence that CoreLogic's use of CrimSAFE denies or otherwise makes unavailable housing pursuant to section 3604(a)." Doc. 317, at 46.

## SUMMARY OF ARGUMENT

The district court erred in holding that CoreLogic cannot be liable under Section 3604(a) because it does not itself disqualify applicants or directly control the landlord's ultimate decision whether to accept or reject a prospective tenant.

The text of Section 3604(a) makes clear that an entity can be held liable for violating the FHA even if that entity does not have the power to make the ultimate housing decision. And, consistent with that text as well as the FHA's broad remedial purpose, courts have consistently held that non-housing providers who lack direct control over the housing provider's ultimate decision may still violate the statute when their discriminatory actions operate to "make unavailable or deny" housing in other ways. That includes by facilitating discrimination by the housing provider or by depriving people of access to some prerequisite that they need to obtain housing. The inquiry under Section 3604(a), in short, does not turn principally (or even primarily) on whether the defendant actually exercises direct control over the final housing decision.

Thus, rather than focusing narrowly on whether CoreLogic directly exercises control over its customers' final housing decisions, the court should have engaged in a standard causation analysis under the FHA. As in other disparate-impact cases, that analysis would focus on whether the disparities plaintiffs alleged were real and whether they stemmed from CoreLogic's specific tenant-screening

practices. This Court should therefore vacate the judgment and remand this case with instructions for the district court to apply the proper legal standard to plaintiffs' FHA claim.

## ARGUMENT

**Tenant-screening companies are subject to 42 U.S.C. 3604(a) because they can effectively "make [housing] unavailable."**

The district court erred in analyzing whether CoreLogic can be subject to liability under Section 3604(a). *See* Doc. 317, at 46. As relevant here, Section 3604(a) makes it unlawful "[t]o refuse to sell or rent . . . or otherwise make unavailable or deny, a dwelling to any person because of race." 42 U.S.C. 3604(a). Plaintiffs may establish a violation of this provision either through a disparate treatment theory, which requires proof that a defendant acted with a discriminatory intent or motive, or a discriminatory effects theory, where a housing decision is shown to have an unjustified disparate impact on a protected class or perpetuate segregation. *See Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016).

Here, the district court failed to properly analyze plaintiffs' disparate impact claim because it held, as a threshold matter, that CoreLogic cannot be subject to FHA liability for "mak[ing] housing unavailable." *See* Doc. 317, at 36-37. Specifically, the court reasoned that there was "only a tenuous connection between CoreLogic and the housing provider's decision" whether to accept an applicant.

- 11 -

Doc. 317, at 44. Although the court acknowledged that a "non-ultimate decisionmaker" could theoretically be liable under the FHA (*see* Doc. 317, at 44-45 (citing *Cabrera v. Jakabovitz*, 24 F.3d 372, 378 n.2 (2d Cir. 1994)), the court's stated rationale for rejecting plaintiffs' claim against CoreLogic would essentially foreclose liability against any non-housing provider that does not exercise direct control over the provider's final housing decision. Under the court's view, a non-housing provider cannot "make [housing] unavailable" where it "cannot direct a housing provider to accept an applicant," "does not have any power to intervene" in a housing provider's decisions, "is not the agent or supervisor of [the housing provider]," and is not "even part of the discussion when a housing provider decides to accept an applicant." Doc. 317, at 44.

As explained below, this reasoning cannot be squared with the text of the FHA or the case law construing it. Rather than focusing narrowly on CoreLogic's ability (or inability) to control ArtSpace's final housing decisions, the court should have examined CoreLogic's actions under traditional principles of causation.

A. **Text and precedent make clear that Section 3604(a) reaches the actions of non-housing providers even though they do not make the final decision whether to accept or reject a tenant.**

1. The text of Section 3604(a) makes clear that, as a general matter, entities that do not directly make the ultimate decision to rent or sell housing (*i.e.*, third-party actors) can be liable for discrimination. "Unlike Title VII, which provides a

cause of action against specified *employers* who discriminate, the FHA does not identify a class of potential defendants who can be charged—so that not only landlords, but also public housing authorities, cooperative boards, block associations, real estate agents, or, indeed, *anyone*, is potentially liable." *Francis v. Kings Park Manor, Inc.*, 944 F.3d 370, 387 n.9 (2d Cir. 2019) (Livingston, J., dissenting), *opinion vacated on reh'g en banc*, 992 F.3d 67 (2d Cir. 2021).

