# 23-1118
# 23-1166

**IN THE**
**UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT**

---

CONNECTICUT FAIR HOUSING CENTER and CARMEN ARROYO,
individually and as next friend for Mikhail Arroyo,

*Plaintiffs – Appellants, Cross – Appellees*,

v.

CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,

*Defendant – Appellee, Cross – Appellant.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

---

**BRIEF OF AMICI CURIAE NATIONAL FAIR HOUSING ALLIANCE; FAIR HOUSING JUSTICE CENTER; LONG ISLAND HOUSING SERVICES, INC.; HOUSING OPPORTUNITIES MADE EQUAL, INC.; WESTCHESTER RESIDENTIAL OPPORTUNITIES, INC.; AND CNY FAIR HOUSING, INC. IN SUPPORT OF PLAINTIFFS–APPELLANTS, CROSS–APPELLEES**

---

Yiyang Wu
Zoila Hinson
RELMAN COLFAX PLLC
1225 19th Street, NW Suite 600
Washington, D.C. 20036
(202) 728-1888

*Counsel for Amici Curiae*

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ........................................................1

INTEREST OF *AMICI CURIAE* .....................................................................2

INTRODUCTION AND SUMMARY OF THE ARGUMENT ............................6

ARGUMENT ........................................................................................................9

  I.  Proprietary Tenant Screening Algorithms Increasingly
     Make Applicant Decisions for Housing Providers........................................9

  II. Tenant Screening Algorithms Likely Discriminate on the Basis
     of Race and Ethnicity..................................................................................12

     A. Credit History .......................................................................................13

     B. Criminal Legal Involvement ................................................................14

     C. Evictions................................................................................................17

     D. Unreliable and Incomplete Data ..........................................................19

  III. This Court Should Interpret "Otherwise Make Unavailable" To Effect the
     Broad Remedial Purpose of the FHA. .......................................................22

  IV. Tenant Screening Companies Should Be Held Liable Under the FHA ........25

     A. Tenant Screening Companies Can Make Housing Unavailable in
     Violation of the FHA. ................................................................................25

     B. The District Court Erred in Holding CoreLogic Did Not
     Make Housing Unavailable. .......................................................................29

CONCLUSION ...................................................................................................32

# TABLE OF AUTHORITIES

**Cases**                                                    **Page(s)**

*Cabrera v. Jakabovitz*,
24 F.3d 372 (2d Cir. 1994) ...............................................................26

*Evans v. UDR, Inc.*,
644 F. Supp. 2d 676 (E.D.N.C. 2009) .............................................11

*Ga. State Conf. of NAACP v. City of LaGrange*,
940 F.3d 627 (11th Cir. 2019) .........................................................24

*Gilead Cmty. Servs., Inc. v. Town of Cromwell*,
432 F. Supp. 3d 46 (D. Conn. 2019) ............................................6, 24

*Louis v. SafeRent Sols., LLC*,
No. 22-CV-10800, 2023 WL 4766192 (D. Mass. Jul. 26, 2023) ...............*passim*

*Mhany Mgmt., Inc. v. Cnty. Of Nassau*,
819 F.3d 581 (2d Cir. 2016) ......................................................6, 24, 26

*Nationwide Mut. Ins. Co. v. Cisneros*,
52 F.3d 1351 (6th Cir. 1995) ...................................................6, 24, 26

*Ragin v. New York Times Co.*,
923 F.2d 995 (2d Cir. 1991) ............................................................24

*S & R Dev. Ests., LLC v. Town of Greenburgh, New York*,
336 F. Supp. 3d 300 (S.D.N.Y. 2018) .............................................24

*Saunders v. Gen. Servs. Corp.*,
659 F. Supp. 1042 (E.D. Va. 1987) ..................................................24

*Schroeder v. De Bertolo*,
879 F. Supp. 173 (D.P.R. 1995) .......................................................24

*Sofarelli v. Pinellas Cnty.*,
931 F.2d 718 (11th Cir. 1991) .........................................................24

*Spencer v. Conway*,
No. CV 00-350, 2001 WL 34366573 (C.D. Cal. Jul. 5,2001)...........................26

*Steptoe v. Sav. of Am.*,
    800 F. Supp. 1542 (N.D. Ohio 1992) ...................................................24

*Taylor v. Accredited Home Lenders, Inc.*,
    580 F. Supp. 2d 1062 (S.D. Cal. 2008).............................................24

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*,
    576 U.S. 519 (2015)................................................................8, 9, 22, 24

*Thurmond v. Bowman*,
    211 F. Supp. 3d 554 (W.D.N.Y. 2016)..........................................6, 24

*Trafficante v. Metropolitan Life Ins., Co.*,
    409 U.S. 205 (1972).......................................................................23

*United States v. Mitchell*,
    580 F.2d 789 (5th Cir. 1978) .............................................................26

*United States v. Youritan Const. Co.*,
    370 F. Supp. 643 (N.D. Cal. 1973)....................................................6

*Viens v. Am. Empire Surplus Lines Ins. Co.*,
    113 F. Supp. 3d 555 (D. Conn. 2015)................................................26

## Statutes

Civil Rights Act of 1968, Pub. L. 90-284,
    82 Title VIII Stat. 73, 81-89(1968)....................................................23

Fair Housing Act, 42 U.S.C. § 3601 *et seq.*.......................................*passim*

## Other Authorities

24 C.F.R. § 100.7(a)(1)(i) .......................................................................26

Beiers, Sophie, et al., *Clearing the Record: How Eviction Sealing
    Laws Can Advance Housing Access for Women of Color* (Jan. 10,
    2020), https://www.aclu.org/news/racial-justice/clearing-the-
    record-how-eviction-sealing-laws-can-advance-housing-access-
    for-women-of-color ...............................................................................19

Bhatia, Shivangi, *To "Otherwise Make Unavailable": Tenant Screening Companies' Liability Under the Fair Housing Act's Disparate Impact Theory*, 88 FORDHAM L. REV. 2551 (2020) ..........................21

Blumstein, Alfred, & Kiminori Nakamura,*"Redemption" in an Era of Widespread Criminal Background Checks*, Nat'l Inst. Just. J. (June 2009)........................................................................................16

Boshart, Abbyh, *How Tenant Screening Services Disproportionately Exclude Renters of Color from Housing,* Urban Institute (Dec. 21, 2022), https://housingmatters.urban.org/articles/how-tenant-screening-services-disproportionately-exclude-renters-color-housing...............................................................................21

Broady, Kristen, et al., *An analysis of financial institutions in Black-majority communities: Black borrowers and depositors face considerable challenges in accessing banking services*, BROOKINGS INST. (Nov. 2, 2021), https://brookings.edu/articles/an-analysis-of-financial-institutions-in-black-majority-communities-black-borrowers-and-depositors-face-considerable-challenges-in-accessing-banking-services/.................................................13

Carson, E. Ann, Bureau Just. Stats., U.S. Dep't of Justice, *Prisoners in 2014* tbl. 10 (Sept. 2015), http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5387 .....................................15

Carson, E. Ann, Bureau Just. Stats., U.S. Dep't of Justice, *Prisoners in 2020 – Statistical Tables* tbl. 11 (Dec. 2021), https://bjs.ojp.gov/content/pub/pdf/p20st.pdf.....................................15

Comment Letter, Nat'l Fair Housing. Alli., *Request for Information on Tenant Screening* (May 30, 2023). ...........................................10, 13, 14, 21

Complaint, *FTC v. AppFolio, Inc.*, No. 1:20-cv-03563 (D.D.C.)..........................................................20, 21

Complaint, *FTC v. RealPage, Inc.*, 3:18-cv-02737-N (N.D. Tex.)...........................................................20

Complaint, *FTC v. Transunion Rental Screening Solutions, Inc.,* et al., No. 1:23-cv-2659 (D. Colo.).................................................21

