# In the
# United States Court of Appeals
## FOR THE SECOND CIRCUIT

————————

AUGUST TERM 2024
Nos. 23-1118(L), 23-1166(XAP)

CONNECTICUT FAIR HOUSING CENTER AND CARMEN ARROYO,
INDIVIDUALLY AND AS CONSERVATOR OF MIKHAIL ARROYO,
*Plaintiffs-Appellants-Cross-Appellees,*

v.

CORELOGIC RENTAL PROPERTY SOLUTIONS, LLC,
*Defendant-Appellee-Cross-Appellant.*[*]

————————

On Appeal from the United States District Court
for the District of Connecticut

————————

ARGUED: NOVEMBER 20, 2024
DECIDED: FEBRUARY 20, 2026

————————

Before:     CABRANES, WESLEY, and MENASHI, *Circuit Judges.*

Plaintiffs Connecticut Fair Housing Center and Carmen Arroyo, for herself and on behalf of her son Mikhail, claimed that Defendant CoreLogic Rental Property Solutions—which reports the

———————————————————

[*] The Clerk of Court is directed to amend the caption as set forth above.

credit and criminal histories of prospective tenants to housing providers—violated the Fair Housing Act when it facilitated the denial of housing based on criminal history because that practice has a disparate impact on African American and Hispanic rental applicants. Arroyo also argued that CoreLogic's policy regarding the disclosure of consumer reports of individuals under conservatorships was inadequate under the Fair Credit Reporting Act and had a disparate impact on handicapped individuals in violation of the Fair Housing Act. The district court concluded that (1) the plaintiffs failed to show CoreLogic was covered by the Fair Housing Act, and (2) CoreLogic violated the Fair Credit Reporting Act because it told Arroyo that she needed to have a power of attorney to request Mikhail's consumer file even though she had a conservatorship over him.

We vacate in part, affirm in part, and reverse in part. First, we conclude that the Connecticut Fair Housing Center lacked standing to bring this suit. "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1563-64 (2024). Second, while we disagree with the district court that the Fair Housing Act excludes certain types of defendants, we nevertheless agree that CoreLogic did not cause the denial of housing in this case. For that reason, Arroyo failed to establish a prima facie case of disparate-impact discrimination. Third, Arroyo provided CoreLogic with a facially invalid copy of the certificate of conservatorship. Because she did not provide valid documentation of a conservatorship even after being informed of the need to do so, she cannot show that CoreLogic's documentation requirements prevented her from obtaining Mikhail's consumer file.

ERIC DUNN, National Housing Law Project, Richmond, VA (Christine Webber, Cohen Milstein Sellers & Toll PLLC, Washington, DC; Greg Kirschner, Connecticut Fair Housing Center, Hartford, CT, *on the brief*), *for Plaintiffs-Appellants-Cross-Appellees*.

TIMOTHY J. ST. GEORGE, Troutman Pepper Hamilton Sanders LLP, Richmond, VA (Jim M. O'Toole, O'Toole + O'Toole PLLC, Hartford, CT, *on the brief*), *for Defendant-Appellee-Cross-Appellant*.

YAEL BORTNICK, Civil Rights Division, U.S. Department of Justice, Washington, DC (Kristen Clarke, Nicolas Y. Riley, Civil Rights Division, U.S. Department of Justice, Washington, DC; Damon Smith, Sasha Samberg-Champion, Ayelet Weiss, Margaret Donahue, Paul Osadebe, U.S. Department of Housing and Urban Development, Washington, DC, *on the brief*), *for Amicus Curiae United States*.

Jennifer L. Sarvadi, Hudson Cook, LLP, Washington, DC, *for Amicus Curiae Consumer Data Association and Professional Background Association*.

Yiyang Wu, Zoila Hinson, Relman Colfax PLLC, Washington, DC, *for Amici Curiae National Fair Housing Alliance, Fair Housing Justice Center, Long Island Housing Services, Inc., Westchester Residential Opportunities, Inc., and CNY Fair Housing, Inc.*

MENASHI, *Circuit Judge*:

Carmen Arroyo ("Arroyo") applied to change apartments in a building managed by WinnResidential, a national residential property management company. WinnResidential and other landlords use screening platforms to gather information about a prospective tenant in order to evaluate the tenant's rental application. One such screening platform is CrimSAFE, a product of CoreLogic Rental Property Solutions, LLC. When WinnResidential receives a rental application, it enters the applicant's information into CrimSAFE and receives a credit and criminal history report. The management of WinnResidential has access to details about the applicant's criminal history, but the on-site property manager will know only whether the applicant's criminal history meets the criteria that WinnResidential has established to disqualify an applicant. WinnResidential ultimately decides whether to accept or to reject an applicant.

Arroyo already lived in the building, but she applied to move into a new apartment with her son Mikhail, who had been injured in a serious accident. WinnResidential rejected Mikhail's application because of his CrimSAFE criminal history report. For over a year following the rejection, Arroyo and WinnResidential negotiated over Mikhail's application. During that time, Arroyo learned that Mikhail's report had identified a pending shoplifting charge in Pennsylvania. She successfully sought the dismissal of the shoplifting charge in Pennsylvania state court. She then reached a settlement with WinnResidential after she—with the assistance of the Connecticut Fair Housing Center ("CFHC")—filed an action alleging housing discrimination with the Connecticut Commission on Human Rights and Opportunities ("CHRO").

Arroyo learned of the pending shoplifting charge from WinnResidential instead of CoreLogic because CoreLogic refused to provide her a copy of Mikhail's CrimSAFE report. Per CoreLogic's policies, Arroyo was required to submit a power of attorney demonstrating that she was authorized to request materials on Mikhail's behalf. Arroyo provided a copy of her certificate of conservatorship over Mikhail, but CoreLogic rejected that document because the copy did not show that the certificate had an impressed seal. Without such a seal, the certificate would be facially invalid.

Arroyo argues that CoreLogic violated the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*, when it provided the CrimSAFE platform that allowed WinnResidential to deny a rental application based on the applicant's criminal history. She claims that such denials have a disparate impact on Hispanic applicants. The CFHC joins her complaint as a plaintiff, alleging the same harm with respect to African American applicants. Arroyo additionally argues that CoreLogic's policy of requiring a third party seeking a consumer file to submit a power of attorney violates the FHA as applied to handicapped individuals who cannot execute a power of attorney but are under a valid conservatorship. She argues that CoreLogic's conduct in this case showed willful noncompliance with the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, because CoreLogic should have accepted Arroyo's conservatorship certificate.

The district court "conducted a ten-day bench trial." *CFHC v. CoreLogic Rental Prop. Sols., LLC*, No. 18-CV-705, 2023 WL 4669482, at *1 (D. Conn. July 20, 2023). It concluded that the FHA does not apply to CoreLogic because CoreLogic did not itself disqualify applicants or make housing unavailable; instead, the housing provider decided what criminal history it considered relevant and whether to disqualify an applicant. *See id.* at *17-20. The district court

additionally held that (1) Arroyo failed to show that CoreLogic had a policy of rejecting record requests based on conservatorship certificates, and (2) it was permissible for CoreLogic to require a conservatorship certificate that was facially valid rather than accept the facially invalid certificate Arroyo provided. *See id.* at *23. The district court nevertheless held CoreLogic liable under the FCRA for making it "impossible" for Arroyo to request Mikhail's report during the period in which it asked for a power of attorney. *Id.*

We vacate in part, affirm in part, and reverse in part. First, the CFHC lacked standing to bring this suit, and the district court erred in holding otherwise. "[A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1563-64 (2024). The CFHC has shown that it committed resources to address the disparate impact it claims that CrimSAFE has on African American applicants, but "[a]n organization cannot manufacture its own standing in that way." *Id.* at 1564. Because the CFHC did not suffer an injury in fact caused by CoreLogic, the district court lacked subject matter jurisdiction over its claim, which should have been dismissed for lack of standing.

Second, while we disagree with the district court that the FHA excludes certain types of defendants, we nevertheless agree that CoreLogic did not cause the denial of housing in this case. For that reason, Arroyo failed to establish a prima facie case of disparate-impact discrimination.

Third, Arroyo provided CoreLogic with a facially invalid copy of the certificate of conservatorship. Because she did not provide valid documentation of a conservatorship even after being informed of the

6

need to do so, she cannot show that CoreLogic's documentation requirements prevented her from obtaining Mikhail's report.

We vacate the judgment insofar as the district court considered the claim of the CFHC on the merits, and we dismiss the CFHC's appeal for lack of standing. We affirm the judgment insofar as the district court held that CoreLogic was not liable to Arroyo under the FHA. And we reverse the judgment insofar as the district court imposed liability on CoreLogic under the FCRA.

## BACKGROUND

Carmen Arroyo is a resident of ArtSpace, a residential building in Windham, Connecticut. At the time the complaint was filed, Arroyo lived there with her son Mikhail who suffered a traumatic brain injury in a 2015 accident. At the time of the accident, however, Arroyo lived alone and therefore was required to apply for Mikhail to join the lease. To facilitate the background check for such an application, WinnResidential, the property manager of ArtSpace, used CoreLogic's screening platform CrimSAFE.