Rather than limit liability to specific actors, Section 3604(a)'s statutory text plainly "focuses on prohibited acts." *Meyer v. Holley*, 537 U.S. 280, 285 (2003); *see also Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 534 (2015) (explaining that the language of Section 3604 is "results-oriented"). Specifically, Section 3604(a) prohibits three acts: (1) "[t]o refuse to sell or rent" housing based on a protected characteristic, (2) "to refuse to negotiate for the sale or rental of" housing, and (3) to "otherwise make unavailable or deny" housing. 42 U.S.C. 3604(a). A landlord's ultimate housing decisions would generally be covered by either the prohibition on "refus[ing] to sell or rent" or "refus[ing] to negotiate for the sale or rental" of an apartment based on a prohibited ground. To "otherwise make [housing] unavailable" must therefore be understood to refer primarily to actions other than ultimate housing decisions, including those by non-housing providers. *See, e.g.*, *United States v. Taylor*, 142 S. Ct. 2015, 2024 (2022) (recognizing that in interpreting federal statutes, courts

"do not lightly assume Congress adopts two separate clauses in the same law to perform the same work").

Thus, the phrase "otherwise make unavailable or deny" in Section 3604(a) must be read to reach not only those who sell or rent property but also "those who, in practical effect, assisted in those transactions of ownership and disposition." *Michigan Prot. & Advoc. Serv., Inc. v. Babin*, 18 F.3d 337, 345 (6th Cir. 1994). And the surrounding text further supports this reading of Section 3604(a). For instance, this Court has expressly rejected attempts to construe the phrase "with respect to the sale or rental of a dwelling" in Section 3604(c) as "appl[ying] only to dwelling owners or their agents." *United States v. Space Hunters, Inc.*, 429 F.3d 416, 424 (2d Cir. 2005); *see also Fair Hous. Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1219 (9th Cir. 2012) (stating that it is "quite clear" that Section 3604(c) would apply to a third-party website that facilitated discrimination among people seeking prospective roommates if roommate discrimination were prohibited by the FHA). Read in context then, the most natural reading of Section 3604(a) is one that applies broadly to actions by public and private entities that "affect the housing market for minorities." *Jackson v. Okaloosa Cnty.*, 21 F.3d 1531, 1542 & n.17 (11th Cir. 1994) (collecting cases).

2. Consistent with the statute's text, courts have consistently held that non-housing providers may be liable under Section 3604(a). *See, e.g.*, *Casa Marie, Inc.*

*v. Superior Ct. of P.R. for Dist. of Arecibo*, 988 F.2d 252, 257 n.6 (1st Cir. 1993) (explaining that the FHA "may proscribe discriminatory acts by persons who are neither sellers nor lessors of property"). To this end, courts have routinely found that conduct by non-housing providers—including mortgage redlining, municipal land use practices, racial steering, homeowner's insurance, and appraisals—may effectively make housing unavailable. *See, e.g.*, *Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir.), *as amended* (Apr. 30, 2010) (collecting cases holding that the FHA applies to homeowner's insurance); *Hanson v. Veterans Admin.*, 800 F.2d 1381, 1386 (5th Cir. 1986) (holding that a discriminatory appraisal may effectively make housing unavailable); *McDiarmid v. Economy Fire & Cas. Co.*, 604 F. Supp. 105, 107 (S.D. Ohio 1984) (collecting cases about the FHA's application to the denial of services in a variety of contexts).