Consumer Fin. Prot. Bureau, *Justice-Involved Individuals and the Consumer Financial Marketplace*, https://files.consumerfinance.gov/f/documents/ cfpb_jic_report_2022-01.pdf.........................................................................20, 21

Consumer Fin. Prot. Bureau, *Tenant Background Checks Market* (Nov. 2022)..................................................................................................*passim*

Consumer Fin. Prot. Bureau, *Who are the credit invisibles? How to help people with limited credit histories* (Dec. 2016), https://files.consumerfinance.gov/f/documents/201612_cfpb_credit _invisible_policy_report.pdf................................................................................13

CoreLogic, Inc., Form 10-K, Exhibit 21.1, (Feb. 20, 2020), https://www.sec.gov/Archives/edgar/data/36047/00000360472000 0015/clgx-12x31x2019xex2111.htm. ............................................................20

Desmond, Matthew, *Evicted* (2016) .......................................................................19

Desmond, Matthew, MacArthur Foundation, *Poor Black Women Are Evicted at Alarming Rates, Setting Off a Chain of Hardship* (Mar. 2014), https://www.macfound.org/media/files/hhm_research_brief_- _poor_black_women_are_evicted_at_alarming_rates.pdf................................18

Eckart, Kim, *Study reveals gender, racial disparities in evictions*, Feb. 11, 2020, https://phys.org/news/2020-02-reveals-gender-racial- disparities-evictions.html.................................................................................18

Entrata, *ResidentVerify*, www.entrata.com/products/residentverify ......................11

Exec. Order No. 14110, 88 Fed. Reg. 75191 (Oct. 30, 2023) ...........................7, 12

Fannie Mae, *Housing Choice Voucher Program Explained* (2022), https://multifamily.fanniemae.com/media/15531/display.................................13

First Advantage, *RightID Brochure*, https://fadv.com/wp- content/uploads/ResidentRightID.brochure.pdf...............................................10

Graetz, Nick, et al., *A comprehensive demographic profile of the US evicted population*, PNAS (Aug. 2023), https://pubmed.ncbi.nlm.nih.gov/37782792/......................................................18

Greenberg, Deena, et al., *Discrimination in Evictions: Empirical Evidence and Legal Challenges,* 51 HARV. C.R.-C.L. REV. 115 (2016). ........................................................18, 19

H.R. Rep. No. 100-711 (1988)...............................................................23

Hepburn, Peter, et al., Eviction Lab, *Racial and Gender Disparities among Evicted Americans*, SOCIO. SCI. 653 (Dec. 16, 2020), https://sociologicalscience.com/download/vol-7/december/SocSci_v7_649to662.pdf. ............................................18

Kerner, Otto, et al., *Report of the National Advisory Commission on Civil Disorders* (1968) ......................................................................23

Killough, Catherine, *How Tenant Screening Algorithms Deepen Housing Disparities*, CHANGEWIRE, Jun. 30, 2023, https://changewire.org/how-tenant-screening-algorithms-deepen-housing-disparities/...........................................................................17

Kirchner, Lauren, & Matthew Goldstein, *How Automated Background Checks Freeze Out Renters*, N.Y. TIMES, May 28, 2020, https://www.nytimes.com/2020/05/28/business/renters-background-checks.html.............................................................17

McBrien, Thomas, et. al., Elec. Priv. Info. Ctr., *Screened and Scored in the District of Columbia* (Nov. 2022), https://epic.org/screened-scored-in-DC/..............................................................................15

MRI Real Estate Software, *Resident Screening*, https://www.mrisoftware.com/products/resident-screening/.................10, 11

Nat'l Tenant Network, *NTN DecisionPoint*, https://ntnonline.com/resident-screening/ntn-decisionpoint .............................11

Office of the Tenant Advocate, *Guide for Eviction*, (Nov. 15), https://ota.dc.gov/page/guide-eviction...............................................18

RealPage, *AI Screening*, https://www.realpage.com/apartment-marketing/resident-screening/ai-screening/.......................................11

RealPage, *Resident Screening*, https://www.realpage.com/apartment-marketing/resident-screening/..............................................................10

vi

Rice, Lisa, President and CEO, Nat'l Fair Hous. All., *Congressional Testimony for the House Finance Services Task Force on Artificial Intelligence's Hearing* (May 7, 2021), https://nationalfairhousing.org/wp-content/uploads/2022/01/Lisa-Rice-House-Testimony-on-AI-5-7-21.pdf.............................................12

Ruiz-Goiriena, Romina, & Kevin Crowe, *"I lost everything": Black women get evicted more than anyone else. A looming eviction crisis will make it worse*, USA TODAY (Apr. 2022), https://www.usatoday.com/in-depth/news/nation/2022/04/04/eviction-rates-black-women-at-risk/6901242001/#:~:text=Black%20women%20renters%20get%20filed,once%20again%20suffer%20the%20most .............................................19

Schneider, Valerie, *Locked Out by Big Data: How Big Data, Algorithms and Machine Learning May Undermine Housing Justice*, 52 COLUM. HUM. RTS. L. REV. 251 (2020)...........................................11

Tesfai, Afomeia, & Kim Gilhuly, Hum. Impact Partners, *The Long Road Home: Decreasing Barriers to Public Housing for People with Criminal Records* (May 2016), https://humanimpact.org/wp-content/uploads/2018/10/OHA-HIA-Final-Report.pdf ....................................15

TransUnion, *ResidentScore*, https://www.transunion.com/product/resident-score..........................................10

Turner, Michael, & Patrick Walker, *Potential Impacts of Credit Reporting Public Housing Rental Payment Data* (Oct. 2019), https://www.huduser.gov/portal/sites/default/files/pdf/Potential-Impacts-of-Credit-Reporting.pdf ........................................................14

U.S. Dep't of Hous. & Urb. Dev., Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions (Apr. 4, 2016), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHA STANDCR.PDF. ............................................................16, 27, 30, 32

U.S. Dep't of Hous. & Urb. Dev., *Urban Landlords and the Housing Choice Voucher Program* (May 2018) ...............................................13

Warren, Cael, Wilder Research, *Success in Housing: How Much Does Criminal Background Matter?* (Jan. 2019), https://www.wilder.org/sites/default/files/imports/AEON_Housing Success_CriminalBackground_Report_1-19.pdf ...............................................16

Wu, Chi Chi, & Ariel Nelson, Nat'l Consumer L. Ctr., *Mission Creep: A Primer on Use of Credit Reports & Scores for Non-Credit Purposes* (Aug. 2022), https://www.nclc.org/images/pdf/credit_reports/ Mission_Creep_rpt.pdf ....................................................................................14

Yardi, *Screening Works Pro*, https://www.yardi.com/products/resident-screening/ ........................................10

## CORPORATE DISCLOSURE STATEMENT

*Amici Curiae* National Fair Housing Alliance; Fair Housing Justice

Center; Long Island Housing Services, Inc.; Housing Opportunities Made Equal,

Inc.; Westchester Residential Opportunities, Inc.; and CNY Fair Housing, Inc.

are all nonprofit organizations. They have no parent corporations and no

publicly held corporation owns a portion of any of them.

## INTEREST OF *AMICI CURIAE*[1]

*Amici Curiae* are nonprofit fair housing organizations that work to ensure equal housing opportunities in their communities and engage in efforts to end residential segregation.