## I

CoreLogic is a company that offers tenant screening products and services to housing providers, including criminal history screening. One of CoreLogic's products is CrimSAFE, a program that searches for criminal records in CoreLogic's database and generates reports based on those records. CoreLogic's database includes records from over 800 jurisdictions across the United States. CoreLogic classifies criminal records into three primary categories: (1) Crimes Against Property, (2) Crimes Against Persons, and (3) Crimes Against Society. Each category includes further sub-classifications.

CrimSAFE filters criminal records based on criteria set by the housing provider. The housing provider determines which records it wants CrimSAFE to identify based on (1) the type of offense, (2) the severity or disposition of the offense (such as a felony conviction, a felony charge, a non-felony conviction, or a non-felony charge), and (3) the age of offense, also called the "lookback period." For convictions, the housing provider may set a lookback period of between zero and ninety-nine years; for charges, it may set a lookback period of between zero and seven years. If CrimSAFE identifies a criminal record based on the housing provider's criteria, the provider receives a report with all available information about the record in the CoreLogic database. The provider decides whether to share with its property managers and staff the full report or a more limited report communicating only whether criminal records were found.

When a housing provider submits a rental application to CrimSAFE, the resulting tenant screening report includes a "lease decision" based on the provider's criteria and the applicant's credit score and criminal history. The housing provider determines the language in the report that accompanies a found criminal record. In Mikhail's case, the report stated: "Please verify the applicability of these records to your applicant and proceed with your community's screening policies." J. App'x 481. Even when CrimSAFE identifies a criminal record, the housing provider may still decide to approve an applicant. If the housing provider elects to deny the application, CrimSAFE can generate an adverse action letter template. The housing provider may customize the letter and decide whether and when to transmit it.

In April 2016, Carmen Arroyo informed the on-site property manager that she wanted to move from her one-bedroom apartment to a two-bedroom apartment so that her son Mikhail could live with her following the accident. The on-site property manager informed Arroyo that she would need to submit Mikhail's information for WinnResidential to conduct a background check. The background check resulted in a report of "Record(s) Found," reflecting a criminal history. *Id.* WinnResidential sent an adverse action letter to the Arroyos explaining that the application was denied based on the CrimSAFE report and that Mikhail had the right to obtain the information in his consumer file. It also indicated that CoreLogic did not make the decision to take the adverse action.

The Arroyos never received the adverse action letter, but Arroyo learned that Mikhail's application was denied from the on-site property manager, who gave her CoreLogic's telephone number. Arroyo contacted both WinnResidential and CoreLogic.

In her conversations with WinnResidential, Arroyo explained that Mikhail was disabled and asked why his application was denied. Management of WinnResidential became involved, and Arroyo asked the CFHC for assistance with Mikhail's application. In December 2016, Arroyo learned from WinnResidential that Mikhail's application had been denied because of a criminal record identified in his CrimSAFE report that related to a pending shoplifting charge in Pennsylvania. Arroyo contacted the court in Pennsylvania about the charge, and in April 2017 she was informed that the charge had been withdrawn. In the meantime, she filed a complaint with the CHRO for a reasonable accommodation for Mikhail from WinnResidential. In its answer to the complaint, WinnResidential

denied that it knew "the exact details as to the denial of each applicant" or "the facts behind the criminal background findings" because it had "trust" in CoreLogic's reports. Answer at 4-5, *CFHC v. CoreLogic Rental Prop. Sols., LLC*, No. 18-CV-705 (D. Conn. Oct. 18, 2019), ECF No. 105-6. The CHRO held an evidentiary hearing on June 13, 2017. Ten days later, WinnResidential allowed Mikhail to move into ArtSpace.

While negotiations with WinnResidential were ongoing, Arroyo asked CoreLogic to provide the details of Mikhail's CrimSAFE report. After Mikhail's application was denied on April 26, 2016, Arroyo called CoreLogic to request Mikhail's file, explaining that she was her son's conservator. CoreLogic sent her a consumer disclosure form. Arroyo submitted an incomplete form on June 24, 2016. Arroyo included a copy of a State of Connecticut Probate Court Certificate of Conservatorship. The certificate included the warning that it was "NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED," but an impressed seal was not visible on the copy. J. App'x 475.

After receiving Arroyo's packet, CoreLogic sent her a letter instructing her to contact the company. Even though it was sent to the address Arroyo listed on the consumer disclosure form, the letter was returned to the sender. CoreLogic's internal note system documented that it could not accept the conservatorship certificate and needed a special authorization for a power of attorney as well as Mikhail's signature. Because she had not heard from the company since sending the form, Arroyo contacted CoreLogic in September 2016. At that time, CoreLogic advised Arroyo that it required a notarized power of attorney from Mikhail and that it could not accept a conservatorship certificate pursuant to its standard policies for third party authorization. Those policies—as recorded in CoreLogic's

Authentication Procedure Guide—explained that CoreLogic could "accept a third party request" in circumstances including "but not limited to" when the third party submits a "[v]alid (including notarization) Power of Attorney." *Id.* at 577. The Authentication Procedure Guide further provided that "[f]or any scenarios not covered in this section, including how to determine if a POA is valid, please reach out to the Supervisor." *Id.*

Arroyo spoke with the attorney handling Mikhail's probate case, who told her that she should not need a power of attorney because a conservatorship affords her broader rights under state law. In fact, it would have been impossible for Arroyo to obtain a power of attorney because Mikhail lacked the capacity to authorize one as a conservatee. On November 1, 2016, she again called CoreLogic to relay the lawyer's advice. The matter was escalated to the legal department at CoreLogic, and two weeks later CoreLogic called Arroyo to inform her that the copy of the conservatorship certificate would be acceptable if the seal were visible. The next day, Arroyo resubmitted the form with the accompanying materials, but the copy of the conservatorship certificate again lacked a visible seal. CoreLogic called Arroyo three times about this submission, but she did not respond. Instead, the CFHC called CoreLogic at Arroyo's request and was informed that the copy of the conservatorship certificate needed a visible seal.

The interaction between Arroyo and CoreLogic was the first and only instance of a "conserved individual who has requested a file disclosure" from CoreLogic. *CFHC v. CoreLogic Rental Prop. Sols., LLC*, 478 F. Supp. 3d 259, 282 (D. Conn. 2020).

## III

Arroyo and the CFHC filed this lawsuit against CoreLogic on April 24, 2018, alleging six causes of action: on behalf of all plaintiffs, (1) discrimination on the basis of race and national origin in violation of the FHA and (2) discrimination on the basis of a handicap in violation of the FHA; on behalf of the Arroyos, (3) discrimination on the basis of a handicap in violation of the FHA and (4) violations of the Connecticut Unfair Trade Practices Act ("CUTPA"); and, on behalf of Mikhail, (5) violations of the FCRA, 15 U.S.C. § 1681g, and (6) violations of the FCRA, 15 U.S.C. § 1681h.

## A

CoreLogic moved for summary judgment on each claim and to dismiss the FHA discrimination claims on behalf of African American applicants because the Arroyos are not African American and the CFHC lacked organizational standing.[1] Arroyo and the CFHC cross-moved for summary judgment on the FCRA claims, the CUTPA

---

[1] CoreLogic also moved to dismiss Arroyo's claims under the FHA as to discrimination on the basis of a handicap and under the CUTPA because she lacked "statutory standing." *CFHC*, 478 F. Supp. 3d at 284-85. The statutory standing inquiry asks whether a plaintiff has interests that "fall within the zone of interests protected by the law invoked," *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129 (2014) (quoting *Allen v. Wright*, 468 U.S. 737, 751 (1984)), and therefore "has a cause of action under the statute," *id*. at 128. That inquiry "does not implicate subject-matter jurisdiction." *Id.* at 128 n.4 (quoting *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 643 (2002)). Because the question is not jurisdictional and CoreLogic has not challenged the decision of the district court that Arroyo falls within the zone of interests, we do not address the issue. *See City of Almaty v. Khrapunov*, 956 F.3d 1129, 1134 (9th Cir. 2020).

claims, and the FHA claims regarding race and national origin. *See CFHC*, 478 F. Supp. 3d at 272-73.