In so holding, courts have explicitly recognized that non-housing providers make housing unavailable when their conduct deprives people of access to some prerequisite for obtaining housing. For instance, in *NAACP v. American Family Mutual Insurance Co.*, the NAACP sued an insurance company, alleging that it had violated the FHA by charging higher rates and declining to write insurance for people who lived in certain areas. 978 F.2d 287, 291 (7th Cir. 1992). The NAACP argued that the refusal to provide insurance makes a dwelling unavailable because lenders require borrowers to secure property insurance. *Id.* at 297. The Seventh

Circuit agreed, relying on straightforward logic:  "No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable."  *Ibid.*  Furthermore, the court explained, Section 3604 "omits reference to any person," so there is no reason to "distinguish insurers from other[]" parties that affect housing.  *Id.* at 299.

The Sixth Circuit reached a similar conclusion in *Nationwide Mut. Ins. Co. v. Cisneros*, which involved a challenge by a pair of insurance companies to HUD's authority to regulate homeowners' insurance under the FHA.  52 F.3d 1351, 1354 (6th Cir. 1995).  The insurers challenged a HUD regulation that interpreted Sections 3604(a) and (b) to prohibit property insurers from discriminating on the basis of race.  24 C.F.R. 100.70(d)(4).  The insurers argued that the regulation exceeded HUD's authority because the phrase "'otherwise make unavailable or deny' must only include activities that directly affect the availability of a dwelling."  *Cisneros*, 52 F.3d at 1357.  Citing the FHA's broad purpose, the Sixth Circuit rejected this argument and held that "HUD's interpretation of the [FHA] is consistent with the goals of the [FHA] and a reasonable interpretation of the statute."  *Id.* at 1360.

Critically, in both *American Family* and *Cisneros*, the courts recognized that property insurers have the power to make housing unavailable even though other participants in the home-selling process—namely, the lender and the homeowner—exercise independent power to block any given sale.  Indeed, the

- 16 -

insurers' influence over housing availability is entirely contingent on the fact that lenders require all borrowers to purchase such insurance. Nevertheless, the fact that lenders have the power to unilaterally change or relax their insurance-purchasing requirements did not render the insurers' role in the process so attenuated as to fall beyond the reach of Section 3604(a). *See, e.g.*, *National Fair Hous. All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 29 (D.D.C. 2017) (collecting cases holding that "insurers—including insurers who sell products to landlords—can be held liable under the FHA").

3. A prospective tenant's failure to obtain a positive tenant-screening report can have the same effect of making housing unavailable as a prospective homebuyer's failure to obtain insurance. It is increasingly common for landlords to use tenant-screening companies to conduct background checks on a rental applicant's criminal history. *See* Shivangi Bhatia, *To "Otherwise Make Unavailable": Tenant Screening Companies' Liability Under the Fair Housing Act's Disparate Impact Theory*, 88 Fordham L. Rev. 2551, 2559 (2020). Like CoreLogic, these companies often provide landlords with a "recommendation" based on the data they obtain. *See id.* at 2560 (citation omitted); Doc. 317, at 10 (explaining that CrimSAFE's tenant-screening reports include decision messages of either "accept" or "decline" (citation omitted)). And they encourage landlords to give these recommendations determinative weight when making their housing

- 17 -

decisions.  *See* Doc. 317, at 8 (noting that CoreLogic marketed CrimSAFE to
landlords as "a robust tool that relieves your staff from the burden of interpreting
criminal search results" which "deliver[s]" a "leasing decision . . . to your staff"
(citation omitted)).  Many landlords—like ArtSpace—do so.  *See id.* at 20-21.
Like insurance, a favorable criminal-background check has, in many cases, become
a prerequisite for housing.  Thus, an adverse recommendation from a tenant-
screening company often does, in practice, make housing unavailable.

Even absent an explicit recommendation to a landlord, a tenant-screening
company's activities can still operate to make housing unavailable in other ways.
If a tenant-screening company provides a landlord with incomplete or inaccurate
information about prospective tenants, or otherwise packages the information in a
way that induces a landlord to disproportionately reject certain kinds of tenants
without sound justifications, then those actions could also make housing
unavailable.  The record in this case suggests that certain CrimSAFE features may
well fall into this category.  For instance, CrimSAFE allows housing providers to
exclude applicants with non-felony charges up to seven-years old, even if the
person was never convicted.  *See* Doc. 317, at 6, 9-10.  As the HUD 2016
Guidance explains, "[a] housing provider with a policy or practice of excluding
individuals because of one or more prior arrests (without any conviction) cannot
satisfy its burden of showing that such policy or practice is necessary to achieve a

substantial, legitimate, nondiscriminatory interest." HUD 2016 Guidance at 5; *see also* Doc. 194, at 34-35 (recognizing that CrimSAFE's lookback period for charges "allows clients to disqualify innocent people who have been charged but not convicted"). Thus, to the extent that CrimSAFE provides landlords with information that leads those landlords to reject certain prospective tenants unjustifiably (based on misimpressions created by non-felony arrests that did not result in convictions), its conduct may operate to make housing unavailable.