The National Fair Housing Alliance ("NFHA") is a national organization dedicated to ending discrimination and ensuring equal opportunity in housing for all people. Founded in 1988, NFHA is a consortium of 167 private, non-profit fair housing organizations, state and local civil rights agencies, and individuals. NFHA strives to eliminate housing discrimination and ensure equal housing opportunities for all people through leadership, homeownership, credit access, tech equity, education, member services, public policy, community development, and enforcement initiatives. Relying on the Fair Housing Act ("FHA") and other civil rights laws, NFHA undertakes important enforcement initiatives in cities and states across the country and participates as *amicus*

---

[1] Under Federal Rule of Appellate Procedure 29(a)(4)(E), *Amici Curiae* National Fair Housing Alliance; Fair Housing Justice Center; Long Island Housing Services, Inc.; Housing Opportunities Made Equal, Inc.; CNY Fair Housing, Inc.; and Westchester Residential Opportunities certify that no party's counsel authored this brief in whole or in part, that no party or party's counsel contributed money intended to fund the preparation or submission of the brief, and that no person (other than *Amici Curiae,* their members, and their counsel) contributed money intended to fund the preparation or submission of the brief.

2

*curiae* in other cases to further its goal of achieving equal housing opportunities for all.

Fair Housing Justice Center ("FHJC"); Long Island Housing Services, Inc.; Housing Opportunities Made Equal, Inc. ("HOME"); Westchester Residential Opportunities, Inc. ("WRO"); and CNY Fair Housing, Inc. ("CNYFH") are nonprofit, public interest fair housing organizations within the Second Circuit and members of NFHA.

The FHJC is a nonprofit civil rights organization dedicated to eliminating housing discrimination, promoting policies that foster open, accessible, and inclusive communities, and strengthening enforcement of fair housing laws. The FHJC serves all five boroughs of New York City and the seven surrounding New York counties of Dutchess, Nassau, Orange, Putnam, Rockland, Suffolk, and Westchester. The FHJC uses testing and other tools to investigate allegations of housing discrimination. When the FHJC uncovers evidence of discrimination, it files lawsuits and other enforcement actions alleging violations of the FHA, and its interests will be adversely affected if the scope of the FHA is limited to exempt tenant screening companies.

Long Island Housing Services, Inc. is an over 50-year-old civil rights organization focused on fair housing. It provides fair housing education,

3

advocacy, counseling, investigation and enforcement in Suffolk and Nassau counties in New York. Long Island Housing Services' mission is the elimination of unlawful housing discrimination and promotion of decent and affordable housing through advocacy and education. Its enforcement activities are bolstered by the broad scope of the FHA and would be hindered if that scope were artificially narrowed to exclude tenant screening companies that influence housing decisions.

HOME is a nonprofit corporation organized and existing under the laws of New York State with its principal place of business located in Buffalo, New York. HOME provides comprehensive fair housing services in Erie, Niagara, Cattaraugus, Chautauqua, Genesee, Wyoming, and Orleans Counties, all of which are within the Second Circuit. Founded in 1963, HOME's mission is to promote the value of diversity and ensure all people an equal opportunity to live in the housing and communities of their choice through education, advocacy, the creation of housing opportunities, and the enforcement of fair housing laws through investigating allegations of housing discrimination and taking necessary legal action to counteract and eliminate discriminatory practices. HOME's enforcement work is strengthened by the broad scope of the FHA in general and the "otherwise make unavailable" housing provision in particular.

4

WRO is a New York nonprofit corporation with its principal place of business in White Plains, New York. It is the mission of WRO to promote equal, affordable and accessible housing opportunities for all residents in the region in which it operates, all of which is within the Second Circuit. To achieve its mission, WRO's fair housing department provides education about fair housing rights and responsibilities, conducts investigations of allegations of housing discrimination, conducts systemic testing for fair housing violations, and enforces the fair housing laws. WRO uses the broad scope of the prohibition on otherwise making housing unavailable in its enforcement work.

CNYFH is a non-profit organization located in Syracuse, New York. CNYFH is dedicated to eliminating housing discrimination, promoting open communities, and ensuring equal access to housing opportunity for all people in Central and Northern New York. CNYFH engages in a variety of research, education, and enforcement activities in service of this mission. Among other work, CNYFH provides fair housing education to renters and housing providers, advocates for local and state housing policies to promote residential integration and improve access to housing, investigates allegations of housing discrimination through testing and other means, and brings fair housing enforcement actions in federal and state courts.

5

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

The Fair Housing Act (the "FHA"), 42 U.S.C. §§ 3601-3619, is a far-reaching federal civil rights law that protects individuals from housing discrimination and seeks to eradicate systemic discrimination throughout the United States. Among other prohibitions, Section 3604(a) of the FHA makes it unlawful to "otherwise make unavailable" housing to a person because of their race, color, sex, familial status, or national origin.[2] The "making housing unavailable" provision of the FHA has been broadly construed to reach "every practice which has the effect of making housing more difficult to obtain on prohibited grounds."[3] The statute prohibits, for example, actions that result in the delay and discouragement of housing and it may extend to all actors involved in a housing transaction, not just owners or agents.[4]

With this appeal, the Second Circuit will become the first court of appeals to address whether and under what conditions a tenant screening company makes housing unavailable within the meaning of § 3604(a). Within the housing industry, tenant screening products are rapidly growing and highly influential. In

---

[2] 42 U.S.C. § 3604(a).
[3] *Thurmond v. Bowman,* 211 F. Supp. 3d 554, 564 (W.D.N.Y. 2016).
[4] *Gilead Cmty. Servs., Inc. v. Town of Cromwell,* 432 F. Supp. 3d 46, 72 (D. Conn. 2019); *United States v. Youritan Const. Co.,* 370 F. Supp. 643, 648 (N.D. Cal. 1973); *Nationwide Mut. Ins. Co. v. Cisneros,* 52 F.3d 1351, 1360 (6th Cir. 1995); *see also Mhany Mgmt., Inc. v. Cnty. Of Nassau,* 819 F.3d 581, 600 (2d. Cir. 2016).

October 2023, the White House highlighted the risks of tenant screening products in its Executive Order on the Safe, Secure, and Trustworthy Development and Use of Artificial Intelligence.[5] This Court's decision must consider the potential for tenant screening products to thwart the FHA's purposes and precedent.

Here, the critical question is whether a tenant screening product makes housing more difficult to obtain. For two interrelated reasons, tenant screening products are likely to impose barriers to housing access on the basis of protected characteristics. First, the tenant screening industry increasingly relies on proprietary products, algorithms, and models that make recommendations to housing providers about whether to accept applicants. These products, algorithms, and models often contain inputs that discriminate against Black and Latino applicants on the basis of race and ethnicity. Specifically, although tenant screening companies rarely disclose the exact data on which their algorithms rely, they often include an applicant's credit history, involvement with the criminal legal system, and eviction history—all of which have both have a disproportionate negative effect on Black and Latino applicants and fail to accurately predict

---

[5] Exec. Order No. 14110, 88 Fed. Reg. 75191, 75213 (Oct. 30, 2023) (hereinafter, "AI EO") (recommending that the Secretary of Housing and Urban Development and the Director of the Consumer Financial Protection Bureau issue guidance regarding tenant screening systems).

successful tenancy. In other words, tenant screening algorithms include
discriminatory, unjustified inputs, yet the companies shroud their algorithms in
secrecy and offer allegedly clean "recommendations" to housing providers
identifying allegedly "safe" renters.

Second, tenant screening products also complicate housing providers'
obligations under the FHA. Tenant screening companies often market themselves
as taking the applicant decision *away* from housing providers; they even vouch to
housing providers that the providers will be protected from FHA exposure. This
raises the concern that housing providers will point to the products and disclaim
their own role in making housing decisions. Worse, tenant screening companies
can make it more difficult for housing providers to independently assess
applications. With limited insight into what factors a tenant screening company
uses, the weight it assigns those factors, or the operations of its model, housing
providers can be blocked from independently assessing the algorithmic
recommendation. Even when a housing provider *can* conduct an assessment, it
may still defer to or be influenced by the recommendation of the tenant screening
product—particularly one that has been advertised to ensure FHA compliance.