The district court held that the CFHC had standing to pursue its claim under the FHA. According to the district court, organizations that "allege that a defendant's actions have 'frustrated the organization plaintiff's services, with a consequent drain on resources' have standing to bring FHA claims." *Id.* at 286 (alterations omitted) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 369 (1982)). In this case, the CFHC alleged that "the disparate impact of CrimSAFE on African American and Latino applicants frustrates CFHC's mission [of] ensuring that *all* people have equal access to the housing of the[ir] choice." *Id.* And the CFHC has devoted resources to providing "guidance on the use of criminal records" and to revising "its public trainings and presentations to account for [CoreLogic's] policies regarding criminal records." *Id.*

The district court held that Arroyo could not establish that CoreLogic failed to disclose Mikhail's consumer report in violation of the FCRA because the FCRA obligates a consumer reporting agency to require "that the consumer furnish proper identification" before any information is disclosed. 15 U.S.C. § 1681h(a)(1). The required identification must be sufficient to "match consumers with their files" and "commensurate with an identifiable risk of harm arising from misidentifying the consumer." 12 C.F.R. § 1022.123(a). The district court explained that "[w]here state law defines the validity of an identification document," the state-law requirements for establishing validity inform what qualifies as "'proper identification' under the FCRA." *CFHC*, 478 F. Supp. 3d at 307. Under the laws of Connecticut—as the conservatorship certificate stated on its face—a conservatorship certificate is "NOT VALID WITHOUT COURT OF PROBATE SEAL IMPRESSED." *Id.*

The district court concluded, however, that CoreLogic might have "violated its duty under 15 U.S.C. § 1681g by failing to 'provide a statement that the consumer's identity cannot be verified; and directions on how to complete the request, including what additional information or documentation will be required to complete the request, and how to submit such information.'" *Id.* at 308 (alteration omitted) (quoting 12 C.F.R. § 1022.137(a)(2)(iii)(C)). The district court said that this violation might have occurred between the June 2016 internal note that CoreLogic required a power of attorney and the November 2016 decision to accept a conservatorship certificate. *See id.* at 308-09. It therefore granted summary judgment to CoreLogic on the FCRA claim only with respect to conduct preceding June 2016 and following November 2016.

The district court granted summary judgment to CoreLogic on the claim that it violated the FHA by adopting a policy with a disparate impact on the handicapped. The district court concluded that the record did not suggest that CoreLogic had a policy of not allowing conservators to obtain the files of conservatees or of requiring conservators always to submit a power of attorney to receive those files. Instead, CoreLogic had a policy of referring uncommon circumstances—such as a conservatorship—to a supervisor. To the extent that Arroyo argued that CoreLogic should have been clearer about how a conservator could obtain files, the district court concluded that the record did not suggest that CoreLogic had a policy of telling consumers that a power of attorney is required when a conservatorship certificate would suffice.

The district court also granted summary judgment to CoreLogic on the claims that it violated the FHA through disparate treatment on the basis of a handicap and a failure to accommodate. The district court concluded that the record did not suggest that the

policy of supervisory review masked an intent to discriminate against handicapped consumers. The district court further concluded that it would not be a reasonable accommodation for CoreLogic to accept a copy of the conservatorship certificate without a visible seal because the FCRA requires CoreLogic to obtain proper identification, which in this case meant a facially valid certificate. Thus, the district court granted summary judgment to CoreLogic on the FHA handicap claims. But it allowed the FHA claims asserting disparate impact and disparate treatment on the basis of race and national origin—as well as the CUTPA claim—to proceed to trial.

**B**

The district court held a bench trial. To resolve the claims under the FHA, the district court considered the "initial matter" of "whether CoreLogic is subject to the FHA." *CFHC*, 2023 WL 4669482, at *16. It decided that CoreLogic was not subject to the FHA because it had not been shown that CoreLogic "sets the terms, conditions, or privileges of rental," *id.* (referencing 42 U.S.C. § 3604(b)), or "makes unavailable or denies housing," *id*. (alterations omitted) (quoting 42 U.S.C. § 3604(a)). The district court explained that CrimSAFE does not disqualify applicants because the housing provider decides whether to accept or decline an application. The district court further concluded that "[f]or the same reasons that the FHA claims failed, the CUTPA claims relating to the use of CrimSAFE fail." *Id.* at *26. It dismissed as abandoned the CUTPA claims related to the file disclosure. *See id.* at *27.

The district court decided that Arroyo showed a violation of the FCRA for the June to November 2016 period. The district court reiterated that Arroyo never submitted proper identification, *see id.* at *21, but it concluded that CoreLogic was nevertheless liable for

"making it impossible for a consumer to exercise its rights to their consumer file" during the four-month period, *id.* at *23.[2] The district court decided that the violation was willful because CoreLogic adopted policies that "supported the position [set out] by the consumer representatives that they needed a power of attorney." *CFHC*, 2023 WL 4669482, at *24. It was "entirely foreseeable" that a person who might "lack physical and/or mental capacity to make a valid power of attorney" would request records, and "CoreLogic's written policies entirely overlooked this group of people with the effect of denying Mr. Arroyo his right to his consumer report." *Id.* Arroyo did not prove actual damages, however, because there was no evidence that (1) Arroyo would have submitted a valid conservatorship certificate or (2) CoreLogic's delay caused WinnResidential not to move the Arroyos into the two-bedroom apartment. *See id.* at *25. As a result, the district court imposed $1,000 in statutory damages pursuant to 15 U.S.C. § 1681n and treble punitive damages. *See id.* at *26.

Arroyo and the CFHC appealed the judgment insofar as the district court rejected the FHA race and national origin claims at trial and the claims regarding a reasonable accommodation and discrimination on the basis of a handicap at summary judgment. CoreLogic cross-appealed the judgment insofar as the district court imposed liability under the FCRA.

---

[2] The district court did not rely on the regulation it referenced at summary judgment, *see CFHC*, 478 F. Supp. 3d at 308 (citing 12 C.F.R. § 1022.137(a)(2)(iii)(C)), because "the regulation was only raised for the first time in a reply brief without any meaningful analysis of its application to the facts of this case," *CFHC*, 2023 WL 4669482, at *22.

## DISCUSSION

"We review a district court's decision to grant summary judgment *de novo*, resolving all ambiguities and drawing all permissible factual inferences in favor of the party against whom summary judgment is sought." *Garcia v. Heath*, 74 F.4th 44, 47-48 (2d Cir. 2023) (quoting *Burg v. Gosselin*, 591 F.3d 95, 97 (2d Cir. 2010)). "Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Kravitz v. Purcell*, 87 F.4th 111, 118-19 (2d Cir. 2023) (quoting *Doninger v. Niehoff*, 642 F.3d 334, 344 (2d Cir. 2011)).

"On appeal from a judgment after a bench trial, we review the district court's findings of fact for clear error and its conclusions of law *de novo*." *Mayer v. Ringler Assocs. Inc.*, 9 F.4th 78, 84 (2d Cir. 2021) (emphasis added) (quoting *Hartford Roman Cath. Diocesan Corp. v. Interstate Fire & Cas. Co.*, 905 F.3d 84, 88 (2d Cir. 2018)). "The district court's finding of proximate cause is a factual finding that is subject to clear error review." *Liberty Ins. Corp. v. Hudson Excess Ins. Co.*, 147 F.4th 249, 258 (2d Cir. 2025). We will set aside a factual finding only if "we are 'left with the definite and firm conviction that a mistake has been committed.'" *Barrows v. Becerra*, 24 F.4th 116, 135 (2d Cir. 2022) (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)).

## I

Before reaching the merits, we address the threshold issue of whether the CFHC has standing to raise its claim against CoreLogic. The CFHC alleged that CoreLogic discriminates against African American and Hispanic applicants in violation of the FHA. Because it is "a jurisdictional requirement, standing to litigate cannot be waived

or forfeited." *Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951 (2019). We hold that the CFHC lacks standing to raise its discrimination claim.

## A

"Article III of the Constitution limits the jurisdiction of federal courts to 'Cases' and 'Controversies.'" *Murthy v. Missouri*, 144 S. Ct. 1972, 1985 (2024) (quoting U.S. Const. art. III, § 2). By limiting the judicial power to cases or controversies, Article III "confines the federal courts to a properly judicial role." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). For a dispute to qualify as a genuine case or controversy, the plaintiff must have "such a personal stake in the outcome of the controversy as to warrant [its] invocation of federal-court jurisdiction." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (internal quotation marks omitted) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To establish standing to invoke that jurisdiction, the plaintiff "must demonstrate (i) that [it] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *All. for Hippocratic Med.*, 144 S. Ct. at 1555.

"[O]rganizations may have standing 'to sue on their own behalf for injuries they have sustained.'" *Id.* at 1563 (quoting *Havens*, 455 U.S. at 379 n.19). When it sues on its own behalf, the organization must show that "it was directly injured as an organization." *Conn. Parents Union v. Russell-Tucker*, 8 F.4th 167, 172 (2d Cir. 2021).

Two decisions of the Supreme Court address the issue of organizational standing as it arises in this case. In *Havens*, the Supreme Court considered whether a housing organization called HOME had standing to sue under the FHA. HOME, which offered

counseling and referral services, alleged that an owner-operator of apartment complexes had provided false information to HOME as part of the racial steering practices of the owner-operator. *See* 455 U.S. at 368-69. HOME asserted standing to sue on its own behalf, reasoning that (1) it "has been frustrated by [the] defendants' racial steering practices in its effort to assist equal access to housing through counseling and other referral services," and (2) it "has had to devote significant resources to identify and counteract the defendant[s'] racially discriminatory steering practices." *Id.* at 379 (quoting the complaint).

The Supreme Court agreed: "If, as broadly alleged, [the defendants'] steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact." *Id.* The Court reasoned that the "injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

Following the decision in *Havens*, our court held that the "expenditure of resources and frustration of an organization's mission" are sufficient "to establish an injury in fact." *Moya v. DHS*, 975 F.3d 120, 130 (2d Cir. 2020); *see also Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 111 (2d Cir. 2017) ("[W]here an organization diverts its resources away from its current activities, it has suffered an injury that has been repeatedly held to be independently sufficient to confer organizational standing.").