**B.      Instead of focusing on CoreLogic's control over the ultimate housing decision, the district court should have engaged in a standard causation analysis under the FHA.**

1. The case law outlined above makes clear that any person or entity whose actions facilitate discrimination by housing providers (like appraisers) or deprive people of access to some prerequisite that they need to obtain housing (like property insurers) can be held liable under Section 3604(a). Tenant-screening services should be treated the same way under the statute.

Reading Section 3604(a) to reach tenant-screening companies is also consistent with this Court's statement that "[t]he provisions of 42 U.S.C. § 3604 are to be given broad and liberal construction.'" *Cabrera*, 24 F.3d at 388 (quoting *Woods-Drake v. Lundy*, 667 F.2d 1198, 1201 (5th Cir. 1982)); *see also* 42 U.S.C. 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."). And it is consistent

with HUD guidance stating that such companies are covered by Section 3604(a).

*See* HUD 2022 Guidance at 3 (explaining that past FHA guidance on "how to assess claims of illegal discrimination . . . applies to a wide-range of entities covered by the Act, including private landlords, management companies, condominium associations or cooperatives, [and] third-party screening companies," among others).

2.  Given the broad purpose of the FHA, where courts engage in a threshold analysis of whether a non-housing provider is *subject* to the FHA, it should be a low bar.[6]  This is not to say that all non-housing providers will ultimately be *liable* under the FHA.  Even if a court determines that a defendant is subject to the FHA,

---

[6] Tenant-screening companies such as CoreLogic may also be subject to the FHA under 42 U.S.C. 3604(b).  Plaintiffs initially raised a claim under 42 U.S.C. 3604(b), which makes it unlawful "[t]o discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race" or other specified grounds.  Doc. 1, at 49; Doc. 178 (Joint Trial Mem.), at 12.  Although the district court rejected plaintiffs' Section 3604(b) claim on the grounds that CoreLogic does not "set[] the terms, conditions, or privileges of rental" (Doc. 317, at 34), the court overlooked whether CoreLogic discriminates "in the provision of services" in connection with the "sale or rental of a dwelling," 42 U.S.C. 3604(b).  Plaintiffs seem to have abandoned this argument on appeal, but tenant-screening activities likely fall within the broad definition of "services."  *See, e.g.*, *Georgia State Conf. of the NAACP v. City of LaGrange*, 940 F.3d 627, 634 (11th Cir. 2019) (construing "services" in Section 3604(b) to include any "housing-related service that is directly connected to the sale or rental of a dwelling").

- 20 -

the court would still need to address the three-step burden-shifting framework for disparate-impact claims. *See* 24 C.F.R. 100.500(c) (establishing the burdens of proof in discriminatory effects cases). Under this framework: (1) a plaintiff must show that the challenged practice "caused or predictably will cause a discriminatory effect" on a protected class; (2) the burden then shifts to the defendant to show that the "challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests"; and (3) if the defendant satisfies its burden under step two, the plaintiff must then prove that the defendant's interest in "the challenged practice could be served by another practice that has a less discriminatory effect." *Ibid.*; *Mhany Mgmt.*, 819 F.3d at 618-620 (adopting HUD's burden-shifting test).

This framework requires the plaintiff to demonstrate, at the first step, "a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Mhany Mgmt.*, 819 F.3d at 617 (citation omitted). Typically, in evaluating causation, courts examine the relationship between the specific policy or practice that the plaintiff identified and the disparity the plaintiff alleged, often focusing on statistical evidence. *See, e.g.*, *Reyes v. Waples Mobile Home Park Ltd. P'ship*, 903 F.3d 415, 425-426 (4th Cir. 2018). Thus, this framework already has built into it an inquiry into whether

the defendant's practices made housing unavailable or whether the connection between their conduct and the outcome was too attenuated.