The Supreme Court has repeatedly held that the FHA has broad language
and an expansive remedial purpose. This includes its interpretation, in *Texas*

8

*Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, of § 3604(a)'s prohibition on making housing unavailable.[6] Under that broad language, a tenant screening company makes housing unavailable at least[7] when it offers a recommendation or applicant score to a housing provider that impedes an applicant from obtaining housing, while making it more difficult for the housing provider to conduct a fully-informed, independent applicant review. Because CrimSAFE makes housing unavailable, the Court should reverse the District Court's determination that Defendant-Appellee CoreLogic Rental Property Solutions, Inc. ("CoreLogic") is not subject to the FHA.

## ARGUMENT

### I. Proprietary Tenant Screening Algorithms Increasingly Make Applicant Decisions for Housing Providers.

The modern tenant screening industry began in the 1990s as the digitization of court records and credit information allowed tenant screening companies and data brokers to build private databases of information about prospective tenants.[8] The products offered by tenant screening companies vary widely; they include raw data on eviction and criminal history, "proprietary risk scores based on underlying

---

[6] 576 U.S. 519, 534 (2015).

[7] *Amici* do not contend these are the *only* circumstances under which a tenant screening company makes housing unavailable, but rather address the conditions relevant to the CrimSAFE product.

[8] Consumer Fin. Prot. Bureau, *Tenant Background Checks Market* 10-11 (Nov. 2022) (hereinafter, "*Tenant Background Checks Market*").

data scraped from various third-party sources," and "express recommendations" about applicants.[9] According to a 2019 estimate from an industry research firm, tenant screening services generated approximately $1.3 billion in revenue annually and had grown by 3.3 percent over the five preceding years.[10]

Tenant screening companies that offer scores or recommendations claim to eliminate uncertainty in identifying tenants and to help housing providers avoid costly outcomes.[11] For example, CoreLogic advertised the removal of "human bias or judgment" as a "benefit" of its CrimSAFE product, at issue here.[12]

Some companies further claim that their products can shield housing providers from FHA liability. CoreLogic advertised CrimSAFE as "[i]mprov[ing]

---

[9] Comment Letter, Nat'l Fair Hous. All., *Request for Information on Tenant Screening* 3 (May 30, 2023) (hereinafter, "NFHA Comment Letter").

[10] *Tenant Background Checks Market* at 10.

[11] *Id.* at 11; *see also* MRI Real Estate Software, *Resident Screening*, https://www.mrisoftware.com/products/resident-screening/ ("Gain peace of mind with accurate, AI-powered screening"); TransUnion, *ResidentScore*, https://www.transunion.com/product/resident-score ("Better determine the likelihood of evictions with a scoring model made specifically for the MultiFamily industry"); RealPage, *Resident Screening*, https://www.realpage.com/apartment-marketing/resident-screening/ ("Less Fraud, Less Risk, Less Expense"); First Advantage, *RightID Brochure*, https://fadv.com/wp-content/uploads/ResidentRightID.brochure.pdf ("You can have it all – fight fraud and attract quality residents with an intuitive user-friendly experience"); Yardi, *Screening Works Pro*, https://www.yardi.com/products/resident-screening/ ( "Minimize Risk With Analytics").

[12] Dkt. 116-23.

Fair Housing compliance,"[13] and provided CrimSAFE customers with a certificate of Fair Housing Act compliance.[14] Such claims are common.[15]

Despite these claims, the Consumer Financial Protection Bureau was unaware of any "objective validation of tenant screening company models" or detailed explanations of their operation as of November 2022.[16] Instead, tenant screening products are often shrouded in mystery.

Companies increasingly offer a proprietary algorithmic risk score or recommendation to approve or reject an application.[17] The housing provider typically receives only the score or recommendation; it receives minimal information about the factors relied on or the operation of the model.[18] For example, CoreLogic offers a product that issues an "accept/decline/conditional

---

[13] Dkt. 116-23.

[14] Dkt. 116-37; *see also* Dkt. 116-10 (claiming "Fair Housing compliance is optimized" with CoreLogic's products' use).

[15] MRI Real Estate Software, *Resident Screening*, https://www.mrisoftware.com/products/resident-screening/ ("ensur[e] you're in compliance with the Fair Housing Act"); RealPage, *AI Screening*, https://www.realpage.com/apartment-marketing/resident-screening/ai-screening/ (claiming "Fair Housing Compliance" as a benefit); Entrata, *ResidentVerify*, www.entrata.com/products/residentverify ("Reduce risk of compliance violations"); Nat'l Tenant Network, *NTN DecisionPoint*, https://ntnonline.com/resident-screening/ntn-decisionpoint ("All of our tools have been designed to ensure…complian[ce] with Fair Housing Laws.").

[16] *Tenant Background Checks Market* at 41; *see also id.* at 40.

[17] *See generally* Valerie Schneider, *Locked Out by Big Data: How Big Data, Algorithms and Machine Learning May Undermine Housing Justice*, 52 COLUM. HUM. RTS. L. REV. 251 (2020); *see e.g.*, *Evans v. UDR, Inc.*, 644 F. Supp. 2d 676, 677 (E.D.N.C. 2009).

[18] *See Tenant Background Checks Market* at 40.

11

decision" based on a proprietary "SafeRent Score."[19] Housing providers can select a minimum SafeRent Score and a range to "accept with conditions," but CoreLogic does not disclose the weight assigned to any factors or the sources of its data; housing providers cannot change its algorithm.[20]

## II.  Tenant Screening Algorithms Likely Discriminate on the Basis of Race and Ethnicity.

The opacity of tenant screening models exacerbates the likelihood of discrimination. President Biden's recent Executive Order about artificial intelligence expressly recognized the possibility that tenant screening systems may violate the FHA.[21]

Algorithms frequently reproduce historical injustices.[22] As discussed below, tenant screening companies often rely on factors including credit scores, past involvement with the criminal legal system, and eviction records. These factors

---

[19] *Louis v. SafeRent Sols., LLC*, No. 22-CV-10800, 2023 WL 4766192, at *2 (D. Mass. Jul. 26, 2023) ("*SafeRent*"). CoreLogic is now known as SafeRent.

[20] *Id*.

[21] AI EO at 75213 (noting the dangers of tenant screening systems and their use of criminal records, eviction records, and credit information).

[22] *See, e.g.*, Lisa Rice, President and CEO, Nat'l Fair Hous. All., *Congressional Testimony for the House Finance Services Task Force on Artificial Intelligence's Hearing* 4-8 (May 7, 2021), https://nationalfairhousing.org/wp-content/uploads/2022/01/Lisa-Rice-House-Testimony-on-AI-5-7-21.pdf.

both fail to accurately predict rental outcomes and have disproportionate negative

effects on Black and Latino applicants.[23]

### A. Credit History

Many tenant screening companies, including CoreLogic through its

SafeRent product, offer a tenant recommendation based in part on applicants'

credit history.[24] Credit-based screenings disproportionately negatively affect Black

and Latino applicants. In 2021, the average credit score for white consumers was

more than fifty points higher than that for Black consumers and more than thirty

points higher than that for Latino consumers.[25] Further, Black and Latino

consumers are more likely to have no credit history or insufficient history to

generate a credit score.[26]

---

[23] In contrast, tenant screening companies ignore housing voucher income, *see, e.g.*, *SafeRent*, 2023 WL 4766192, at *2, which is directly relevant to a tenant's ability to pay rent, more secure and reliable than other forms income, *see* U.S. Dep't of Hous. & Urb. Dev., *Urban Landlords and the Housing Choice Voucher Program* 26 (May 2018), and disproportionately benefits people of color, Fannie Mae, *Housing Choice Voucher Program Explained* (2022), https://multifamily.fanniemae.com/media/15531/display.

[24] *SafeRent*, 2023 WL 4766192, at *2; *see* NFHA Comment Letter at 6-7.