More recently, however, the Supreme Court revisited the issue and clarified that *Havens* has been overread. In *FDA v. Alliance for Hippocratic Medicine*, four medical associations sued the FDA over

modifications to the conditions of use for mifepristone. *See* 144 S. Ct. at 1553. The associations asserted standing to sue on their own behalf "based on their incurring costs to oppose [the] FDA's actions." *Id.* at 1563. The costs included "conduct[ing] their own studies on mifepristone," "drafting citizen petitions," and "engaging in public advocacy and public education" to "inform their members and the public about mifepristone's risks." *Id.* Relying on *Havens*, the associations argued that "standing exists when an organization diverts its resources in response to a defendant's actions." *Id.* at 1564. The Supreme Court rejected that proposition:

> [A]n organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action. An organization cannot manufacture its own standing in that way.

> The medical associations respond that under [*Havens*], standing exists when an organization diverts its resources in response to a defendant's actions. That is incorrect. Indeed, that theory would mean that all the organizations in America would have standing to challenge almost every federal policy that they dislike, provided they spend a single dollar opposing those policies. *Havens* does not support such an expansive theory of standing.

*Id.* at 1563-64 (citations omitted). The Court explained that *Havens* involved an organization that "not only was an issue-advocacy organization, but also operated a housing counseling service." *Id.* at 1564. The allegedly unlawful conduct—providing false information to HOME—"directly affected and interfered with HOME's core business activities" in a way that was "not dissimilar to a retailer who

sues a manufacturer for selling defective goods to the retailer." *Id.* The medical associations, by contrast, did not allege "any similar impediment" to their businesses. *Id.*

The Court emphasized that "*Havens* was an unusual case" and that courts must be "careful not to extend the *Havens* holding beyond its context." *Id.*

**B**

At summary judgment, the district court concluded that the CFHC had standing to sue CoreLogic based on a showing that (1) "the disparate impact of CrimSAFE on African American and Latino applicants frustrates [the] CFHC's mission [of] ensuring that *all* people have equal access to the housing of the[ir] choice," and (2) the "CFHC has changed its public trainings and presentations to account for [CoreLogic's] policies regarding criminal records." *CFHC*, 478 F. Supp. 3d at 286. That decision relied on the premise that an advocacy organization may establish standing by showing a frustration of mission and diversion of resources. The district court did not have the benefit of the decision of the Supreme Court in *Alliance for Hippocratic Medicine* rejecting that premise. In light of that decision, we hold that the CFHC lacks standing to maintain its FHA claim against CoreLogic.

The theory on which the CFHC relied in this litigation is precisely the theory that the Supreme Court rejected in *Alliance for Hippocratic Medicine*: that "standing exists when an organization diverts its resources in response to a defendant's actions." 144 S. Ct. at 1564. The CFHC alleged that it diverted resources to investigate CoreLogic's conduct, to assist individuals whom the CFHC suspected were denied housing because of CoreLogic, and to develop educational programs about the use of criminal record screening

products by housing providers. *See* J. App'x 44-45. When asked at oral argument to identify its injuries in fact, the CFHC said that "frustration of mission and diversion of resources" are injuries that fall "squarely within the *Havens* tradition."[3]

The circumstances of the CFHC, however, do not resemble the "unusual" context of *Havens*. The organization in *Havens* offered counseling and referral services and alleged that the defendants' conduct "perceptibly impaired" those "core business activities." *All. for Hippocratic Med.*, 144 S. Ct. at 1564. The CFHC, by contrast, engages in advocacy and informational programming. The choice of the CFHC to focus its resources on CoreLogic "to the detriment of other spending priorities" does not qualify as an injury in fact that confers standing under Article III. *Id.* at 1563.

The CFHC suggests that the district court prevented it from presenting evidence at trial that would have established an injury in fact. Indeed, the district court decided prior to trial that the CFHC had standing, and CoreLogic did not dispute that issue at trial. But the CFHC nevertheless elicited testimony about its diversion of resources.[4] To the extent that the CFHC would have presented additional evidence, the CFHC acknowledges that the evidence would have further demonstrated frustration of mission and

---

[3] Oral Argument Audio Recording at 1:02.

[4] *See, e.g.*, J. App'x 700-15 (testimony from a former executive director of the CFHC about the resources the organization devoted "to take on the criminal history screening work," its "diversion logs," and the activities it declined to pursue during the relevant time period).

diversion of resources.[5] "That argument does not work to demonstrate standing." *All. for Hippocratic Med.*, 144 S. Ct. at 1563.

The CFHC argues that this case is different from *Alliance for Hippocratic Medicine* because the medical associations in that case alleged only an ideological disagreement with the FDA rather than an actual diversion of resources.[6] But that is incorrect. The Supreme Court explained that the medical associations claimed "to have standing not based on their mere disagreement with FDA's policies, but based on their incurring costs to oppose FDA's actions." *All. for Hippocratic Med.*, 144 S. Ct. at 1563. Those costs included the expenditure of "considerable time, energy, and resources" in petitioning the FDA "as well as engaging in public advocacy and public education." *Id*.

This case is indistinguishable from *Alliance for Hippocratic Medicine*. The CFHC may oppose the products and policies of CoreLogic, but it "cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *Id*. at 1563-64. We conclude that the district court erred by holding that the CFHC had standing to sue. We vacate the judgment of the district court insofar as it addressed the CFHC's claim on the merits, and we dismiss the CFHC's appeal for lack of jurisdiction.

---

[5] *See* Oral Argument Audio Recording at 3:56 (Q: "The evidence you wanted to introduce was about diversion of resources and frustration of mission, right?" A: "Exactly.").

[6] *See* Oral Argument Audio Recording at 2:18.

## C

Five months after oral argument in this appeal, the CFHC moved to dismiss its claims with prejudice and without costs.[7] CoreLogic opposed the dismissal of the claims without costs.[8] "An appeal may be dismissed on the appellant's motion on terms agreed to by the parties or fixed by the court." Fed. R. App. P. 42(b)(2). But we may deny a motion for voluntary dismissal when it "raises questions about procedural propriety on [the movant's] part." *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 421 n.1 (2d Cir. 2005); *see also Khouzam v. Ashcroft*, 361 F.3d 161, 168 (2d Cir. 2004) ("For the government to agree to a vacatur two weeks *after* oral argument suggests that it is trying to avoid having this Court rule on that issue. We therefore decline to grant the order that the parties have agreed to.").

Other courts have denied such a motion when the movants "may be acting strategically" to dismiss an "appeal on an issue they can later press again before a different panel." *In re Nexium Antitrust Litig.*, 778 F.3d 1, 2 (1st Cir. 2015). Those courts have explained that a "party should not be able to 'manipulate the formation of precedent by dismissing an appeal,'" *id.* (alteration omitted) (quoting *Albers v. Eli Lilly & Co.*, 354 F.3d 644, 646 (7th Cir. 2004)), especially when "the motion was filed 'after full briefing, extended oral argument, and several months of deliberation,'" *id.* (quoting *Ford v. Strickland*, 696 F.2d 804, 807 (11th Cir. 1983)).

---

[7] *See* Motion to Dismiss, *CFHC v. CoreLogic Rental Prop. Sols.*, No. 23-1118 (2d Cir. Apr. 16, 2025), ECF No. 138.

[8] *See* Opposition to Motion to Dismiss, *CFHC v. CoreLogic Rental Prop. Sols.*, No. 23-1118 (2d Cir. Apr. 22, 2025), ECF No. 140.

In its motion, the CFHC claims that it "became aware of recent authority further supporting its position that it has standing." Motion to Dismiss, *supra* note 7, at 2. It has not identified that authority, however, and instead of doing so argues that dismissal of its claims would "save the parties' resources and avoid further delay in resolving the substantive claims which are fully addressed by … Arroyo." *Id*. Because dismissal of the claim after briefing and argument would not save resources or avoid delay, we deny the motion.

## II

The FHA makes it unlawful to "refuse to sell or rent … or otherwise make unavailable or deny, a dwelling to any person because of race … or national origin." 42 U.S.C. § 3604(a); *see also* 24 C.F.R. § 100.70(b). A plaintiff may establish a disparate-impact claim under the FHA by showing that the challenged practice had "a disproportionately adverse effect on minorities" and the practice is "otherwise unjustified by a legitimate rationale." *Tex. Dep't of Hous. & Community Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 524 (2015) (internal quotation marks omitted).

Arroyo argues that CoreLogic discriminated against Mikhail because its platform has a disproportionately adverse effect on the availability of housing for Hispanic applicants. The district court concluded that Arroyo failed to show by a preponderance of the evidence that "CoreLogic's use of CrimSAFE denies or makes housing unavailable." *CFHC*, 2023 WL 4669482, at *17.