Here, in contrast, the district court did not address plaintiffs' disparate-impact claims because it held that CoreLogic was not subject to the FHA as a threshold matter. *See* Doc. 317, at 34. And, in reaching that threshold conclusion, the court only examined the relationship between CoreLogic and its clients in general terms. *See ibid.* This was error.

The burden-shifting framework for disparate-impact claims already adequately ensures that defendants whose practices have only an attenuated relationship to discriminatory effects will not be subject to liability by requiring a showing of causality at the first step. *See Mhany Mgmt.*, 819 F.3d at 617. Because the district court did not apply the proper framework, its analysis of causation did not focus on the particular practices that plaintiffs identified—such as the ways that CoreLogic chose to categorize certain offenses in CrimSAFE or provided landlords with information about traffic accidents, up to 99-year old non-felony convictions, or charges that never resulted in convictions—and whether those specific practices "caused or predictably will cause" racial disparities in the tenants ArtSpace ultimately accepted. Nor did the court examine whether CrimSAFE's pattern of recommendations would, over the course of ArtSpace's use of the

product, result in ArtSpace rejecting a higher proportion of qualified applicants of color than qualified white applicants.

The fact that CoreLogic lacks the power to dictate which applicants ArtSpace ultimately accepts does not mean that CoreLogic's product does not have the practical effect of causing the disparity plaintiffs alleged. Indeed, CoreLogic's entire business model rests on the implicit premise that its tenant-screening services will have at least some influence on landlords' housing decisions; otherwise, its product would have little value. While CoreLogic's inability to control the landlord's final decision is certainly relevant in evaluating causation, it should not be determinative. Rather, if CoreLogic's actions cause or predictably will cause a significant disparate impact on the racial makeup of a property, then that should be enough. *See Babin*, 18 F.3d at 345 (holding that a party may be liable under Section 3604(a) where it "in practical effect[] assisted in" the denial of housing).

This Court should therefore remand for the district court to consider whether the evidence shows that the specific aspects of CrimSAFE that plaintiffs have challenged actually produce (or predictably will produce) the racial disparities they have alleged. In conducting that analysis, the court may examine evidence of how ArtSpace has historically used CrimSAFE's recommendations and search function, how often ArtSpace deviates from CrimSAFE's recommendations, how other

- 23 -

landlords typically use CrimSAFE, and how CoreLogic markets CrimSAFE, among any other relevant factors.

## CONCLUSION

For the foregoing reasons, this Court should vacate the judgment and remand this case with instructions for the district court to apply the proper legal standard to plaintiffs' FHA claim.

Respectfully submitted,

DAMON SMITH
  General Counsel

SASHA SAMBERG-CHAMPION
  Deputy General Counsel for
   Enforcement & Fair Housing

AYELET WEISS
  Assistant General Counsel for Fair
   Housing Enforcement

MARGARET DONAHUE
PAUL OSADEBE
  Attorneys
  U.S. Department of Housing and Urban
  Development
  451 7th Street SW
  Washington, D.C.  20410

KRISTEN CLARKE
  Assistant Attorney General

s/ Yael Bortnick
NICOLAS Y. RILEY
YAEL BORTNICK
  Attorneys
  U.S. Department of Justice
  Civil Rights Division
  Appellate Section
  Ben Franklin Station
  P.O. Box 14403
  Washington, D.C.  20044-4403
  (202) 616-8271

- 24 -

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7)(B)(i) because it contains 5699 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).  This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it was prepared in Times New Roman 14-point font using Microsoft Word for Microsoft 365.

s/ Yael Bortnick
YAEL BORTNICK
 Attorney

Date:  November 24, 2023

## CERTIFICATE OF SERVICE

On November 24, 2023, I filed this brief with the Clerk of the Court by using the CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

s/ Yael Bortnick _____
YAEL BORTNICK
 Attorney