[25] Kristen Broady, et al., *An analysis of financial institutions in Black-majority communities: Black borrowers and depositors face considerable challenges in accessing banking services*, BROOKINGS INST. (Nov. 2, 2021), https://brookings.edu/articles/an-analysis-of-financial-institutions-in-black-majority-communities-black-borrowers-and-depositors-face-considerable-challenges-in-accessing-banking-services/.

[26] Consumer Fin. Prot. Bureau, *Who are the credit invisibles? How to help people with limited credit histories* 4 (Dec. 2016), https://files.consumerfinance.gov/f/documents/201612_cfpb_credit_invisible_policy_report.pdf.

At the same time, there is no quantitative evidence that credit scores help predict successful tenancy.[27] To the contrary, credit scores ignore information that is likely predictive of successful tenancy such as past rental payments and tenancy[28] and current income or assets.[29] Research also indicates that people tend to prioritize paying rent over paying other bills and debts.[30] Thus, a poor credit score, which could be based on unpaid consumer debt, will likely overestimate the likelihood an applicant will fail to pay rent. Taken together, this indicates that a tenant screening product's use of credit scores may *decrease* its predictive accuracy.

### B. Criminal Legal Involvement

Tenant screening companies also frequently penalize applicants for past involvement in the criminal legal system, including arrests without convictions.[31] Models that penalize applicants based on criminal records have a disproportionate negative effect on Black and Latino applicants: In 2014, Black men were

---

[27] *See* Chi Chi Wu & Ariel Nelson, Nat'l Consumer L. Ctr., *Mission Creep: A Primer on Use of Credit Reports & Scores for Non-Credit Purposes* 7 (Aug. 2022), https://www.nclc.org/images/pdf/credit_reports/Mission_Creep_rpt.pdf.
[28] Michael Turner & Patrick Walker, *Potential Impacts of Credit Reporting Public Housing Rental Payment Data* 7-8 (Oct. 2019), https://www.huduser.gov/portal/sites/default/files/pdf/Potential-Impacts-of-Credit-Reporting.pdf.
[29] *SafeRent*, 2023 WL 4766192, at *2.
[30] *Tenant Background Checks Market* at 39.
[31] NFHA Comment Letter at 2-3.

14

imprisoned at a rate nearly six times greater than that of non-Latino white men and at a rate nearly three times that of their proportion in the general population.[32] Meanwhile, Latino men were imprisoned at a rate over twice that of non-Latino white men.[33] As the District Court recognized, this trend persists across both arrests and convictions and both nationally and in Connecticut.[34] Arrest and conviction rates are heavily skewed by racism in the criminal legal system.[35] As a result, having a criminal record does not accurately reflect past behavior.

The Department of Housing and Urban Development has issued guidance that past criminal legal involvement has limited value as a predictor of future housing outcomes and that categorical bans on applicants with arrest or criminal

---

[32] E. Ann Carson, Bureau Just. Stats., U.S. Dep't of Justice, *Prisoners in 2014* tbl. 10 (Sept. 2015), http://www.bjs.gov/index.cfm?ty=pbdetail&iid=5387; *see also* E. Ann Carson, Bureau Just. Stats., U.S. Dep't of Justice, *Prisoners in 2020 – Statistical Tables* tbl. 11 (Dec. 2021), https://bjs.ojp.gov/content/pub/pdf/p20st.pdf.

[33] Carson, *Prisoners in 2014*, *supra* note 32 at tbl. 10.

[34] Dkt. No. 194, Mem. of Decisions on Mots. for Summ. Judgment, at 2 (hereinafter, "Summ. Judgment Order"), reported as *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, 478 F. Supp. 3d 259 (D. Conn. 2020).

[35] For example, one study found that Black residents were arrested seven times more often than white residents for opioid related offenses, even though drug offenses are committed at roughly equal rates across races. Thomas McBrien, et. al., Elec. Priv. Info. Ctr., *Screened and Scored in the District of Columbia* 15 (Nov. 2022), https://epic.org/screened-scored-in-DC/; *see also* Afomeia Tesfai & Kim Gilhuly, Hum. Impact Partners, *The Long Road Home: Decreasing Barriers to Public Housing for People with Criminal Records* 5 (May 2016), https://humanimpact.org/hipprojects/the-long-road-home-decreasing-barriers-to-public-housing-for-people-with-criminal-records/.

15

records without individualized reviews will likely violate the FHA.[36] Indeed,

research found eleven out of fifteen categories of criminal offenses did not appear

to predict negative housing outcomes at all.[37] Although offenses "*may contribute* to

negative housing outcomes," any impact "declines rapidly over time; the impact of

a misdemeanor becomes insignificant after 2 years, while felonies become

insignificant after 5 years," and even that effect may be overstated.[38] And there is

no justification for excluding applicants based on arrests, which do not prove past

misconduct.[39] In sum, past criminal behavior is of limited utility in predicting

future housing outcomes—and that utility varies significantly by offense and drops

away rapidly over time.[40]

    This case encapsulates the problems with overly-punitive screening based on

an applicant's criminal record. Mikhail Arroyo's criminal record consisted of a

single charge (without conviction) alleging he stole merchandise worth less than

---

[36] *See* U.S. Dep't of Hous. & Urb. Dev., Office of General Counsel Guidance on Application of Fair Housing Act Standards to the Use of Criminal Records by Providers of Housing and Real Estate-Related Transactions at 5-7 (Apr. 4, 2016) (hereafter "2016 HUD Guidance"), https://www.hud.gov/sites/documents/HUD_OGCGUIDAPPFHASTANDCR.PDF.

[37] Cael Warren, Wilder Research, *Success in Housing: How Much Does Criminal Background Matter?* 15 (Jan. 2019), https://www.wilder.org/sites/default/files/imports/AEON_HousingSuccess_CriminalBackground_Report_1-19.pdf.

[38] *Id.* at 15, 22; *see also* Alfred Blumstein & Kiminori Nakamura, *"Redemption" in an Era of Widespread Criminal Background Checks*, Nat'l Inst. Just. J. 10-14 (June 2009).

[39] 2016 HUD Guidance at 5.

[40] 2016 HUD Guidance at 7.

$150; the charge was below the level of a misdemeanor. It is undisputed that Mr. Arroyo became significantly disabled in an accident in July 2015 and consequently could not pose a safety risk.[41] Nevertheless, the housing provider received a "CrimDecision" that CoreLogic had found disqualifying criminal records and consequently rejected his application to live with his mother/caregiver.[42]

Without CoreLogic's product, the housing provider likely would have engaged in an independent assessment of Mr. Arroyo's application and likely would have considered the negligible safety risk he posed. But CrimSAFE acted in the housing provider's stead. Far from protecting the safety of other tenants, CoreLogic arbitrarily shut Mr. Arroyo, a Latino man, out of housing.

### C. Evictions

Tenant screening companies commonly penalize applicants with past evictions and eviction filings.[43] Tenant screening based on evictions records likewise disproportionately negatively impacts Black and Latino renters, particularly Black and Latino women. The Eviction Lab at Princeton University

---

[41] Summ. Judgment Order at 2.
[42] *Id.* at 15-16.
[43] Lauren Kirchner & Matthew Goldstein, *How Automated Background Checks Freeze Out Renters*, N.Y. TIMES, May 28, 2020, https://www.nytimes.com/2020/05/28/business/renters-background-checks.html; Catherine Killough, *How Tenant Screening Algorithms Deepen Housing Disparities*, CHANGEWIRE, Jun. 30, 2023, https://changewire.org/how-tenant-screening-algorithms-deepen-housing-disparities/.

17

analyzed millions of court records and found that rates for eviction filings and

successful evictions were significantly higher for Black renters than for white

renters and that Black and Latina women face higher eviction and filing rates than

their male counterparts.[44] A separate study in Washington state found that eviction

rates among Black and Latino renters are almost seven times higher than for white

renters.[45] Still other research has confirmed that Black women are more likely to be

evicted than any other demographic group.[46]

      As with credit scores, there is no independent evidence that a past eviction

or eviction filing accurately predicts an applicant will not be a successful tenant.