The district court framed its analysis as a threshold inquiry into whether the FHA applied to CoreLogic. *See id.* at *16-17. We believe the analysis is more straightforward. The FHA does not exclude any class of defendants from its scope. Whether any defendant is subject

to liability under the FHA turns on whether the plaintiff has established a prima facie case of discrimination—including whether the defendant proximately caused the alleged harm. Under that understanding, we agree with the district court that Arroyo failed to establish that CoreLogic violated the FHA because Arroyo did not prove by a preponderance of the evidence that CoreLogic "denies or otherwise makes unavailable housing." *Id.* at *20. We affirm the judgment insofar as the district court rejected Arroyo's disparate-impact claim on the basis of race and national origin.

## A

We apply a three-step burden-shifting framework "in discriminatory effects cases." 24 C.F.R. § 100.500(c); *see Mhany Mgmt., Inc. v. County of Nassau*, 819 F.3d 581, 617-19 (2d Cir. 2016) (applying § 100.500(c)). First, the plaintiff must establish a prima facie case by showing that that the "challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1). Second, the burden shifts to the defendant to show that "the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests." *Id.* § 100.500(c)(2). Third, the burden shifts back to the plaintiff to show that the "interests supporting the challenged practice could be served by another practice that has a less discriminatory effect." *Id.* § 100.500(c)(3).

This appeal implicates the causation requirement at step one. To establish a prima face case, a plaintiff must show that the challenged practice was the proximate cause of the alleged injury. *See Bank of Am. Corp. v. City of Miami*, 581 U.S. 189, 201-03 (2017). The proximate cause analysis asks "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits." *Id.* at 201 (quoting *Lexmark*, 572 U.S. at 133). "[F]oreseeability alone is not

sufficient to establish proximate cause under the FHA" because it "does not ensure the close connection that proximate cause requires." *Id.* at 201-02. Rather, the plaintiff must show a "direct relation between the injury asserted and the injurious conduct." *Id.* at 202-03 (quoting *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258, 268 (1992)).

The requirement of a direct relation ensures that disparate-impact liability under the FHA does not extend further than Congress intended. "The housing market is interconnected with economic and social life" such that a violation of the FHA may "'be expected to cause ripples of harm to flow' far beyond the defendant's misconduct." *Id.* at 202 (quoting *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters* (*AGC*), 459 U.S. 519, 534 (1983)). The FHA does not indicate "that Congress intended to provide a remedy wherever those ripples travel." *Id.*; *see also In re Am. Express Anti-Steering Rules Antitrust Litig.*, 19 F.4th 127, 139 (2d Cir. 2021) ("Proximate cause stands for the proposition that 'the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing.'") (quoting *AGC*, 459 U.S. at 536).

As a result, the Supreme Court has cautioned that liability under the FHA will not extend "beyond the first step." *Bank of Am.*, 581 U.S. at 203 (quoting *Hemi Grp. v. City of New York*, 559 U.S. 1, 10 (2010)). Under the first-step rule, "injuries that happen at the first step following the harmful behavior are considered proximately caused by that behavior." *Am. Express*, 19 F.4th at 140. In that way, the directness requirement "limits liability to parties injured at the first step of the causal chain of the defendants' actions." *Id.* at 135. The directness requirement "may also" make it "difficult to establish causation

because of the multiple factors that go into [housing] decisions." *Inclusive Communities*, 576 U.S. at 543.[9]

## B

Arroyo argues that the district court erred by deciding as a threshold matter that the FHA did not apply to CoreLogic rather than proceeding to consider whether Arroyo had established a prima facie

---

[9] The Supreme Court has described the FHA as including a "robust causality requirement." *Inclusive Communities*, 576 U.S. at 542. This court has said that "we do not read *Inclusive Communities* to set forth a new rule requiring use of the words 'robust causality'" in a jury instruction, *Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th 124, 152 n.13 (2d Cir. 2025), but "we agree that a defendant may not be held liable for racial disparities it did not cause," *id.* at 152. Other courts have suggested that the "robust causality" language is more significant. *See, e.g., Sw. Fair Hous. Council, Inc. v. Maricopa Domestic Water Improvement Dist.*, 17 F.4th 950, 962 (9th Cir. 2021) (explaining that the FHA requires "robust causality that shows, beyond mere evidence of a statistical disparity, that the challenged policy, and not some other factor or policy, caused the disproportionate effect"); *Inclusive Communities Project, Inc. v. Lincoln Prop. Co.*, 920 F.3d 890, 902 (5th Cir. 2019) ("We read the Supreme Court's opinion in *ICP* to undoubtedly announce a more demanding test than that set forth in the HUD regulation."); *Oviedo Town Ctr. II, L.L.L.P. v. City of Oviedo*, 759 F. App'x 828, 834 (11th Cir. 2018) ("The Supreme Court's solution was to impose a robust causality requirement ensuring that racial imbalance does not, without more, establish a prima facie case of disparate impact.") (internal quotation marks and alterations omitted); *Ellis v. City of Minneapolis*, 860 F.3d 1106, 1111 (8th Cir. 2017) ("The 'cautionary standards' announced in *Inclusive Communities* include a 'robust causality requirement.'"). Regardless of that possible dispute, our precedents do not depart from the requirement that a plaintiff must establish a direct relation. *Cf. Saint-Jean*, 129 F.4th at 152 n.13 (explaining that the "'robust causality' … language is not at odds with the instructions in this case").

case of discrimination. Arroyo additionally argues that the district court did not apply the proper causation standard.

We agree that the district court misconceived the three-step framework for a disparate-impact claim under the FHA by adding an additional threshold step. But that error did not fundamentally affect the analysis. The district court concluded that the disparate-impact claim failed because Arroyo did not establish that CoreLogic caused the denial of Mikhail's application. That means Arroyo failed to establish a prima facie case of discrimination—not that CoreLogic is beyond the reach of the FHA. Properly conceived, we see no error in the conclusion of the district court. Nor did the district court err in requiring a showing of direct causation.

**1**

The district court stated that it "cannot address the discriminatory impact and discriminatory treatment claims without deciding," as "an initial matter," "whether CoreLogic is subject to the FHA." *CFHC*, 2023 WL 4669482, at *16. The district court thereby treated the question of whether "CoreLogic denies or otherwise makes housing unavailable" as a threshold inquiry that precedes the three-step burden-shifting framework. *Id.* at *17. Arroyo argues that the framework includes no such threshold inquiry. We agree.

We begin with the statutory text. CoreLogic does not "sell" or "rent" housing, so its liability under the FHA must turn on whether it has acted to "otherwise make unavailable or deny, a dwelling to any person" because of a protected characteristic. 42 U.S.C. § 3604(a). "[T]he phrase 'otherwise make unavailable' refers to the consequences of an action." *Inclusive Communities*, 576 U.S. at 534. The "operative text" of the FHA thus "looks to results." *Id.*

29

The "results-oriented phrase" in the statute has two implications here. *Id.* at 535. First, a defendant may not avoid liability under the FHA simply because it is not itself the housing provider. The district court reached the same conclusion. *See CFHC*, 2023 WL 4669482, at *19 ("An entity can be liable under the FHA even when they are not the ultimate decisionmaker."); *id.* ("[A]n entity other than a landlord or property seller can be liable for violating the FHA."). And we have long recognized as much. *See, e.g.*, *Saint-Jean*, 129 F.4th at 140 (explaining that a bank might be liable under the FHA based on its lending practices); *Mhany Mgmt.*, 819 F.3d at 624 (affirming a judgment against a municipality on a disparate-treatment claim); *Cabrera v. Jakabovitz*, 24 F.3d 372, 393 (2d Cir. 1994) (explaining that a real estate agent might be liable under the FHA based on "racial steering").[10]

Second, the FHA does not insulate from liability certain types of conduct. "The phrase 'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory housing practices." *Mhany Mgmt.*, 819 F.3d at 600 (quoting *LeBlanc-Sternberg v.*

---

[10]  So have other courts. *See, e.g.*, *Ojo v. Farmers Grp., Inc.*, 600 F.3d 1205, 1208 (9th Cir. 2010) (evaluating a discrimination claim under the FHA based on "the denial and pricing of homeowner's insurance"); *Nationwide Mut. Ins. Co. v. Cisneros*, 52 F.3d 1351, 1359-60 (6th Cir. 1995) (same); *NAACP v. Am. Family Mut. Ins. Co.*, 978 F.2d 287, 301 (7th Cir. 1992) (same); *Mich. Prot & Advocacy Serv., Inc. v. Babin*, 18 F.3d 337, 345 (6th Cir. 1994) (explaining that the FHA may reach "those who, in practical effect, assisted in those transactions of ownership and disposition"); *Casa Marie, Inc. v. Superior Ct. of P.R. for Dist. of Arecibo*, 988 F.2d 252, 257 n.6 (1st Cir. 1993) (noting that the FHA "may proscribe discriminatory acts by persons who are neither sellers nor lessors of property"); *Edwards v. Johnston Cnty. Health Dep't*, 885 F.2d 1215, 1221 n.14 (4th Cir. 1989) (explaining that the operative provisions of the FHA "are not directed only to those persons who sell, rent or finance real estate").