Indeed, an eviction does not even prove that the applicant has had an unsuccessful

tenancy: tenants can be evicted for many reasons, including a landlord's decision

to sell or renovate a unit[47] or because the tenant has been a victim of domestic

---

[44] Peter Hepburn, et al., Eviction Lab, *Racial and Gender Disparities among Evicted Americans*, SOCIO. SCI. 653, 657, 659 (Dec. 16, 2020), https://sociologicalscience.com/download/vol-7/december/SocSci_v7_649to662.pdf; *see also* Nick Graetz, et al., *A comprehensive demographic profile of the US evicted population*, PNAS 1, 3 (Aug. 2023), https://pubmed.ncbi.nlm.nih.gov/37782792/.

[45] Kim Eckart, *Study reveals gender, racial disparities in evictions*, PHYS.ORG, Feb. 11, 2020, https://phys.org/news/2020-02-reveals-gender-racial-disparities-evictions.html.

[46] *See generally* Matthew Desmond, MacArthur Foundation, *Poor Black Women Are Evicted at Alarming Rates, Setting Off a Chain of Hardship* (Mar. 2014), https://www.macfound.org/media/files/hhm_research_brief_-_poor_black_women_are_evicted_at_alarming_rates.pdf; Hepburn, *supra* n.44 at 657–59; Deena Greenberg, et al., *Discrimination in Evictions: Empirical Evidence and Legal Challenges*, 51 HARV. C.R.-C.L. REV. 115, 120 (2016).

[47] *See, e.g.*, Office of the Tenant Advocate, *Guide for Eviction*, (Nov. 15, 3:04 PM), https://ota.dc.gov/page/guide-eviction.

violence[48]—and can be evicted for no reason at all if the tenancy is at-will or the lease has expired.[49] The mere fact of an eviction filing shows even less. Further, research indicates that racial and ethnic differences in evictions result in significant part from racism by landlords.[50] An ACLU study found that Black women renters were three times more likely than white renters to have an eviction filing that ultimately resulted in a dismissal, indicating that Black female renters are more likely to face evictions that were illegal or unjustified.[51] Without evidence that evictions predict future housing outcomes, the fact that an eviction does not necessarily reflect past misconduct makes its predictive value even more suspect.

### D. Unreliable and Incomplete Data

In addition to these discriminatory factors, tenant screening companies fail to ensure the accuracy, integrity, and completeness of the records on which they

---

[48] Matthew Desmond, *Evicted* 191 (2016).

[49] Greenberg et al., *supra* n. 46 at 120.

[50] For example, Black women are more likely to face eviction even when controlling for the failure to pay rent. Romina Ruiz-Goiriena and Kevin Crowe, *"I lost everything": Black women get evicted more than anyone else. A looming eviction crisis will make it worse*, USA TODAY, April 2022, https://www.usatoday.com/in-depth/news/nation/2022/04/04/eviction-rates-black-women-at-risk/6901242001/#:~:text=Black%20women%20renters%20get%20filed,once%20again%20suffer%20the%20most; *see also* Graetz, *supra* n. 44, at 1, 4.

[51] Sophie Beiers, et al., *Clearing the Record: How Eviction Sealing Laws Can Advance Housing Access for Women of Color* (Jan. 10, 2020), https://www.aclu.org/news/racial-justice/clearing-the-record-how-eviction-sealing-laws-can-advance-housing-access-for-women-of-color.

rely. In turn, these unreliable records compound the algorithms' underlying discrimination.

Inaccuracies in tenant screening companies' data are well-documented. In 2020, AppFolio, Inc. settled Federal Trade Commission charges that it failed to ensure that applicant identifiers reasonably matched the identifiers in the records it purchased from a third-party vendor—CoreLogic Screening Services, LLC,[52] then a sibling corporation to CoreLogic Rental Property Solutions.[53] These "matching" errors may disproportionately impact Black, Latino, and Asian consumers due to the higher incidence of surname clustering in those groups, meaning that higher percentages of those populations share a smaller number of common last names.[54]

The records themselves include numerous inaccuracies. Eviction records "are of notoriously low quality" and frequently include "inaccuracies in who's named on an eviction filing, the outcome of the case, []the relevance of the action,"

---

[52] Complaint, *FTC v. AppFolio, Inc.*, No. 1:20-cv-03563, at 6 (D.D.C.), filed December 8, 2020; *see also* Complaint, *FTC v. RealPage, Inc.*, 3:18-cv-02737-N, at 6-8 (N.D. Tex.), filed October 16, 2018 (describing pervasive matching errors in tenant screening product).

[53] *See* CoreLogic, Inc., Form 10-K, Exhibit 21.1, (Feb. 20, 2020), https://www.sec.gov/Archives/edgar/data/36047/000003604720000015/clgx-12x31x2019xex2111.htm.

[54] *See* Consumer Fin. Prot. Bureau, *Justice-Involved Individuals and the Consumer Financial Marketplace* at 31 (hereinafter "*Justice-Involved Individuals*"), https://www.consumerfinance.gov/data-research/research-reports/justice-involved-individuals-consumer-financial-marketplace/.

and the grounds for eviction.[55] Tenant screening companies also record eviction

information inaccurately, including recording each court filing as a separate

eviction, inaccurately reporting the case disposition, labeling any amount a

landlord sought as a judgment amount, and inappropriately including sealed

records.[56]

Criminal records are no better—they are notoriously outdated, inaccurate,

and incomplete and often fail to disclose if charges were dismissed or dropped.[57]

Tenant screening companies have issued reports with missing or inaccurate

dispositions; with missing or inaccurate offense names, types, or dates; that

included multiple entries for the same conviction;[58] and that include information

prohibited by statute.[59]

The practical consequences are two-fold. First, these inaccuracies exacerbate

underlying racism in tenant screening models. Because Black and Latino

---

[55] Abbyh Boshart, *How Tenant Screening Services Disproportionately Exclude Renters of Color from Housing*, THE URBAN INSTITUTE, December 21, 2022, https://housingmatters.urban.org/articles/how-tenant-screening-services-disproportionately-exclude-renters-color-housing.

[56] Complaint, *FTC v. Transunion Rental Screening Solutions, Inc.,* et al., No. 1:23-cv-2659 (D. Colo.), filed October 18, 2023.

[57] *See* NFHA Comment Letter at 11; Shivangi Bhatia, *To "Otherwise Make Unavailable": Tenant Screening Companies' Liability Under the Fair Housing Act's Disparate Impact Theory*, 88 FORDHAM L. REV. 2551, 2582 (2020).

[58] Complaint, *FTC v. AppFolio, Inc.*, No. 1:20-cv-03563, at 7 (D.D.C.), filed December 18, 2020. The eviction records provided by CoreLogic also included similar errors. *Id.*

[59] *See Tenant Background Checks Market* at 35; *Justice-Involved Individuals* at 32.

applicants are more likely to have eviction or criminal records, records that are

duplicative or that fail to include the disposition are more likely to affect them,

compounding the punitive effects of the initial eviction or criminal record. Second,

tenant screening companies typically do not include the underlying records on

which they rely in their reports.[60] When a tenant screening company does not

provide complete underlying records, a housing provider cannot conduct an

individual applicant review to correct for any bias in the algorithm or overrule the

recommendation. In these cases, the tenant screening company has made housing

unavailable within the meaning of § 3604(a).

## III.     This Court Should Interpret "Otherwise Make Unavailable" To Effect the Broad Remedial Purpose of the FHA.

The FHA's legislative history requires this Court to interpret "otherwise

make unavailable" broadly. The FHA was passed with the intent to dismantle

pervasive housing segregation during a time of widespread protests and urban

inequality. In February 1968, the Kerner Commission released a report that

"identified residential segregation and unequal housing and economic conditions in

the inner cities as significant, underlying causes of the social unrest."[61] It

---

[60] *Tenant Background Checks Market* at 42.