*Fletcher*, 67 F.3d 412, 424 (2d Cir. 1995)). Congress appears even to have envisioned that the FHA would reach the use of criminal records to make housing decisions. Congress amended the statute in 1988 to state that "[n]othing in [subchapter I of the FHA] prohibits conduct against a person because such person has been convicted by any court of competent jurisdiction of the illegal manufacture or distribution of a controlled substance." Fair Housing Amendments Act of 1988, Pub. L. No. 100-430, § 6(d)(2), 102 Stat. 1619, 1623 (codified at 42 U.S.C. § 3607(b)(4)). Congress would not have needed to add this safe harbor if the FHA did not otherwise apply to denials of housing based on criminal history. *See Inclusive Communities*, 576 U.S. at 538 ("[C]ertain criminal convictions are correlated with sex and race. By adding an exemption from liability for exclusionary practices aimed at individuals with drug convictions, Congress ensured disparate-impact liability would not lie if a landlord excluded tenants with such convictions.") (citation omitted). We avoid interpretations of statutes under which some provisions "would be superfluous." *Id.* at 537.

The applicable regulation reflects this understanding of 42 U.S.C. § 3604(a). The regulation provides that a discriminatory housing practice is "an act that is unlawful under section 804, 805, 806, or 818 of the Fair Housing Act." 24 C.F.R. § 100.20. And a "practice has a discriminatory effect" when "it actually or predictably results in a disparate impact on a group of persons." *Id.* § 100.500(a).

Because the FHA does not categorically exclude types of actors or actions, we see no basis for engaging in a threshold inquiry before proceeding to the plaintiff's prima facie case. In fact, the issue the district court treated as a threshold question—whether Arroyo proved that "CoreLogic denies or otherwise makes housing unavailable," *CFHC*, 2023 WL 4669482, at *17—is an element of the prima facie case. At step one, "[t]he charging party … has the burden

of proving that a challenged practice caused or predictably will cause a discriminatory effect." 24 C.F.R. § 100.500(c)(1).

The district court should have started its analysis by considering whether Arroyo had established a prima facie case of discrimination, including whether she had established by a preponderance of the evidence that CoreLogic proximately caused the unavailability of housing. We recognize that the district court did not exclude CoreLogic from the scope of the FHA simply because CoreLogic was "not the ultimate decisionmaker." *CFHC*, 2023 WL 4669482, at *19. But the district court still purported to address whether CoreLogic makes housing unavailable "before" it could "evaluate whether the Plaintiffs have met their burden on the elements" of their claims. *Id.* at *17. That was erroneous.

**2**

Despite the error in how the district court described the applicable framework, CoreLogic argues that the district court properly considered whether CoreLogic proximately caused the denial of housing to Mikhail. We agree. The district court considered whether Arroyo had established a direct relation between the alleged injury and the allegedly unlawful practice of CoreLogic. We see no error in the determination of the district court that she failed to do so.

Although the district court did not use the phrase "proximate cause," it properly applied that standard. The district court observed that "the FHA does not reach entities whose involvement is 'tenuous.'" *Id.* at *19 (quoting *Mhany Mgmt.*, 819 F.3d at 621). And it determined that Arroyo had "shown only a tenuous connection between CoreLogic and the housing provider's decision, which is not enough to find CoreLogic 'makes unavailable or denies' housing." *Id.* at *20. After reviewing the role of CoreLogic in evaluating a rental

application, the district court concluded that Arroyo had "failed to prove by a preponderance of the evidence that CoreLogic's use of CrimSAFE denies or otherwise makes unavailable housing pursuant to section 3604(a)." *Id.* In other words, the district court decided that Arroyo had failed to establish proximate cause.

That conclusion followed from the trial record and the district court's factual findings. Although CoreLogic categorized available criminal records and offered filtering options to housing providers, it was the housing provider that controlled every other aspect of the application process. In addition to establishing its own screening policies, the housing provider decided (1) the configuration of CrimSAFE, including the criminal records that would be considered relevant and the lookback period that would apply; (2) which employees would have access to the full criminal record report; (3) what message would accompany the CrimSAFE report and appear in any adverse action letter; (4) whether a report would result in an action or further investigation and whether an adverse action letter would be sent; and (5) whether the application would be approved or denied.

CoreLogic also informed the housing provider of its control over the platform and the application process. CoreLogic instructed the housing provider to apply its own screening policies and to designate an employee to receive the full criminal record report. The default message in the CrimSAFE report instructed the housing provider to "verify the applicability of these records to your applicant and proceed with your community's screening policies." J. App'x 481. At the time of Mikhail's application, WinnResidential had configured the CrimSAFE settings to include that default message.

Based on this record, we agree with the district court that CoreLogic's CrimSAFE product did not disqualify housing applicants or prevent housing providers from assessing each candidate. The attenuated connection between CoreLogic's creation of a tool that allows a housing provider to access criminal records and the ultimate decision of the provider to deny an application falls short of the required "direct relation" between the conduct and the harm. *Bank of Am.*, 581 U.S. at 202 (quoting *Holmes*, 503 U.S. at 268). CrimSAFE may assist a housing provider by filtering records the housing provider deems relevant, but "no housing provider who uses CrimSAFE could reasonably believe that CoreLogic makes housing decisions for them." *CFHC*, 2023 WL 4669482, at *18.

**3**

Arroyo raises several objections to the conclusion of the district court. None is persuasive.

First, Arroyo argues that the proximate cause standard required her to establish only that CrimSAFE made housing "more difficult to obtain." Appellants' Br. 22-24. But the Supreme Court has explained that because "[t]he housing market is interconnected with economic and social life," any number of actions by any number of actors might make housing more difficult to obtain. *Bank of Am.*, 581 U.S. at 202. The FHA does not "provide a remedy wherever those ripples travel." *Id*. It instead imposes liability for harms that occur at the first step following the alleged misconduct. In this case, what followed CoreLogic's provision of the CrimSAFE platform were a number of discretionary decisions of the housing provider—including the ultimate decision of the housing provider to approve or to deny an application. The denial of housing did not occur at the first

step following CoreLogic's conduct and therefore was not directly caused by that conduct.

Arroyo purports to accept that the FHA requires a direct relation between the alleged injury and the challenged conduct, *see* Appellants' Br. 24, but she repeatedly frames her argument in terms of foreseeability, *see id.* at 24, 29, 31, 38-39. We agree with the Fourth Circuit that, although Arroyo "claims that this provision reaches every practice having the effect of making housing more difficult to obtain, the text of the statute does not extend so far." *Jersey Heights Neighborhood Ass'n v. Glendening*, 174 F.3d 180, 192 (4th Cir. 1999). "In the context of the FHA, foreseeability alone does not ensure the close connection that proximate cause requires." *Bank of Am.*, 581 U.S. at 202.

Second, Arroyo argues that "CoreLogic was in a position to prevent [the housing provider] from using discriminatory criminal history screening policies by limiting the parameters within which CrimSAFE would return adverse reports." Appellants' Br. 46-47. Arroyo claims, for example, that CoreLogic could have excluded non-conviction records and older records from the CrimSAFE database. But federal law allows CoreLogic to report criminal records and non-conviction records that are less than seven years old. *See* 15 U.S.C. § 1681c(a)(2), (5). Making that information available to a housing provider does not separately violate the FHA. To impose liability on CoreLogic for failing to restrict the accessibility of information that a housing provider might consider—on the theory that restricting the information would reduce the likelihood that the housing provider will ultimately make a discriminatory decision—would extend liability far "beyond the first step" in the causal chain. *Bank of Am.*, 581 U.S. at 203.

Third, Arroyo claims that CoreLogic "chose to report adverse CrimSAFE results to property staff while denying them access to the underlying criminal records relevant to individualized reviews." Appellants' Br. 45. But that is incorrect. The district court found that "[e]ach new user" of CrimSAFE "is, by default, authorized to receive the full data" and that "CrimSAFE does not limit how many users can have full access." *CFHC*, 2023 WL 4669482, at *5. The housing provider "must affirmatively go into the CrimSAFE configuration settings" to limit the information to "senior level managers." *Id.* Arroyo does not challenge those findings. *See* Appellants' Reply Br. 15.

In this case, WinnResidential configured CrimSAFE to "suppress reports from onsite staff" because of a concern that "the staff will use personal interests (such as leasing commissions) in making a leasing decision that the executives believe should be made by someone in a more elevated position." *CFHC*, 2023 WL 4669482, at *5. The leasing agent, who lacked access to the full report, did not follow the message to "verify the applicability of these records to your applicant and proceed with your community's screening policies" but instead told Arroyo that Mikhail's application was denied. *Id.* at *9-10. And indeed the only reason that CrimSAFE identified a criminal record for Mikhail is that WinnResidential configured CrimSAFE to search for those records.

WinnResidential's discretionary decisions that followed CoreLogic's provision of the platform—its configuration of the settings, selection of relevant records, and decision on the housing application—led to the initial denial of housing to Mikhail. CoreLogic did not proximately cause that denial.