[61] *Inclusive Cmtys Project, Inc.*, 576 U.S. at 529 (citing Otto Kerner et al., *Report of the National Advisory Commission on Civil Disorders* (1968) ("Kerner Report")).

recommended that Congress "enact a comprehensive and enforceable open housing law."[62]

After the assassination of Dr. Martin Luther King, Jr. and the subsequent civil unrest, Congress passed the FHA as Title VIII of the Civil Rights Act of 1968.[63] Congress intended for the FHA "to provide . . . for fair housing throughout the United States."[64] Acknowledging that the most effective way to combat broad social issues like segregated schools was to "attack the segregated neighborhood," Congress concluded that "fair housing is one more step toward achieving equality in opportunity and education[.]"[65] The goal of the FHA was to replace racial segregation with "truly integrated neighborhoods."[66]

Consistent with the FHA's broad language and expansive remedial purpose, the Supreme Court has repeatedly held that the FHA must be given a "generous construction" to carry out a "policy that Congress considered to be of the highest priority."[67] "'[T]he language of the FHA is broad and inclusive,' 'prohibits a wide range of conduct,' 'has a broad remedial purpose,' and 'is written in decidedly far-

---

[62] Kerner Report at 26.
[63] Pub. L. 90-284, 82 Stat. 73, 81-89 (1968).
[64] 42 U.S.C. § 3601; *see also* H.R. Rep. No. 100-711, at 15 (1988) (the FHA "provides a clear national policy against discrimination in housing").
[65] *Id.* at 3421 (statement of Sen. Mondale)).
[66] *Id.* at 3422.
[67] *Trafficante v. Metropolitan Life Ins., Co.*, 409 U.S. 205, 209-12 (1972).

23

reaching terms.'"[68] Thus Courts have applied the FHA to neighbors, management companies, realtors, financiers, lending companies, newspapers, brochures, telecommunication devices, and insurance companies.[69]

In *Texas Department of Housing and Community Affairs v. Inclusive Communities Project, Inc.*, the Supreme Court recognized that "Congress' use of the phrase, 'otherwise make unavailable' refers to the consequences of an action rather than the actor's intent," and that such language functions "as a catchall phrase, looking to consequences, not intent."[70] The provision reaches "every practice which has the effect of making housing more difficult to obtain on prohibited grounds,"[71] including delaying tactics and discouragement,[72] and extends to "other actors who, though not owners or agents, are in a position directly to deny a member of a protected group housing rights."[73] It is against this backdrop that CrimSAFE should be assessed.

---

[68] *Ga. State Conf. of NAACP v. City of LaGrange*, 940 F.3d 627, 631-32 (11th Cir. 2019).

[69] *Sofarelli v. Pinellas Cnty.,* 931 F.2d 718, 722 (11th Cir. 1991); *Taylor v. Accredited Home Lenders, Inc.*, 580 F. Supp. 2d 1062, 1068-69 (S.D. Cal. 2008); *Schroeder v. De Bertolo*, 879 F. Supp. 173, 177 (D.P.R. 1995); *Steptoe v. Sav. of Am.*, 800 F. Supp. 1542, 1546-47 (N.D. Ohio 1992); *Nationwide Mut. Ins. Co.,* 52 F.3d at 1357; *Ragin v. New York Times Co.*, 923 F.2d 995, 999-1000 (2d Cir. 1991); *Saunders v. Gen. Servs. Corp.*, 659 F. Supp. 1042, 1057-59 (E.D. Va. 1987).

[70] 576 U.S. at 534-35; *see also S & R Dev. Ests., LLC v. Town of Greenburgh, New York*, 336 F. Supp. 3d 300, 310 (S.D.N.Y. 2018).

[71] *Thurmond,* 211 F. Supp. 3d at 564 (internal quotation omitted).

[72] *Gilead Cmty. Servs., Inc.*, 432 F. Supp. at 72).

[73] *Nationwide Mut. Ins. Co.*, 52 F.3d at 1360; *see also Mhany Mgmt., Inc.*, 819 F.3d at 600.

24

**IV.** **Tenant Screening Companies Should Be Held Liable Under the FHA**

Given the broad scope and purpose of the FHA and its "making housing unavailable" provision, a tenant screening company makes housing unavailable, and thus is subject to the FHA, whenever its product makes housing more difficult to obtain. CrimSAFE made housing more difficult to obtain for Mr. Arroyo (and numerous other applicants) by, *inter alia*: issuing recommendations that applicants be denied housing, categorizing criminal records information and only allowing a housing provider to screen out complete categories of criminal records; and making an independent housing provider assessment more difficult.

### A. Tenant Screening Companies Can Make Housing Unavailable in Violation of the FHA.

In this context, the critical question for FHA applicability is whether the tenant screening product makes housing more difficult to obtain. Tenant screening products may make housing unavailable in a variety of ways; indeed, the variety and rapid growth of the industry counsel against unnecessarily fashioning overly broad rules. Relevant to this case, a tenant screening product makes housing more difficult to obtain where it provides the housing provider with a score or recommendation to reject a tenant while simultaneously making it more difficult

25

for the housing provider to make a fully-informed, independent decision about applicants.

The FHA's reach is expressly not limited to landlords or other ultimate decisionmakers—as the District Court itself recognized.[74] To the contrary, any person or entity who assists the housing provider[75] or the person seeking housing[76] or otherwise directly affects the housing options available may make housing unavailable, even if a housing provider can theoretically overrule them.[77] Courts have therefore recognized that agents or brokers who "steer" Black homebuyers away from certain communities,[78] municipalities engaged in exclusionary zoning,[79] and insurance companies who deny homeowners insurance in discriminatory ways can all make housing unavailable under § 3604(a).[80] In *SafeRent*, the District of

---

[74] Dkt. No. 317, Mem. of Decision and Order at 43 (hereinafter "MDO"), reported as *Conn. Fair Hous. Ctr. v. CoreLogic Rental Prop. Sols., LLC*, No. 3:18-CV-705, 2023 WL 4669482 (D. Conn. July 20, 2023).

[75] *SafeRent*, 2023 WL 4766192, at *8-*10; *Viens v. Am. Empire Surplus Lines Ins. Co.*, 113 F. Supp. 3d 555, 565-66 (D. Conn. 2015).

[76] *Cabrera v. Jakabovitz*, 24 F.3d 372, 378-79, 390 (2d Cir. 1994); *United States v. Mitchell*, 580 F.2d 789, 791 (5th Cir. 1978) ("The Fair Housing Act prohibits not only direct discrimination but practices with racially discouraging effects; steering evidences an intent to influence the choice of the renter on an impermissible racial basis.").

[77] *Cf. Spencer v. Conway*, No. CV 00-350, 2001 WL 34366573, at *2 (C.D. Cal. Jul. 5 ,2001) (instruction to discriminate given to landlord's employees otherwise makes housing unavailable, even if instruction was not followed); *see also* 24 C.F.R. § 100.7(a)(1)(i) ("A person is directly liable [under the FHA] for…[t]he person's own conduct that *results in* a discriminatory housing practice.") (emphasis added).

[78] *See, e.g. Cabrera*, 24 F.3d at 378-79, 390.

[79] *See, generally, Mhany Mgmt., Inc.*, 819 F.3d 581.

[80] *Nationwide Mut. Ins. Co.*, 52 F.3d at 1360.

26

Massachusetts recently held that another CoreLogic product could otherwise make housing unavailable as well.[81] In other words, a tenant screening product makes housing unavailable so long as it directly makes it more difficult for an applicant to receive housing, even if the housing provider is the ultimate decisionmaker.