Fourth, Arroyo argues that even if WinnResidential denied Mikhail's application, CoreLogic should still be considered the proximate cause of the denial based on the "cat's paw" theory described in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011). In *Staub*, a supervisor submitted false complaints about an employee due to bias. *See id.* at 414. The vice president of human resources credited the complaints and "decided to fire him." *Id.* at 415. The Supreme Court held that the company could be liable for the discriminatory conduct of the supervisor even though a different person made the adverse employment decision. The Court explained that "the ultimate decisionmaker's exercise of judgment" did not "automatically render[] the link to the supervisor's bias 'remote' or 'purely contingent.'" *Id.* at 419 (quoting *Hemi Grp.*, 559 U.S. at 9). "[T]he ultimate decisionmaker's judgment" could "be deemed a superseding cause of the harm" only if it was "a 'cause of independent origin that was not foreseeable.'" *Id.* at 420 (quoting *Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837 (1996)). "But the supervisor's biased report may remain a causal factor if the independent investigation [by the decisionmaker] takes it into account without determining that the adverse action was, apart from the supervisor's recommendation, entirely justified." *Id.* at 421.

In other words, the cat's paw theory applies when the decisionmaker does not exercise independent judgment. Instead, another person "manipulates [the decisionmaker] into acting as a mere conduit for his discriminatory intent." *Menaker v. Hofstra Univ.*, 935 F.3d 20, 38 (2d Cir. 2019) (alteration omitted) (quoting *Vasquez v. Empress Ambulance Serv., Inc.*, 835 F.3d 267, 272 (2d Cir. 2016)). The theory does not apply to the facts established in this case. CoreLogic provided a service that allowed WinnResidential to access accurate information based on WinnResidential's own decisions about which

records were relevant. And CoreLogic expressly disclaimed any suggestion that the information in its database dictated a particular disposition of the rental application. The disposition was instead a matter of applying the housing provider's own "screening policies." *CFHC*, 2023 WL 4669482, at *5. Even assuming that those policies could be shown to have a disparate impact that violates the FHA, those policies did not originate with CoreLogic. The trial did not establish that WinnResidential was "acting as a mere conduit" for CoreLogic's policies when it evaluated Mikhail's application. *Menaker*, 935 F.3d at 38 (quoting *Vasquez*, 835 F.3d at 272). As a result, the cat's paw theory does not apply. It cannot rescue Arroyo's disparate-impact claim regarding race and national origin.

## III

In addition to the disparate-impact claim, Arroyo alleged that CoreLogic violated the FHA by discriminating against Mikhail on the basis of his handicap. The FHA makes it unlawful to "discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling" based on the person's "handicap." 42 U.S.C. § 3604(f)(2). "Discrimination" includes "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).

Arroyo argued that CoreLogic discriminated on the basis of Mikhail's handicap in two ways. First, CoreLogic's policy regarding the disclosure of consumer reports had a disparate impact on the handicapped. Second, CoreLogic refused to provide the reasonable accommodation of allowing Arroyo to access Mihail's report based on the documentation she provided.

The district court granted summary judgment to CoreLogic on both claims. The district court concluded that the requirement of submitting a copy of the conservatorship certificate with a visible seal before disclosing Mikhail's file was reasonable rather than discriminatory. We agree with the district court.

## A

We evaluate this disparate-impact claim under the burden-shifting framework described above. *See Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 40 n.11 (2d Cir. 2015). The plaintiff first must establish a prima facie case of discrimination. Then "the burden shifts to the defendant to assert a legitimate, nondiscriminatory rationale for the challenged decision." *Id.* (quoting *Mitchell v. Shane*, 350 F.3d 39, 47 (2d Cir. 2003)). At that point, "the burden shifts back to the plaintiff to demonstrate that discrimination was the real reason for the defendant's action." *Id.* (quoting *Mitchell*, 350 F.3d at 47).

Arroyo alleged that CoreLogic discriminated against Mikhail by requiring that all third parties requesting a disclosure provide a power of attorney. Because a person subject to an involuntary conservatorship cannot provide a power of attorney, this purported requirement "effectively prevent[s] substantially any conserved person in Connecticut from obtaining copies of their tenant-screening reports from CoreLogic." Appellants' Br. 49.

The record at summary judgment, however, did not suggest that CoreLogic maintained a policy of requiring a court-appointed conservator to provide a power of attorney to receive the conservatee's consumer file. Arroyo was "responsible for isolating and identifying the *specific* [housing] practices that are allegedly responsible for any observed statistical disparities." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005) (quoting *Wards Cove Packing Co. v.*

39

*Atonio*, 490 U.S. 642, 656 (1989)); *see Inclusive Communities*, 576 U.S. at 533 (noting that *Smith* and other cases "provide essential background and instruction" for the FHA).

Although CoreLogic initially told Arroyo that she needed to submit a power of attorney to receive Mikhail's file, the record did not indicate that CoreLogic generally imposed this requirement. CoreLogic's Authentication Procedure Guide stated that a requester could receive a third party's file by providing a power of attorney and instructed employees to "reach out to the Supervisor" regarding "any scenarios" in which the requester could not satisfy that requirement. J. App'x 192. The failure of an employee to follow the written policies in a particular instance does not establish a policy that may serve as the basis of disparate-impact liability. *See Inclusive Communities*, 576 U.S. at 543 ("[A] plaintiff challenging the decision of a private developer to construct a new building in one location rather than another will not easily be able to show this is a policy causing a disparate impact because such a one-time decision may not be a policy at all.").[11]

On appeal, Arroyo argues that the district court's post-trial finding that CoreLogic willfully violated the FCRA contradicts the

---

[11] A single discriminatory incident might lead to liability under a theory of disparate treatment rather than disparate impact. *See Rodriguez v. Bear Sterns Cos., Inc.*, No. 07-CV-1816, 2009 WL 5184702, at *16 (D. Conn. Dec. 22, 2009) ("While isolated incidents may give rise to a discriminatory treatment claim under the FHA, they do not support a disparate impact claim."); *see also Bennett v. Roberts*, 295 F.3d 687, 698 (7th Cir. 2002) ("To establish a prima facie case of disparate impact, … [i]solated and singular incidents generally are insufficient."). Arroyo raised a disparate-treatment claim in her complaint, but she did not oppose CoreLogic's motion for summary judgment on that claim, *see CFHC*, 478 F. Supp. 3d at 312, and she does not raise it as an issue on appeal.

conclusion it reached at summary judgment. Following the trial, the district court determined that CoreLogic willfully violated the FCRA because the insistence on a power of attorney was "not a one-off circumstance involving one or two employees who made a mistake" but reflected the fact that "[t]he policy only identifies a power of attorney as a means of validating a third party's agency over a consumer." *CFHC*, 2023 WL 4669482, at *24. But the need to account for conservatorships was "an entirely foreseeable circumstance as many people are subject to conservatorships," and "CoreLogic's written policies entirely overlooked this group of people." *Id.*

Even if the written policies overlooked the foreseeable circumstance that a conservator might request a consumer file—and that the request might therefore result in a period in which the company requested a power of attorney before the intervention of a supervisor—it does not follow that the policies "predictably result[] in a disparate impact." 24 C.F.R. § 100.500(a). Arroyo argues that she did not need to provide statistical evidence of a disparate impact because the policies inevitably result in a disparate impact. *See* Appellants' Reply Br. 48 & n.175. But in this case, the record established that the policies had no such impact. The uncontroverted evidence identified at summary judgment—and then presented at trial—showed that CoreLogic had never encountered a request from a conservator for a conservatee's consumer file. *See CFHC*, 478 F. Supp. 3d at 282. Not only did Arroyo present "no statistics or other proof demonstrating that the [challenged] practices have a significantly adverse or disproportionate impact on the physically disabled," *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1218 (11th Cir. 2008) (quoting *Gamble v. City of Escondido*, 104 F.3d 300, 306 (9th Cir. 1997)), but the record established the absence of such an impact. *Cf. id.* ("[I]t 'is not sufficient for disparate impact purposes' to show

only that an ordinance 'prevents a handicapped person from living in a particular house.'") (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 576 (2d Cir. 2003)).

Arroyo argues that some statistical evidence identified at summary judgment suggested a disparate impact. She says that "people with disabilities comprise only 11% of Connecticut's population, but comprise 100% of those harmed by CoreLogic's policy." Appellants' Reply Br. 50 n.184. But it does not follow from these data that conservatees other than Mikhail were or will be affected by CoreLogic's policies. It is also not correct that all conservatees will necessarily be considered disabled for purposes of the FHA. The FHA excludes from the definition of "handicap" an "addiction to a controlled substance." 42 U.S.C. § 3602(h). But "substance use disorder" is a reason to impose a conservatorship in Connecticut.[12]

Arroyo argues that at summary judgment the district court should not have credited the affidavit of a CoreLogic employee asserting that CoreLogic had never received another conservator's request for a consumer file. But the district court was not required to discount testimony by making a credibility determination at summary judgment. *See Kaytor v. Electric Boat Corp.*, 609 F.3d 537, 545-46 (2d Cir. 2010). Arroyo was instead required to identify evidence sufficient to raise a question of material fact as to whether another conservatee had been affected by CoreLogic's policies. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).[13]

---

[12] Office of the Probate Court Administrator, Connecticut Probate Courts, 2018-2019 Biennial Report, at 11 (Jan. 13, 2021).