Most—if not all—tenant screening products will fail this test. First, as discussed above, tenant screening products offer tenant scores or recommendations that claim to eliminate risk in tenant selection. Second, because tenant screening companies keep their algorithms proprietary and shrouded in secrecy, they fail to give housing providers the information necessary to engage in a meaningful individualized review. Specifically, tenant screening companies routinely fail to provide information necessary for a housing provider to make an independent and fully-informed decision about an applicant, including: (1) the factors on which the tenant screening product relies, (2) the weight given to those factors or how its model operates, (3) the evidence justifying those factors and assigning them that weight, and (4) the records on which the tenant screening company relied.[82] Without disclosure of the specific factors used and the particular operation of the

---

[81] *SafeRent*, 2023 WL 4766192, at *8-*10.
[82] *See supra*, n. 18-20. HUD's guidance regarding the use of criminal records in tenant screening expressly endorsed individual assessments by housing providers as a less discriminatory alternative to categorical bans based on criminal history. 2016 HUD Guidance at 7.

company's model, a housing provider cannot meaningfully assess the tenant
screening company's recommendation. Without the underlying records, the
housing provider would be forced to rely on the company's reports, which
frequently misrepresent the underlying records. Finally, without independent
evidence of the degree to which the algorithm accurately predicts the behavior it
purports to, whether this behavior is relevant to a successful tenancy, and whether
the product has a disparate impact on the basis of a protected characteristic, the
housing provider will not be able to assess the applicant independently and weigh
the value of the recommendation and will likely assume the tenant screening
product does what it claims to do—accurately predict a successful tenancy—even
if there is no evidence to that effect.

Tenant screening companies' routine failure to provide the housing provider
with a full body of information with which to make a housing decision is critical.
Without full disclosure of all four categories of information described above, a
housing provider cannot conduct a fully-informed and independent review of the
tenant screening company's recommendation. And if the housing provider cannot
do so, the tenant screening company is steering the housing decision and should be
subject to the FHA.

### B. The District Court Erred in Holding CoreLogic Did Not Make Housing Unavailable.

This Court should reverse the District Court and hold that CoreLogic's CrimSAFE product otherwise makes housing unavailable. As the District Court recognized, CoreLogic "marketed and sold CrimSAFE as rendering a decision on an applicant's suitability for tenancy based on their criminal history."[83] CoreLogic represented to housing providers that "criminal record search results are evaluated using our own advanced, proprietary technology and an accept/decline leasing decision is delivered to your staff"[84] and that it "render[ed] a decision on an applicant's suitability for tenancy based on their criminal history."[85] When the housing provider asked CoreLogic to review an applicant, CoreLogic issued a "CrimDecision."[86] And CoreLogic's own advertising shows that it intended for the housing provider to rely on the CrimDecision—as the provider did in the case of Mr. Arroyo. CoreLogic clearly provided a product that made it more difficult for Mr. Arroyo to receive housing.

In its bench trial decision, the District Court gave great weight to the fact that housing providers selected the categories of criminal records that were

---

[83] Summ. Judgment Order at 6.
[84] *Id.* at 7.
[85] *Id.* at 34.
[86] *Id.* at 6.

29

disqualifying and the lookback periods.[87] But the District Court did not properly

consider CoreLogic's *own role* in making housing unavailable. CoreLogic—not

the housing provider—created these categories of criminal records.[88] These

categories limited the housing providers' options: a landlord could not modify

what was included in a category or have crimes reclassified. For example, it was

impossible to exclude convictions for vandalism without also excluding

convictions for "traffic accidents involving damage," which CoreLogic's expert

conceded had no relationship to tenancy.[89] This provides a sharp contrast to other

CoreLogic products that provide an applicant's criminal records, but do not filter

or categorize them.[90] Notably, when a housing provider receives unfiltered

criminal records, the FHA prohibits it from categorically excluding applicants the

way CrimSafe does; instead, a housing provider must conduct an individualized

review.[91] There is thus no question that CrimSAFE was a product that steered the

housing provider's decisions, not simply a pass-through.

 CrimSAFE also made it more difficult for a housing provider to conduct an

independent review. CoreLogic did not provide housing providers the complete list

---

[87] MDO at 9-11, 20-21, 23, 35-36.
[88] Summ. Judgment Order at 35-36.
[89] *Id.* at 35-36.
[90] *Id.* at 7.
[91] 2016 HUD Guidance at 5-7.

of crimes in each category, information about how those categories were created,

or evidence that justified lookback periods—including a lookback up to seven

years for an arrest. CoreLogic continued to offer these settings even after it learned

of HUD guidance that excluding applicants on arrests alone violates the FHA.[92]

That certain senior-level managers had access to underlying records does not

change the fact that CoreLogic failed to provide the housing provider sufficient

information to make a fully informed decision. Specifically, CoreLogic never

disclosed (a) the screening factors—*i.e.*, the complete list of crimes in each

category—and (b) any evidence justifying either the categorizations or the

predictive value of any particular criminal record. It is also undisputed that the

underlying criminal records were suppressed from the review of leasing agents, the

staff members most able to conduct an independent review of Mr. Arroyo's renter

profile.[93] Without this information, a housing provider cannot engage in the

individual applicant review required for the housing provider to avoid FHA

---

[92] Summ. Judgment Order at 13.

[93] As Plaintiffs-Appellants' opening brief notes, "Even if a review [by the housing provider] does take place, an adverse CrimSAFE result tends to shape that review, because such a report means the applicant has disqualifying criminal history under that landlord's policy and should not be approved absent some error or grounds for an exception or change to the policy." Br. of Pls-Appellants at 38. To the extent the Court feels bound by the district court's factual findings on this issue, Amici respectfully urge the Court to make clear that tenant screening companies may not escape liability merely by giving a housing provider access to records without a clear showing the housing provider has the information and capacity to conduct a truly independent review.

31

liability.[94] Together, these factors make plain that CrimSAFE, the product, makes it more difficult for an applicant to obtain housing.

Ultimately, CrimSAFE's value lies in taking decision-making away from the housing provider. CrimSAFE "categorizes records for housing providers and simplifies decision-making. Were [CoreLogic's] clients to never use CrimSAFE's…message as a basis for a decision, CrimSAFE logically could not provide [CoreLogic's] claimed benefits."[95] This was critical to the District Court's decision at summary judgment, yet the District Court failed to explain why it became irrelevant after trial. This Court should recognize that the District Court erred in its analysis, reverse its decision, and give CoreLogic the responsibility it repeatedly claimed to its customers it had.

## CONCLUSION

For the reasons above, *Amici Curiae* respectfully urge this Court to rule in favor of Plaintiffs-Appellants.

---

[94] 2016 HUD Guidance at 5-7.
[95] Summ. Judgment Order at 36.

32

Dated: November 30, 2023   Respectfully Submitted,

            */s/ Zoila Hinson*
            Yiyang Wu
            Zoila Hinson
            RELMAN COLFAX PLLC
            1225 19th Street, N.W., Suite 600
            Washington, DC 20036
            Phone: (202) 728-1888
            Fax: (202) 728-0848
            ywu@relmanlaw.com
            zhinson@relmanlaw.com

            *Counsel for Amici Curiae*

33

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rules of Appellate Procedure 29(a)(5) and 32(a)(7) and Local Rules 29(a)(5), 29.1(c) and 32(a)(4)(A) because it contains 6,972 words, excluding the parts of the brief exempted by Rule 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in 14-point Times New Roman font.

*/s/ Zoila Hinson*
Zoila Hinson

## CERTIFICATION OF SERVICE

This brief was electronically filed on November 30, 2023. with the Clerk of

the Court for the United States Court of Appeals for the Second Circuit by using

the appellate CM/ECF system. Participants in the case are registered CM/ECF

users, and service will be accomplished by the appellate CM/ECF system.


*/s/ Zoila Hinson*
Zoila Hinson