[13] The district court later decided that trial testimony by the same affiant about a different issue was unpersuasive. *See CFHC*, 2023 WL 4669482, at

The district court considered whether the disparate-impact claim could survive summary judgment on the theory that CoreLogic required conservators to "provide more onerous documentation of their authority than an individual holding a power of attorney." *CFHC*, 478 F. Supp. 3d at 310. We agree with the district court that CoreLogic was still entitled to summary judgment on the claim even if this theory established a prima facie case of discrimination. At the second step of the burden-shifting framework, CoreLogic identified a legitimate business justification for requiring Arroyo to submit additional documentation before disclosing Mikhail's file. Federal law requires CoreLogic to obtain "proper identification" from a party before disclosing a consumer report. *See* 15 U.S.C. § 1681h(a)(1). CoreLogic must also "adopt reasonable procedures … with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information." *Id.* § 1681(b). In this case, Arroyo submitted with her disclosure request a copy of her conservator certificate that lacked a visible seal. The certificate, however, stated that it was "not valid without court of probate seal impressed." J. App'x 463. Requiring that the documentation establish the validity of the conservatorship certificate was a legitimate reason for requiring Arroyo to submit a copy of the certificate with a visible seal.

## B

Arroyo's failure-to-accommodate claim fails for similar reasons. She needed to show at summary judgment that "the accommodation requested was reasonable." *Olsen v. Stark Homes, Inc.*,

---

*12 n.6 (disagreeing with her "interpretation of the internal notes"). Not only was that issue unrelated to the summary judgment decision, but "the district court's grant of summary judgment must be examined independently of the evidence presented at trial." *Griffin v. Sirva Inc.*, 835 F.3d 283, 287 (2d Cir. 2016) (internal quotation marks omitted).

759 F.3d 140, 156 (2d Cir. 2014). "Requested accommodations are reasonable where the cost is modest and they do not pose an undue hardship or a substantial burden on the housing provider." *Id.* Arroyo requested that CoreLogic accommodate Mikhail's handicap by accepting the conservatorship certificate as she submitted it—without a visible seal. But that was not a reasonable accommodation request because it would have required CoreLogic to ignore the certificate's own proviso that it was valid only with an impressed seal, which was not visible in the copy Arroyo submitted.

Arroyo relies on cases involving other documents and laws. In *Warfield v. Byron*, for example, the Fifth Circuit rejected the argument that the lack of a seal on a photocopy of a summons deprived the district court of jurisdiction. *See* 137 F. App'x 651, 656 (5th Cir. 2005). But the conservatorship certificate, unlike the summons, expressly required an impressed seal to establish its validity. In *Schwab v. GMAC Mortgage Corporation*, the Third Circuit held that the lack of a notary's embossment on a photocopy of a mortgage did not affect the validity of the mortgage for recording purposes. *See* 333 F.3d 135, 137-38 (3d Cir. 2003). The applicable statute required a visible seal on the photocopy but did not require that the embossment be visible. "The statute thus makes a sharp distinction between the seal, which must be visible on photographic recording processes, and the embossing, which need not have that attribute." *Id.* at 138. The Third Circuit adhered to the statutory requirement regarding the visibility of the seal. Its opinion did not suggest that it would be unreasonable to adhere to the requirement of the conservatorship certificate that it be impressed with a seal by requesting a copy that reflected one.

Arroyo says that "there is no apparent reason to apply visible seal requirements more strenuously in Connecticut than other states." Appellants' Br. 53. But the certificate states on its face that it is not

valid without the impressed seal. *See* J. App'x 463. It was not unreasonable for CoreLogic to confirm the validity of the certificate and thereby Arroyo's legal authority to obtain Mikhail's report. The FCRA requires CoreLogic to "adopt reasonable procedures … with regard to … confidentiality." 15 U.S.C. § 1681(b), and it did not exceed that mandate here.[14]

Arroyo suggests that CoreLogic's delay in telling her that a copy of the conservatorship certificate would be acceptable if the copy had a visible seal was "tantamount to a denial of a reasonable accommodation." Appellants' Br. 56 (citing *Logan v. Matveevskii*, 57 F. Supp. 3d 234, 273 (S.D.N.Y. 2014)). Even if in some circumstances an "indeterminate delay" may be equated with "an outright denial," *Groome Res. Ltd. v. Parish of Jefferson*, 234 F.3d 192, 199-200 (5th Cir. 2000), that equation does not hold when Arroyo's behavior contributed to the delay. *Cf. Logan*, 57 F. Supp. 3d at 271 ("In assessing whether a defendant has constructively denied a plaintiff's request for an accommodation through unreasonable delay, courts often consider whether the delay was caused by the defendant's unreasonableness … as opposed to mere bureaucratic incompetence or other comparatively benign reasons.").

---

[14] Arroyo references 12 C.F.R. § 1022.137, which imposes special requirements on a "nationwide specialty consumer reporting agency." The district court rejected any argument based on the regulation because "the regulation was only raised for the first time in a reply brief without any meaningful analysis of its application to the facts of this case" and Arroyo "presented no legal authority or argument that this regulation establishes a private right of action." *CFHC*, 2023 WL 4669482, at *22. On appeal, Arroyo acknowledges that the regulation might "not provide a private cause of action" and that she "never pleaded a claim" pursuant to the regulation. Appellants' Reply Br. 38-39. Under these circumstances, we see no error in the conclusion of the district court.

Arroyo's first disclosure request form was incomplete and CoreLogic attempted to send her a letter in June 2016 to notify her of the deficiency. *See* J. App'x 148-49. She called back two months later, but she did not submit any new forms after that call. *See id.* at 149. CoreLogic referred the matter to a supervisor and legal counsel, and Arroyo finally sent new materials in November 2016. *See id.* at 150. When CoreLogic called to discuss that form, it did not hear back until mid-December, when the CFHC became involved on her behalf. *See id.* at 151. This record does not permit the inference that the delay amounted to a constructive denial of Arroyo's request. *See Logan*, 57 F. Supp. 3d at 271-72 (relying on "affirmative evidence of [the housing authority's] good faith in responding to Plaintiff's request," including that "[d]espite th[e] lack of response, THA nevertheless followed up").

## IV

A claim under the FCRA may be asserted on Mikhail's behalf because a defendant that violates the statute "with respect to any consumer" is "liable to that consumer." 15 U.S.C. § 1681n(a). Mikhail's claim relies on the proposition that he had a right for his mother to receive his consumer report. A consumer has a right to a disclosure only if he "furnish[es] proper identification." *Id.* § 1681h(a)(1). The furnishing of proper identification is a "condition precedent" to Mikhail's right to receive his file. *Ogbon v. Beneficial Credit Servs., Inc.*, No. 10-CV-3760, 2013 WL 1430467, at *10 (S.D.N.Y. Apr. 8, 2013); *see also Clay v. Equifax, Inc.*, 762 F.2d 952, 960 (11th Cir. 1985) ("We emphasize that a disclosure under section 1681g is required only 'upon proper request and identification' of the consumer."). Neither Arroyo nor Mikhail submitted "proper identification" that would allow CoreLogic to conclude that a valid request came on behalf of Mikhail. *See CFHC*, 478 F. Supp. 3d at 306.

For that reason, Mikhail was never entitled to have his mother receive his consumer file.

Arroyo argues that the FCRA imposes liability based not on CoreLogic's failure to disclose the consumer report but on its "willful failure to properly inform Ms. Arroyo what additional identification was needed," which "effectively prevented her from obtaining the file disclosure on Mr. Arroyo's behalf." Appellants' Reply Br. 33. The district court similarly concluded that CoreLogic set an impossible condition that functioned as a constructive denial of the disclosure request. *See CFHC*, 2023 WL 4669482, at *23 ("A consumer reporting agency cannot circumvent its legal obligation *to disclose* a consumer report by making it impossible for a consumer to properly request it. … CoreLogic required Ms. Arroyo to produce a document that she legally could not produce, thereby making it impossible for her *to obtain* her conserved son's consumer report.") (emphasis added).

The argument fails because Arroyo could not establish that, absent the "impossible condition," she would have submitted proper identification. The undisputed evidence showed that even after Arroyo received clear instructions to submit the conservatorship certificate with a visible seal, she did not do so. As a result, she did not show that her failure to submit proper identification and to obtain the disclosure resulted from CoreLogic's conduct. *See id.* at *25 ("[T]he evidence does not show whether, and if so when, Ms. Arroyo would have furnished proper identification for the consumer report …. There was no evidence presented that she *ever* furnished proper identification even after she knew what was needed.").[15]

---

[15] CoreLogic argues that the FCRA claims should be dismissed for lack of standing because whether Mikhail suffered an injury from the late disclosure relies on undue speculation. But the disclosure of the file would

## CONCLUSION

We vacate the judgment of the district court insofar as it considered the claim of the CFHC on the merits, and we dismiss the CFHC's appeal for lack of standing. We affirm the judgment insofar as it held that CoreLogic was not liable to Arroyo under the FHA. We reverse the judgment insofar as the district court imposed liability on CoreLogic under the FCRA.

---

have allowed Arroyo to obtain an earlier dismissal of Mikhail's then-pending charge in Pennsylvania. That suffices to establish an injury caused by the delayed disclosure.